IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF PAUL GEORGE

No. 2:22-mc-50

## RESPONDENT'S EXHIBITS

1. Edited list of Exhibit Filed Under Seal Re Court Order of May 7, 2024, with Current Status of Listed Cases and Additional Case Example of DAO Not Conceding Death Penalty Relief in PCRA and Habeas Corpus Proceedings

2. Post-2018 Krasner DAO Concession Cases in Federal District Court: Detailing Relief and Reasons for Concessions

3. Pre-2018, pre-Krasner DAO Concessions by the Commonwealth of Death Penalty Relief in Federal District Court

4. Pre-2018, pre-Krasner Federal Court Rulings Vacating Death Penalties in Contested Habeas Proceedings

5. Pre-2018, pre-Krasner DAO Concession of Death Penalty Relief by the Commonwealth in State Post-Conviction Proceedings

6. February 20, 1990, DAO Concession of Death Penalty Verdict and Order for New Trial by Judge Albert F. Sabo

7. Expert Report of Professor Bruce A. Green

8. Good Character Letters

# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF PENNSYLVANIA

## IN THE MATTER OF PAUL GEORGE          NO. 2:22-MC-00051

### RESPONDENT'S OPPOSITION TO CHALLENGES TO A DEATH SENTENCE: CURRENT STATUS

1. Commonwealth v. Anthony Reid, CP-51-0602521-1989 Court of Common Pleas, Philadelphia County

   Commonwealth opposed PCRA request for death penalty relief on the ground that the vacating of a conviction that established an aggravator did not affect the penalty as it left the jury determination of one other aggravator and no mitigators. The DAO also opposed guilt phase relief that was sought on *Brady* grounds, arguing that while there was compelling evidence of suppressed evidence, there was no prejudice as the evidence was not material given the relative strength of the Commonwealth's case at trial. The case is pending in the PCRA trial court.

2. Commonwealth v. Lavar Brown, CP-51-CR-020891-2004, Court of Common Pleas, Philadelphia County

   See attached Commonwealth Response to Petition for Post-Conviction Relief, opposing relief for petitioner Brown, following the ruling by the Supreme Court, 196 A.3d 130 (Pa. 2018). The jury properly found one aggravating circumstance and no mitigators and, therefore, the invalidity of another aggravator (prior conviction for murder that had been reversed) did not justify death penalty reversal. The case is presently pending in state PCRA proceedings.

3. Commonwealth v. Darien Houser, CP-51-CR-0605181-2004, Court of Common Pleas, Philadelphia County.

   See Commonwealth's Response to Ineffectiveness Claim Regarding the 9711(d)(1) Aggravating Factor, opposing death penalty relief for petitioner Houser as the victim, a Judicial Warrant Officer, is included among the class of murder victims enumerated under 41 Pa.C.S. 9711(d)(1) for which a death penalty is permitted.

   On a later PCRA petition, Houser claimed ineffectiveness of counsel at both the guilt and penalty phases and on those claims, the DAO conceded relief on the penalty phase but not on the guilt phase. The PCRA is pending in state court.

4. Commonwealth v. Lenwood Mason, 759 CAP, Supreme Court of Pennsylvania.

See attached Brief for Appellee, Commonwealth of Pennsylvania, filed 5/22/2018, opposing death penalty relief for Appellant Mason due to waiver of claims in the PCRA trial court. Thereafter, on a federal habeas petition, the DAO conceded relief on the death penalty on the separate grounds of ineffectiveness of counsel.

5.  Commonwealth v. Donte Thomas, CP-51-0606781-2006, Court of Common Pleas, Philadelphia County

Respondent DAO filed Brief in the Supreme Court opposing PCRA relief on the death penalty where defendant argued that defense counsel was ineffective for "chastising and berating the jury for its swift verdict during the guilt phase." The Supreme Court denied relief. See attached Brief and Opinion.

2

# EXHIBIT 1

# (FILED UNDER SEAL)

FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF | : MISCELLANEOUS |
| | : |
| PAUL GEORGE | : NO.: 2:22-mc-00050-PD |
| | : |
| IN THE MATTER OF | : MISCELLANEOUS |
| | : |
| NANCY WINKELMAN | : NO.: 2:22-mc-00051-PD |
| | : |

**SUPPLEMENT TO RESPONDENTS' MAY 23, 2024 NOTICE TO THE COURT**

Respondents Nancy Winkelman and Paul George, by their current counsel, hereby state as follows:

1. On May 23, 2024, Respondents filed a Notice to the Court in response to the Court's May 7, 2024 Order. Attached thereto is a document titled "List of Cases in Which the Current District Attorney's Office Has Opposed a Challenge to a Sentence of Death in Post-Conviction Proceedings".

2. That List cites *Commonwealth v. Anthony Reid*, CP-51-0602521-1989, and states that "The transcript of the hearing at which the [Commonwealth's] opposition was stated, April 3, 2024, has been requested and will be filed with this Court when received."

3. Respondents subsequently obtained a copy of the April 3, 2024, hearing transcript in *Reid*, which is attached as Exhibit A.

4. The relevant portion of the transcript is at pages 56-60 where Respondent George opposed the petitioner's request for death penalty relief that was based on the

dismissal of a murder conviction that had been used as an aggravating circumstance in the death penalty proceedings. Respondent George agreed that the prior murder conviction could no longer be considered, but he argued that the death penalty was still valid as a separate aggravator had been found by the jury, and there were no mitigators proven by the petitioner.

Dated:  June 4, 2024

Respectfully submitted,

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN

By: */s/ David Rudovsky*
    David Rudovsky (No. 15168)
    drudovsky@krlawphila.com
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400


HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
    John S. Summers (No. 41854)
    jsummers@hangley.com
    Andrew M. Erdlen (No. 320260)
    aerdlen@hangley.com
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200

*Counsel for Respondents Nancy Winkelman and Paul George*

# EXHIBIT A

Case 2:14-cv-05451-PD   Document 72   Filed 01/05/22   Page 1 of 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ANTHONY REID, | : | |
| | : | |
| Petitioner, | : | CIVIL ACTION NO. 14-5451-PD |
| | : | (re: Mark Lisby homicide) |
| v. | : | CAPITAL CASE |
| | : | |
| JOHN E. WETZEL, et al., | : | |
| | : | |
| Respondents. | : | |

## JOINT MOTION FOR SENTENCING RELIEF ON CLAIM XII
## AND ACCOMPANYING MEMORANDUM OF LAW

Petitioner Anthony Reid, through counsel, and Respondents, through their counsel, the

Philadelphia District Attorney's Office, respectfully request, based upon this Motion and a Joint

Stipulation (attached as Exhibit A), that this Court grant Mr. Reid sentencing relief based on

Claim XII in Mr. Reid's Petition for a Writ of Habeas Corpus by a Prisoner in State Custody

(Petition). Doc. 4. In support of this Motion, the parties aver as follows:

### PROCEDURAL HISTORY

1. Petitioner Anthony Reid is a death-sentenced Pennsylvania prisoner seeking

habeas corpus relief under 28 U.S.C. § 2254. He litigated constitutional claims that his death

penalty was unconstitutional in state court post-conviction proceedings. The Court of Common

Pleas and the Pennsylvania Supreme Court rejected his post-conviction claim that his counsel

was ineffective for failing to conduct an adequate investigation and for failing to present

available mitigating evidence at the penalty phase. *Commonwealth v. Reid*, 99 A.3d 427 (Pa.

2014).

2.      On December 23, 2014, Mr. Reid filed his Petition for Writ of Habeas Corpus in this Court. (Doc. 4). On August 7, 2015, Mr. Reid filed a Memorandum of Law in support of the Petition. (Doc. 20). In Claim XII, Mr. Reid alleged that his trial counsel provided ineffective assistance in failing to investigate, develop, and present available mitigating evidence, including evidence of brain damage, at the capital sentencing phase of trial.

3.      On August 12, 2016, Mr. Reid moved for leave to amend his petition based on the United States Supreme Court's decision in *Williams v. Pennsylvania,* 136 S. Ct. 1899 (2016). (Docs. 32 & 32-1). Mr. Reid also moved to stay federal proceedings pending exhaustion of state court remedies on the new claim. (Doc. 33). On November 1, 2016, this Court granted Mr. Reid's motion for leave to amend the petition and his motion to stay and abey federal proceedings while he exhausted state court remedies. (Doc. 42). The Pennsylvania Supreme Court issued an opinion denying state postconviction relief on August 18, 2020. *Commonwealth v. Reid,* 235 A.3d at 1124 (Pa. 2020).

4.      Since that time, the parties have engaged in informal discovery. On September 16, 2021, the District Attorney's Office produced over 3,400 pages of additional discovery to counsel for Mr. Reid that had not previously been provided to the defense. The litigation of his federal habeas petition is ongoing. *See generally* (Docs. 70, 71).

## LEGAL ARGUMENT

### A.      The Stipulated Facts.

5.      As set forth in the Joint Stipulation attached hereto as Exhibit A, trial counsel failed to conduct a constitutionally adequate investigation of Petitioner's life. Trial counsel failed to hire a mitigation specialist, failed to interview family members prior to trial, failed to develop a social history, failed to secure a mental health expert, failed to gather relevant

2

background records, and failed to marshal any coherent defense mitigation strategy. Trial

counsel did make a belated oral request for expert funding on the morning that the penalty phase

proceeding was set to begin. *See* NT 1/10/91 at 8.4-8.10. The court denied the last-minute

request. *Id.* at 8.11-12. The entire defense penalty phase case consisted of seventeen transcript

pages of testimony.

6. Stipulations of fact are generally binding on parties and the Court. *See Glick v.

White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir. 1972) (noting "judicial admissions are binding

for the purpose of the case in which the admissions are made"); *see also Parilla v. IAP

Worldwide Servs., VI, Inc.,* 368 F.3d 269, 274–75 (3d Cir. 2004) (noting "specific findings of

fact by the District Court were unnecessary" when a party "expressly conceded those facts");

*Bank of the Ozarks v. Perfect Health Skin & Body Ctr., PLLC,* 835 F. App'x 49, 59 (6th Cir.

2020) ("Under federal law, stipulations and admissions in the pleadings are generally binding on

the parties and the Court.") (quoting *Brown v. Tennessee Gas Pipeline Co.,* 623 F.2d 450, 454

(6th Cir. 1980)); *Forcier v. Metro. Life Ins. Co.,* 469 F.3d 178, 186 (1st Cir. 2006) ("In the

absence of fraud, misrepresentation, manifest injustice, or other exceptional circumstances—not

present here—a party who agrees to submit a case on a particular set of stipulated facts cannot

later be heard to complain that she misjudged what evidence might be beneficial to her cause.");

*Quest Med., Inc. v. Apprill,* 90 F.3d 1080, 1087 (5th Cir. 1996) ("Under federal law, stipulations

of fact fairly entered into are controlling and conclusive and courts are bound to enforce them");

*Lucas v. Burnley,* 879 F.2d 1240, 1242 (4th Cir. 1989) (citing *Brown,* 623 F.2d at 454); *Fisher v.

First Stamford Bank & Trust Co.,* 751 F.2d 519, 523 (2d Cir. 1984) ("Generally, a stipulation of

fact that is fairly entered into is controlling on the parties and the court is bound to enforce it.").

3

7. The Supreme Court has recognized that "factual stipulations are formal concessions that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact" and as such, "a judicial admission is conclusive in the case." *Christian Legal Soc. Chapter of Univ. of Cal., Hastings College of Law v. Martinez*, 561 U.S. 661, 678-79, (2010) (citation and quotation marks omitted) (*"Christian Legal Soc."*). The Court further stated that "[l]itigants, we have long recognized, '[a]re entitled to have [their] case tried upon the assumption that . . . facts, stipulated into the record, were established.'" *Id.* at 676 (quoting *H. Hackfeld & Co. v. United States*, 197 U.S. 442, 447 (1905)). This Court and the United States District Court for the Middle District of Pennsylvania have cited the Supreme Court's *Christian Legal Society* decision in recognizing that "factual stipulations are binding and conclusive." *Coia v. Vanguard*, No. 16-cv-3579, 2017 WL 724334, at *6 n.36 (E.D. Pa. Feb. 23, 2017) (quoting *Christian Legal Soc.*); *see also United States Soo Bahk Do Moo Duk Kwan Fed'n, Inc. v. Tang Soo Karate Sch., Inc.*, No. 3:12-CV-00669, 2015 WL 4920306, at *30–31 (M.D. Pa. Aug. 17, 2015) (citing *Christian Legal Soc.*).

8. A "judicial admission by definition is not a product of inadvertence, but a 'formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them . . . [that] has the effect of withdrawing a fact from contention.'" *Wright v. Lamas*, No. 13-CV-06420-WB, 2019 WL 1496055, at *9 (E.D. Pa. Mar. 29, 2019), report and recommendation adopted, 2019 WL 1492208 (E.D. Pa. Apr. 3, 2019) (quoting *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001)) (emphasis in original). "Habeas cases are subject to the ordinary rules concerning judicial admissions," and although "[a]greements like the one tendered in this case are rare in habeas cases," they "generally should be applauded rather than disregarded." *Wright*, 2019 WL 1496055, at *10. As in *Wright*, the parties in this

4

Case 2:14-cv-05451-PD Document 46 Filed 01/05/22 Page 5 of 9

case agree that their "stipulations of fact and proposed conclusions of law are well founded" based on the record, and "their agreement is a fair, just and appropriate resolution of the case." *Id.*

## B.     The Commonwealth's Concession of Relief.

9.     In the Joint Stipulation, the parties agree that based upon the uncontested facts before this Court and pursuant to clearly established federal law, trial counsel was ineffective for failing to investigate, develop, and present available mitigating evidence at the penalty phase of Mr. Reid's trial, and as a result he is entitled to relief on Claim XII.

10.     Also as set forth in the Joint Stipulation, the Pennsylvania Supreme Court did not adjudicate this claim on the merits. It found that the claim was waived because it was raised in Mr. Reid's first Supplemental Amended PCRA Petition and leave to file the supplement had not been granted by the PCRA Court. *See Reid*, 99 A.3d at 437, 464. The parties agree and stipulate that the state court procedural bar is not an independent and adequate state law procedural bar to preclude federal review. At the time of the alleged waiver, the procedural rule was not "firmly established and consistently applied." *Albrecht v. Horn*, 485 F.3d 103, 115 (3d Cir. 2007); *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). In any event, considering the record as a whole including the merits of the claim, the Commonwealth affirmatively waives any procedural-default defense to this claim. As such, the parties stipulate that federal review of the claim is proper.

11.     Unlike factual concessions and stipulations which bind a court, *legal* concessions and stipulations do not. Legal stipulations are, however, entitled to substantial deference. *See Sibron v. New York*, 392 U.S. 40, 58-59 (1968) (citing *Young v. United States*, 315 U.S. 257, 258 (1942)); *see Casey v. United States*, 343 U.S. 808 (1952) (per curiam) (deferring to prosecutor's

5

confession of error on appeal); *United States v. Martinez*, 357 F. App'x 100, 101-02 (9th Cir. 2009) (citing *Casey* for the principle that a prosecutor's confession of error on appeal "is entitled to great weight particularly where the case is resolved by non-precedential opinion"); *Rose v. United States*, 629 A.2d 526, 533 n.17 (D.C. 1993) ("[T]he Supreme Court itself . . . has reversed criminal convictions merely on a confession of error without evidencing any opinion about the merits.") (citations omitted).

12.     On numerous occasions, courts in the Eastern District of Pennsylvania have afforded deference to similar concessions and granted sentencing relief based on the parties' agreement in capital cases. *See, e.g., Murphy v. Wetzel*, No. 99-cv-6362 (E.D. Pa. April 23, 2021) (granting penalty phase relief following parties' stipulation) (Exhibit B attached); *Gibson v. Wetzel*, No. 11-cv-4550 (E.D. Pa. Feb. 24, 2021) (same) (Exhibit C attached); *Gwynn v. Beard*, No. 08-cv-5061 (E.D. Pa. Jan. 13, 2021) (same) (Exhibit D attached); *Fletcher v. Beard, et al.*, No. 10-cv-3188 (E.D. Pa. Dec. 11, 2020) (same) (Exhibit E attached); *Ali v. Wetzel*, No. 11-cv-1812 (E.D. Pa. Aug. 13, 2020) (same) (Exhibit F attached); *Mason v. Wetzel*, No. 17-cv-3759 (E.D. Pa. Oct. 5, 2018) (same) (Exhibit G attached); *Marshall v. Wetzel*, No. 03-cv-3308, slip op. at 3 (E.D. Pa. Nov. 06, 2018) (similar) (Exhibit H attached); *Brown v. Beard*, No. 05-cv-4125, (E.D. Pa. June 27, 2018) (similar) (Exhibit I attached); *Speight v. Beard*, No. 04-cv-4110, 2017 WL 914907, at *17 (E.D. Pa. Mar. 7, 2017) (same); *Hill v. Wetzel*, No. 12-cv-2185 (E.D. Pa. Apr. 12, 2017) (similar) (Exhibit J attached).[1]

---

[1] Additional cases in which stipulated relief was granted are: *Meadows v. Beard*, No. 05-cv-0566, (E.D. Pa. Sept. 8, 2016) (granting penalty phase relief based on parties' stipulation); *Morris v. Beard*, No. 01-cv-3070, (E.D. Pa. June 03, 2013) (adopting a joint stipulation in a capital case, granting habeas relief as to a single guilt-phase claim, and vacating the conviction and sentence on the condition that the parties would return to state court where petitioner would plead guilty as negotiated); *Lewis v. Horn*, No. 00-cv-0802, ECF 80 (E.D. Pa. July 26, 2011) (granting penalty phase relief on parties' agreement); *Montilla v. Beard*, No. 08-cv-1705, (E.D. Pa. Dec.

6

13.     Moreover, the Pennsylvania Supreme Court recently clarified that a federal district court's grant of penalty phase relief based on an agreement of the parties is binding on state courts. *Commonwealth v. Speight*, 249 A.3d 1075 (Pa. April 29, 2021). In *Speight*, based on the parties' agreement, a federal district court granted relief and remanded for the petitioner's death sentence to be vacated. On remand, the Court of Common Pleas refused to vacate the petitioner's death sentence, reasoning that it was not required to do so because the federal court acted on the parties' agreement but did not provide any legal analysis explaining why the state court's post-conviction decision denying relief did not withstand scrutiny under 28 U.S.C. § 2254. The Pennsylvania Supreme Court reversed, observing that the federal district court had vacated the death sentence "as a matter of federal law" and accordingly, the Common Pleas Court was required to follow the federal court's decision and the state trial court's "only task . . . was to resentence [the defendant]." *Id.* at *10.

14.     This Court should give substantial deference to the parties' stipulation and grant the writ. The state courts will abide by this Court's granting of the writ based on the parties' agreement.

## CONCLUSION

15.     For the foregoing reasons and those set forth in the attached Joint Stipulation, the parties request that the Court, in view of the parties' stipulations of fact, give substantial deference to the Commonwealth's concession, grant Mr. Reid penalty phase relief on Claim XII

---

22, 2008) (approving a joint stipulation, granting habeas relief, and vacating all convictions on the condition that the parties would return to state court and the petitioner would plead guilty as negotiated); *Baker v. Horn*, No. 96-cv-0037, (E.D. Pa. Sept. 06, 2007) (approving a joint stipulation in a capital case, granting habeas relief, and vacating the conviction and sentence); *Marshall v. Beard*, No. 2:03-cv-795 (E.D. Pa. May 10, 2007) (granting penalty phase relief on parties' agreement).

of his Petition, and treat Mr. Reid's other penalty phase claims as moot (Claims XIII, XIV, XV, and XVI).

WHEREFORE, the parties request that the Court grant this Joint Motion and issue an order granting the writ in part and vacating Mr. Reid's death sentence.  A proposed order is attached.


Respectfully submitted,

/s/ MATTHEW LAWRY
LEIGH M. SKIPPER
Chief Federal Defender
MATTHEW LAWRY
Assistant Federal Defender
Federal Community Defender Office
 for the Eastern District of Pennsylvania
601 Walnut St., Suite 545 W
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner


Dated:  January 5, 2022

/s/ MATTHEW STIEGLER
LAWRENCE S. KRASNER
District Attorney
MATTHEW STIEGLER
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
215-686-5747

Counsel for Respondents

8

# First Judicial District of Pennsylvania

*51CR06025211989*
*Anthony Reid*

*Hearing (PCRA) Volume 1*
*April 03, 2024*



**Court Reporting System**

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File 4-3-24^REID.txt, 66 Pages*
*CRS Catalog ID: 24051017*

51CR06025211989
Anthony Reid

### Page 1

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

- - -

COMMONWEALTH              :
                          :
VS.              : CP-51-CR-0602521-1989
                 :
ANTHONY REID        :

- - -

PCRA HEARING

APRIL 3, 2024

JUANITA KIDD STOUT CENTER FOR CRIMINAL JUSTICE
COURTROOM 1001
PHILADELPHIA, PENNSYLVANIA

- - -

BEFORE:  THE HONORABLE SCOTT DICLAUDIO, J.

- - -

AUDIO TRANSCRIBED BY GARY PASTER

### Page 2

APPEARANCES:


PAUL GEORGE, ESQUIRE
ASSISTANT DISTRICT ATTORNEY
COUNSEL FOR COMMONWEALTH


LOREN STEWART, ESQUIRE
DEFENDER ASSOCIATION OF PHILADELPHIA
COUNSEL FOR DEFENDANT

### Page 3

WITNESS INDEX

| WITNESS | DIR | CROSS | REDIR | RECROSS |
|---|---|---|---|---|

(NO WITNESSES)

### Page 4

EXHIBIT INDEX

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|

(NO EXHIBITS)

Page 5

THE COURT OFFICER: Number 2, Anthony Reid.

THE COURT: Before I start I know, because my staff is unbelievably good. They give me notes. They underline on my sheet.

Family is here for both sides.

Why is that important?

It's not important to me really because I say everything I'm going to on the record on every case. I'm open and transparent.

What they want me to know is that you guys are going to have to behave yourselves.

Do I need another sheriff? I don't know what I'm going to do good or bad because I haven't done it yet. You look like reasonable nice law abiding people.

Does anybody thing I need another sheriff because you can't keep your motions in check I'll go get a couple of them and they'll stand on each door.

Does anybody thing I need a sheriff? Raise your hand.

I didn't think so either so I want call for one. I just have one with the defendant but I really won't tolerate anything, screaming, yelling from either side.

I swear to you on my children's lives I have no idea what I'm going to do until I do it.

Page 6

I'll hear arguments, it will all be in front of you. You will pay respect to what I'm doing. When I'm not doing a case I can make a joke or two or wear a stupid hat. But when I'm doing this I do this and I'm pretty much one of the best at it.

Of course you heard I've done it for thirty-seven years. Four years as a prosecutor. Twenty-five years as a defense attorney and I'm in my ninth year as a Judge. So about forty years this is all I've done.

They ask me to do it, it goes with my trial experience. It helps to be able to do these when you know what you're doing and I do.

It use to be like each Judge had like ten of them. One of my three bosses ago said yes, we're going to give them all to Scott. Asked me if I can do them I said bring it on, my attitude on everything. So, I kind of have them all.

It went in like one of those wheel carts, it went into every Judges office. Took all the files and gave me a double office, twice the size of this.

I read every word about every case. So, just be rest assured that I'm going to try to do what is fair and just. I don't care if you're white, black, green or orange, gay, straight, tall or short, fat or skinny. I'm

Page 7

going to review the law and I'm going to review the facts. I'm going to put the facts to the law and make the right decision God willing.

You heard me do it in earlier cases with that other guy. I'm like this is good, this is bad. I see this, I don't see that. I denied a couple arguments and I'm like yes, the Judge misspoke.

The other stuff where they didn't pass the note I'm like I think I would you like to hear the reason why the defense attorney didn't listen to the tape where the defendant will say yes, let's make up an alibi.

As a defense lawyer when the prosecutor hands you a tape you should probably listen to it before you start your trial, before your alibi blows up and they play a tape saying hey didn't you guys make this up? That's why the prosecutor had to give it to you beforehand so there's no surprises.

Pretty much if the prosecutor gives you a tape of your client and you don't listen to it before trial and then you put up your alibi and then they play the tape and you don't know as the lawyer, you're not really an effective lawyer, right.

That was that other case. Nothing to do with this case. But, I'm going to basically say if he didn't listen to that tape I'm going to look at him and say why

Page 8

wouldn't you listen to an audio tape of your client telling his girlfriend to make up an alibi before the trial that you had for a year?

Now you decide that is ineffective but if he didn't listen to the tape I'll tell you right now, yes, you're not an effective lawyer if you don't listen to a tape of your client making up an alibi.

There's no tapes in this case, right?

MR. GEORGE: No tapes.

THE COURT: Nothing to do with this case but you get the idea.

So, you're going to hear both sides, what the issues are. You're going to hear both sides position. They're going to tell me what they believe the facts are. I will tell you what facts I'm using, which ones I believe I don't. And then I'll tell you what the law is and then I'm going to tell you what I'm going to do.

Maybe today, if it's really complicated maybe in thirty or sixty days.

Does everybody understand on both sides? Give me thumbs up so everybody will understand my purpose.

Got it and now we're going to start.

How many issues were raised?

MR. STEWART: There are eight claims before the Court, Your Honor.

51CR06025211989
Anthony Reid

Page 9

THE COURT: And I'm going to do them. I'm going to use this fancy word ad seriatim. Does anybody know what that word means? One at a time. We're going to go through each issue one at a time.

And both sides are ready to do that, correct?

MR. GEORGE: Yes.

MR. STEWART: Yes.

THE COURT: I'm just going to find in here the eight issues. They will be numbered one to -- which date would that be?

MR. GEORGE: Your Honor, the first seven are raised in the petition was filed on May 10th, 2022.

THE COURT: May 31st of '23, is it in there numbered?

MR. GEORGE: No, Your Honor, that's a reply.

THE COURT: This is your reply?

Which one is this? May 22nd '23; is that what you said?

MR. GEORGE: May 10th of '22, Your Honor.

THE COURT: It might be easier just to print it out for me instead of going through all of these.

THE CLERK: What was that May, Mr. Stewart?

MR. STEWART: It was May 10, 2022 was the petition. It is the consolidated amended.

THE COURT: One of the advantages of having one

Page 10

Judge do most of them is I know the law because I do them all and the intricacies. In post conviction relief law that's different then trial law.

All right, what is the first argument?

MR. STEWART: Your Honor, the first claim is a due process claim, the 8th and 14th Amendment that Mr. Reid was convicted on an unreliable scientific testimony. Mostly it has to do with the ballistics and the National Academy of Science Report that was issued during the pendency of this case.

It's not a claim that --

THE COURT: Did you present any evidence through live witnesses?

MR. STEWART: At trial, Your Honor?

THE COURT: No, before me.

MR. STEWART: No, Your Honor has not held a hearing in this case, so no.

THE COURT: So, you're telling me that ballistics evidence that convicted thousands of people in Philadelphia is an unreliable science?

MR. STEWART: On claim one, Your Honor, I'm going to submit on papers, on the briefs that is --

THE COURT: So, if I ruled for you pretty much thousands of people will be let go.

MR. STEWART: There's a separate claim two

Page 11

involves ballistics that are specific to this case.

THE COURT: I'm doing claim one right now.

MR. STEWART: Yes, yes.

THE COURT: I understand your claim that all ballistic evidence in Philadelphia County for thirty years is unreliable then every conviction would have to be overturned, every robbery, every gun charge, every murder and every ag assault.

MR. STEWART: And I --

THE COURT: Unless you can provide me with scientific uncontroverted proof that there was something extremely important that would change verdicts, which you haven't provided yet, that claim is denied.

MR. STEWART: And I understand Your Honor's point.

THE COURT: And you understood you were going to loose that one.

MR. STEWART: I did.

THE COURT: All right, let's go to claim two then.

Number one was pretty easy for me.

Let's go to claim two.

MR. STEWART: Your Honor, claim two is a newly discovered evidence claim that relates to the ballistics but not ballistics as a science.

Page 12

THE COURT: So specifically what evidence was recovered that you believe might have been tainted?

MR. STEWART: So, the ballistics evidence that was presented at trial --

THE COURT: You got casings or --

MR. STEWART: So, we have two different types of evidence. There are two projectiles, there are two shell casings.

THE COURT: Two projectiles, two shell casings.

MR. STEWART: They are two different calibers. Completely different calibers.

THE COURT: Are both shell casings of the same in both -- projectiles are the same?

MR. STEWART: Yes, Your Honor.

THE COURT: What are the two projectiles?

MR. STEWART: The projectiles, one was recovered at the hospital from the victim. It's a 38 caliber projectile.

The second projectile is recovered from a windowsill of a nearby house. It was believed to have refracted off of a fender of a car.

THE COURT: The caliber was a?

MR. STEWART: 38.

THE COURT: And then the two casings were?

MR. STEWART: 10 millimeter.

51CR06025211989
Anthony Reid

Page 13

13

THE COURT: 10 millimeter and they were recovered from the scene?

MR. STEWART: From the street.

THE COURT: Nearby the scene.

MR. STEWART: Yes.

THE COURT: Within a block I guess.

MR. STEWART: Sure.

THE COURT: And you're saying what?

MR. STEWART: Your Honor, we have offered evidence, including an expert report, that's part of claim two, that these 10 millimeter shell casings didn't have anything to do with the killing of Michael Waters --

THE COURT: Because 38's and 10 millimeters are different.

MR. STEWART: Correct.

THE COURT: They're different size and shape. Mr. George, from my limited knowledge, I've done thousands of cases, 10 millimeters and 38 calibers are different ammunition.

Do you know if -- and he has an expert report I believe in there somewhere I read that said they're different.

MR. GEORGE: They certainly are.

THE COURT: You said they were entered into evidence in what fashion?

Page 14

14

MR. STEWART: I'm sorry?

THE COURT: Did any expert testify at trial that they're the same?

MR. STEWART: No, Your Honor.

The reason it's significant is that --

THE COURT: The jury should never of heard about the 10 millimeter?

MR. STEWART: So, the Commonwealth connected 10 millimeter shell casings found at the scene to a different homicide. Called a witness from that different homicide who claimed that he could identify a person who had the 10 millimeter gun and that --

THE COURT: From a different episode.

MR. STEWART: Totally unrelated.

THE COURT: And what is the problem with that?

MR. STEWART: So, the problem is that the victim here was killed with a 38.

THE COURT: Got that part.

MR. STEWART: There was testimony that the cartridge cases could have been sitting on the ground for up to twenty-four hours.

THE COURT: Agreed.

MR. STEWART: Also, the thorough investigation included that they found a projectile in the windowsill of a nearby house. They found no 10 millimeter

Page 15

15

projectiles anywhere.

THE COURT: How does that prejudice your client in any way?

MR. STEWART: Because by the ballistics link that the Commonwealth tried to prove, they introduced evidence of another homicide. They brought in a witness --

THE COURT: But they said there was another homicide that had nothing to do with your client, right?

MR. STEWART: No, they said it was absolutely my client. That's how they established --

THE COURT: The other homicide?

MR. STEWART: Yes, that's what they said.

THE COURT: So he had both guns, the 10 millimeter gun and the 38?

MR. STEWART: So, they never said that he had a 38, no.

THE COURT: But the guy was killed with a 38 in this case.

MR. STEWART: Yes, the guy was killed with the 38.

THE COURT: So, they're saying that he fired --

MR. STEWART: Gunshots were fired from a car in this case.

THE COURT: But they're saying that your client

Page 16

16

was responsible for the 10 millimeter casings and the 38 caliber projectiles.

MR. STEWART: They said he was responsible for the 10 millimeter casings. They --

THE COURT: He was convicted of murder in this case so I'm assuming the murdered victim had a 38 in his body so he was the guy that fired the 38.

MR. STEWART: So --

THE COURT: He didn't get hit by a car, the victim, right?

MR. STEWART: Correct.

THE COURT: I'm trying to understand you correctly --

MR. STEWART: And to tell the whole story the prosecutor, the Assistant District Attorney Rodger King, blurted the line and said well 10 millimeter, 38, there was --

THE COURT: Mr. Stewart, let me make sure I understand this right.

MR. GEORGE: He's leaving out a point that's pretty important which there's more then one gun came out of the window of a van and fired shots.

THE COURT: So he could have shot one gun, a 38, ran out of bullets and then took the --

MR. GEORGE: Well, there was three guys in the

51CR06025211989
Anthony Reid

Page 17

17

van. A witness saw two arms come out of the van each with a gun.

THE COURT: So one guy could have shot the 10 millimeter and one guy could have shot the 38.

MR. GEORGE: No, one guy got killed by the 38 and the 10 millimeter didn't hit anybody.

THE COURT: That's what I meant. They both could have fired, I apologize.

So --

MR. GEORGE: Can I say one more thing about it because the other thing you have to understand is a van came around the corner chasing these kids that had been throwing snowballs. The kids had thrown obstructions in the road to try to keep the van from coming after them.

The van pulled up into a vacant lot and that's where the firing took place and that's where the fired cartridge casings were recovered.

THE COURT: Which is consistent with --

MR. GEORGE: Which was consistent but not necessarily -- not one hundred percent scientific.

THE COURT: Consistent.

So Mr. Stewart, explain to me why this is an issue.

MR. STEWART: Because I disagree with what Mr. George said about there being two guns out of the car.

Page 18

18

The witness --

THE COURT: Well one of you have to be right.

MR. STEWART: The witness that Mr. George is talking about, Thomas Stewart, and this is in my reply on page 185. In his statements to police --

THE COURT: What date is that?

MR. STEWART: The statement date?

THE COURT: No the file date.

MR. STEWART: Date filed is 5/31/23.

THE COURT: Okay, I got that in front of me.

What page do you want me to go to?

MR. STEWART: Page 185.

THE COURT: 185, got it.

So, what line am I going to?

MR. STEWART: Line 8.

THE COURT: Got it.

Right before the car got back; is that where you want me to start?

MR. STEWART: Yes, Your Honor.

THE COURT: Right before the car got back on to Dover Street a male in the rear passenger side something --

MR. STEWART: Extended.

THE COURT: Extended his arm out of the rear passenger window and started firing a gun at the kids in

Page 19

19

the intersection.

That part?

MR. STEWART: Yes.

THE COURT: So that is one person who says one person. Do you believe that there is another statement of two people?

MR. STEWART: Judge, the only thing I will add at this point --

THE COURT: I'm not asking you.

Do you believe somewhere in here there are two people?

MR. GEORGE: The same witness testified at trial that he saw two guns.

THE COURT: Where is that?

MR. GEORGE: That is going to be --

THE COURT: Did that happen?

MR. STEWART: It did.

THE COURT: So, one witness says two guns.

MR. STEWART: The same witness changed his story.

THE COURT: Okay.

MR. GEORGE: You could say --

THE COURT: We're good, guys. I promise we're good.

He may have changed the story but you would

Page 20

20

agree with me that the jury could believe all, part or none of a witnesses statement, right?

MR. STEWART: Of course.

THE COURT: And they could choose to believe that he's inconsistent and find your client not guilty. They can choose to believe the one gun part and they can choose to believe the two gun part.

What you're telling me is that there's newly discovered evidence that there's two different calibers but he said they're two different guns.

MR. STEWART: To be clear it's not knew that there were two 2 different calibers. What's new is that this expert is saying look, not only what I've already said, Your Honor, two different calibers, but also the evidence that the Commonwealth presented supposably put Mr. Reid as the driver. And the expert also says the driver is not reaching out the passenger side --

THE COURT: That's nothing I'm going to use as evidence. An expert telling me what arm that goes out, that's common sense.

MR. STEWART: Sure.

THE COURT: That's for juries to decide. I'm not finding prosecutorial error, judicial error because it's more likely if you put your arm out one window then the other. The jury heard what arm and they can choose

Page 21

21

to believe it or not.

I'm not going to sit down, Mr. Stewart, in a position saying I wouldn't believe that. That's not what I'm doing.

I'm here to look at evidence and see if some injustice occurred.

MR. STEWART: That's fine.

THE COURT: And the jury found that at one point the witness said two guns and it's kind of strange he put his arm out the wrong window but that's not new trial stuff. That's inconsistencies, yes, why did they find him guilty? Not grant me a new trial.

New trials are 38 and 10 millimeter are the same gun. We now know they're not the same gun. They said one gun was used but there's really two guns used. That's not the kind of evidence I'm going to grant you a new trial on respectfully.

MR. STEWART: I understand.

THE COURT: I'll put it in abeyance in case there's accumulative effect but I'm really not swayed much about that argument.

We'll go to the third argument.

MR. STEWART: Your Honor, I would respectfully ask that 3, 4, 5 and 6 be considered together.

THE COURT: I will.

Page 22

22

MR. STEWART: They are all Brady.

THE COURT: 18.

MR. STEWART: Back to the petition, Your Honor, it starts at page number 38.

THE COURT: Okay, hold on.

MR. STEWART: It goes awfully long, Your Honor.

THE COURT: It's okay. I am in no rush.

MR. STEWART: All the way to page 78.

THE COURT: Is anybody here in a rush? I don't think so so we're good.

Page 38.

Now, while you tell me in fact we're going to lump them together they are all Brady. You know me better. I don't lump anything together. We're going to go through one Brady at a time, one allegation at a time and see what was missing or hidden.

I'll use the cumulative effect at the end but I want to see what is missing.

The first Brady claim is what? What was missing and not turned over and --

MR. STEWART: The first thing was the medical records that reflected the signatures of Darryl Woods, who was the witness, that is the focus of all the Brady claims.

THE COURT: Darryl Woods' signature was held

Page 23

23

back?

MR. STEWART: Yes.

THE COURT: Is there a reason to believe that it's not his signature. Did you get a handwriting expert?

MR. STEWART: There was handwriting expert evidence presented at trial by the Commonwealth. It's his signature.

THE COURT: They said it was?

MR. STEWART: Yes.

THE COURT: Did the jury believe it?

MR. STEWART: This evidence was suppressed so the jury didn't hear it.

THE COURT: Okay, so what is the issue?

MR. STEWART: So, Your Honor may remember that last year you heard a case involving the same witness, the same Brady violation. Mr. Goldstein and I had codefendants.

THE COURT: Name?

MR. STEWART: Commonwealth verses Anthony Reid, Commonwealth versus Kevin Bowen (ph).

THE COURT: Okay.

MR. STEWART: The issue on the case --

THE COURT: I granted it.

MR. STEWART: You did.

Page 24

24

Mr. George didn't oppose that one.

Your Honor, the issue in the case related to unsigned statements, including an unsigned statement that --

THE COURT: I just want to know about this one.

MR. STEWART: Yes, I need to give you just a piece of that background to tie it to this.

The individual whose name is Darryl Woods --

THE COURT: I don't want to hear about any other case except this one.

MR. STEWART: You need to hear this to understand this case.

THE COURT: I don't.

Tell me what you think the Commonwealth did wrong in this case.

MR. STEWART: Sure, they called Darryl Woods as an eyewitness who testified that he was killed by a 10 millimeter gun.

THE COURT: They can't call him to testify if he's been killed.

MR. STEWART: Excuse me, he had been shot.

Also, another man named Neal Wilkerson had been killed.

THE COURT: Let me go backwards.

They called Woods to say I was shot prior by a

51CR06025211989
Anthony Reid

Hearing (PCRA) Volume 1
April 03, 2024

Page 25

10 millimeter?

MR. STEWART: They called him to say that.

THE COURT: Okay.

MR. STEWART: He took the stand and he said I didn't know who shot me. They used an unsigned statement from him to use this prior inconsistent statement to try to bring it in under Brady Lively, right.

THE COURT: So now let me explain to everybody here what that means.

MR. STEWART: Sure.

THE COURT: If you go to the police and tell them something about my car got stolen and then you describe how my car got stolen, usually after you give the statement the police hand it to you and you sign your name at the bottom which means that you're excepting those facts as true. I signed my name meaning the facts I just gave to the police.

Statements that are signed are treated differently then statements that are unsigned. There's more veracity or truthfulness to a signed one where you affix your name to the bottom of it because a police officer can kind of make up as he goes along, you didn't sign it you are not affirming the truthfulness.

So, the law treatments those kind of statements differently.

Page 26

So, what you're saying is that this person, Mr. Woods, gave a statement to the police. That statement made certain allegations but he didn't sign it.

MR. STEWART: Correct.

THE COURT: And when he said something different at trial the detective read in what he was told allegedly, but it was unsigned.

MR. STEWART: Correct.

THE COURT: And you're saying it's a violation.

MR. STEWART: The Commonwealth called multiple detectives, five, in this trial to say Darryl Woods was medically unable to sign this statement.

THE COURT: Right.

MR. STEWART: Sitting in the Commonwealth's file there's a confidential appendix that's here, the medical records. Sitting in the Commonwealth's file were signed documents consent to treatments signed by Darryl Woods.

THE COURT: Same timeframe?

MR. STEWART: Exactly.

THE COURT: Like how close in time?

MR. STEWART: If Your Honor looks in the petition --

THE COURT: How close in time?

MR. STEWART: Page 49 to 50 has a chart. He

Page 27

signs the document March 14th for medical.

THE COURT: I know it's crazy, I can't see that far.

How close in time?

MR. STEWART: Your Honor --

THE COURT: Minutes, hours?

MR. STEWART: One day before he signs the document.

THE COURT: Well one day you can be medically unable -- my father almost died fifteen minutes away. He was talking to me and the next day he was fifteen minutes from dying.

One day is a long period of time for being medically unable -- Tuesday to be able, be able on Wednesday and unable on Thursday. One day is not good.

Do you have anything within say two hours, three hours?

MR. STEWART: Your Honor, what we have is there are four unsigned statements. There are a total of probably fifteen signed items.

THE COURT: Where are the documents? I'll look at it now.

MR. STEWART: Okay.

THE COURT: Page what?

MR. STEWART: In the petition page 45 to 46.

Page 28

THE COURT: Let me go to page 45. Do you have this, Mr. George?

MR. GEORGE: Your Honor, I agree with what he's saying right now about the timeframe.

THE COURT: I want to see -- so he's basically calling all the cops liars.

MR. GEORGE: This all relates back to the other case where we agreed that there had been a Brady violation.

THE COURT: Are you agreeing there's a Brady violation?

MR. GEORGE: I'm agreeing that a Brady violation occurred in the other case. I am not agreeing that in this case --

THE COURT: Well I only care about this case so I'm going to go, Mr. George respectfully, to he's calling the cops liars and they should never have been able to read in the statement claiming he was unable to sign it.

I'll give you a for instance. He's able to sign something at 1 o'clock for the doctors but not be able to sign at 3 o'clock for the cops. Able to sign something at 1 o'clock for the doctors the next day but not 3 o'clock for the detectives. Able to sign something the next day at 11 in the morning but 2 in the afternoon not being able to sign it.

51CR06025211989
Anthony Reid

Hearing (PCRA) Volume 1
April 03, 2024

Page 29

29

And you're saying it goes up and back.

MR. STEWART: Up and back.

THE COURT: I'm going to take two minutes and go look at this chart so I can see again, one day to another day, no big deal. But within the same day five different times would make me believe that maybe the detectives were playing a little faster and looser with the facts. I'm going to go read that and I'll come back real quick.

(SHORT RECESS)

THE COURT: We're going to have to have an evidentiary hearing, Mr. George. I reviewed it and I'll go over it with you.

It appears that on 3/14 this witness was able to sign stuff.

On 3/16 he was able to sign stuff.

On 3/18 they were able to sign stuff.

On 3/20 they are able to sign stuff.

On 3/21 the doctor says he was unable to sign stuff. Probably might have had some issue, right?

But, the problem on 3/21 he was able to move his arms and legs well.

On 3/22 unable to sign stuff.

Page 30

30

3/30 able to sign stuff. These are dates, March 30th.

On 4/5 able to sign stuff.

But on 4/8 unable to sign stuff.

But on 4/11 able to sign stuff.

On 4/22 able to sign stuff.

So, there's like five days he's not able, the detective said no. Four days he's able the detective said no. Three days he's able the detective say no.

It's something I want to hear from the detectives. What would make him unable?

MR. GEORGE: Judge, we don't dispute any of that. That's exactly why we granted and agreed to relief on the other case because --

THE COURT: I don't care about the other case. I only care about this case.

So, are you in agreement --

MR. GEORGE: But they are intertwined --

THE COURT: Not for me. I have ruled on other cases. I've given one person a new trial and the codefendant not. So, I'm going to keep this one separate for this record.

Are you agreeing with me that the detectives are lying?

MR. GEORGE: No, but --

Page 31

31

THE COURT: He's arguing the detectives are lying, right?

MR. STEWART: Yes.

MR. GEORGE: Can I say on the record what I am agreeing to?

THE COURT: You can.

MR. GEORGE: But that information is important to the defense in the other trial and it wasn't turned over. I definitely agree to that.

THE COURT: How about this trial?

MR. GEORGE: In this trial it wasn't turned over either. The witness in question was called in and he said Mr. Reid isn't the one that shot me and I was able to sign statements and --

THE COURT: Yes, but he's saying they read in the contradicted statement.

MR. GEORGE: And then they did that.

THE COURT: If I think the cops are lying most respectfully then maybe they shouldn't have been able to read it in. That's what he's arguing.

MR. GEORGE: And my argument is --

THE COURT: Are you willing to say the cops shouldn't have been able to read in those statements?

MR. GEORGE: Yes, and the reason I'm saying that --

Page 32

32

THE COURT: Yes?

Okay, then I don't need anybody. You are agreeing to a Brady violation.

MR. GEORGE: I'm agreeing that there was a Brady violation in the other case that it should have been turned over --

THE COURT: Again stop --

MR. GEORGE: -- that it should have been turned over in this case --

THE COURT: Stop, time out, time out.

MR. GEORGE: -- and it should have been turned over here.

THE COURT: I'm going to instruct both of you, I never want to hear the words other case again. I only care about this case.

In this case are you willing to concede that this information should have been passed and because it wasn't passed that constitutes a Brady violation? And as a result of that when the detectives read in the statement that was inculpatory, meaning that he said that someone shot him, the jury shouldn't have been able to consider it?

MR. GEORGE: Correct.

THE COURT: And then I now have to, at another point, not today, say had that not been read into the

51CR06025211989
Anthony Reid

Page 33

33

jury would it have changed the verdict?

MR. GEORGE: Was there a likelihood of a different outcome.

THE COURT: Got it.

MR. GEORGE: Yes.

THE COURT: So you can have a seat now so I can explain it to everybody.

The Commonwealth and I probably, and you can see why, are going to agree that the police officers behavior was unfair and unjust. It doesn't mean they get a new trial though. That's a factor in deciding whether a new trial -- if there's no violations like I found on 1 and 2, no new trial.

If there is a violation I then have to sit as the jury did back -- how many years ago, thirty-five years ago believe it or not. I then said the jury heard five pieces of information, witness, witness, witness, witness, witness. They shouldn't have heard the part where the detective read in this guys statement. They shouldn't have been able to read it into the jury.

I then now am going to have to go back and read everything that was said 35 years ago from the first words to the last and somehow both sides say had the jury not heard that piece of information would they be likely to have reached a different verdict?

Page 34

34

I don't know because I don't know what was read thirty-five years ago. I don't read the transcript before I come today. My first decision is on the law and see if there are violations. If they are none then I don't have to read anything.

The Commonwealth and I agree that they should have told them about this because when they went in there and said oh this statement is true, he couldn't sign it -- it doesn't make much sense, right?

So, if it's unsigned the defendant can't read the words in. If it's unsigned and he couldn't sign it then he can but if it's unsigned and bullshit wise unsigned then he shouldn't have been able to read those statements to the jury.

So, now what I have to do is take out whatever sections in the record like put big X's through them and read the rest and see if there is enough evidence without that.

I don't know what I'm going to say about that because I haven't read the totality of the transcript. I don't know about what other things. But, I'm finding the recommendation of the Commonwealth and where I was going to go anyway is that the jury shouldn't have heard the detectives read in those words.

I'm not asking to agree with what I said but do

Page 35

35

you kind of understand what I'm saying, everybody, mostly? I'll explain it again later if you need me to.

So, we are going to find that there was the Brady violations. I am now going to go to the next phase at a different day and at a different hearing to see if that created enough prejudice where the jury would have likely have reached a different conclusion.

I don't know if he was the only witness or one of ten. I don't know if it was on video because at this stage I don't read those notes of testimony. I don't even have them because I don't want to prejudice myself beforehand.

Everybody understood that from both sides?

So, we agree that there's a Brady violation. The DA is not objecting. They're going to argue prejudice at a later point, I imagine.

MR. STEWART: Yes, Your Honor.

THE COURT: So now, what is the next issue?

MR. STEWART: Can I be heard just on three quick points before we go to that next issue?

THE COURT: I just agreed with you. Do you want me to change my mind?

MR. STEWART: No, Judge.

THE COURT: Then I think you might want to go to your next one.

Page 36

36

MR. STEWART: Your Honor --

THE COURT: You talked me out of things before when they were winning.

As a matter of fact I had a DA crying this week when she won and then she decided to keep talking. I just granted you -- that's a Brady violation and we'll argue prejudice later.

I don't know what more you can possibly get out of that but if you want to try to undo it, go ahead, Loren.

MR. STEWART: Just only, Judge, the Court needs to consider that the jury heard evidence of this other homicide in the prejudice --

THE COURT: I'm going to read it all now.

MR. STEWART: Yes.

THE COURT: I'm going to read everything and we'll see how this fits with that.

All right, are there any other Brady violations?

MR. STEWART: Yes.

THE COURT: What is the next one?

MR. STEWART: I guess before I go through them, Your Honor, the Commonwealth has conceded on them already in the other case and I think in this case, too.

Read back the record please.

Page 37

37

MR. STEWART: Okay, Your Honor, I'll go to the next one.

THE COURT: What did I say a few minutes ago? Everybody heard me, right? I don't want to hear about the other case. I just want to hear about this case. You tell me the issue and if he says I concede the issue on this case -- he also conceded relief on the other case. Are you considering relief on this one?

MR. GEORGE: No, Your Honor.

THE COURT: See how it changes. I just care about this case. The next time I'm going to take a break and come back another day if I hear the words the other case I'm done for today.

Does everybody understand that?

Cell phone goes off I take it.

I'll hear about any other case except that victim and this defendant and his family, I'm leaving for the rest of the day because the last time I checked what happens on other cases have no significance on the victims and the defendant in this case the last I checked.

So, what is the next Brady violation on this case?

MR. STEWART: Claim 5 has evidence of a Brady violation in this case.

Page 38

38

THE COURT: So what happened to claim 4? I think that was 3. What happened with 4.

MR. STEWART: I don't want to say the words, Your Honor.

THE COURT: What is claim 4? What is the Brady violation.

MR. STEWART: Relating to the same witness. Can I say it that way?

THE COURT: So, are you conceding that there was a Brady violation on the same witness?

MR. GEORGE: I'm not sure exactly --

THE COURT: I'm not sure -- you can say about the other case if there's a Brady violation that relates to the other case you can tell me about it. You did on another case so do it now.

MR. GEORGE: If he is saying something about Mr. Woods' testimony and the detectives testimony in this case --

THE COURT: We'll agree.

Should I just throw out all Woods' testimony in this case?

MR. STEWART: Absolutely.

THE COURT: Yes?

MR. GEORGE: Yes.

THE COURT: Let me make that ruling. Anything

Page 39

39

Woods -- did he testify under oath, Woods?

MR. GEORGE: Yes, he testified.

THE COURT: Will I consider what he said under oath, yes. I don't consider what the detective said he said.

MR. GEORGE: Read the trial.

THE COURT: I'll read the whole transcript. Basically what I'm hearing is if Woods testified in open court, whatever the jury heard their allowed to consider. We agree, right?

MR. STEWART: The jury could but --

THE COURT: Everything that Woods said from good morning to go F yourself, if he said it in open court the jury can consider it.

What the detective said that Woods told him I can't consider.

MR. STEWART: But Your Honor can't consider any of Wood's testimony because none of it should have come in.

THE COURT: Woods himself?

MR. STEWART: Absolutely, Your Honor.

THE COURT: Why not?

MR. STEWART: Because the Commonwealth suppressed all of this evidence. This is their word, that could have been used and turned out to be a serial

Page 40

40

liar.

THE COURT: But serial liars can be believed. They could be lying about ten things and tell the truth about eleven.

MR. STEWART: But, Your Honor, when the commonwealth has a note in its own file claim free that says quote signed hospital papers prior to 21st why could not sign on 21st? This is probably a District Attorney, an Assistant District Attorney.

THE COURT: The bottom line is a jury is not going to consider anything he didn't sign but anything he testified to under oath the jury is free to consider whether it's truthful or not.

MR. STEWART: But not because -- everything that he said under oath was by and large Rodger King doing a Brady Lively approach using prior inconsistent statements that were unsigned.

THE COURT: It's his answers that are going to be evidence, not what Mr. King asked him.

MR. STEWART: Your Honor, I --

THE COURT: Rodger King said didn't you tell the detective the moon is made of cheese? Yes. That's evidence. But if he said did you tell the detectives that the moon was swiss cheese? No, I didn't tell it was swiss cheese, that's out.

51CR06025211989
Anthony Reid

Page 41
41

MR. STEWART: So, Your Honor --

THE COURT: What he said that's uncontaminated by detectives still comes in.

MR. STEWART: So, Your Honor, in my reply, appendix, is the Commonwealth's brief where they conceded that the Brady violations impact the admissibility of all of Woods testimony, the reliability.

THE COURT: That is the recommendation. When I read the record I'll come back and tell you. That is merely a DA recommendation. I'm of the belief that the jury decides what's believable or not. They can disbelieve 99 out of 100 and leave the one standing that I watched him shoot him.

MR. STEWART: I will --

THE COURT: Hold on, I'm trying -- false in one, false in all. What is the Latin term?

MR. GEORGE: Unknown something.

THE COURT: Something --

Basically one of the instruction is you can believe none, all or some. You can choose to believe -- if he lied one time you can choose to disbelieve all of it.

But, the jury, the last I checked, is the arbiter and final resolution of the facts.

I'll read it and well keep that open and maybe

Page 42
42

there will be a different context for me.

MR. STEWART: Your Honor, may I just for the record, I understand that Your Honor might not agree with it, but the case Hutchinson verses --

THE COURT: Just send it to me and I'll read it.

MR. STEWART: But Your Honor, what it stands for is averments and pleadings constitute finding judicial admissions. The Commonwealths averments in the other case --

THE COURT: Not for me.

MR. STEWART: Well, Your Honor, that's what the Supreme Court says.

THE COURT: Then you'll appeal me. Just because they recommend that someone is a liar, I've had many disagreements with the Philadelphia DA's Office, they're recommendations aren't always followed.

Just because Mr. George states that the guy is a liar doesn't mean I have to think he's a liar.

MR. STEWART: I understand that. But, under Strickler, Kyles, Banks --

THE COURT: I'll read it. Send me it all.

MR. STEWART: But what the Court needs to consider is whether there's a reasonable probability with a different result without the Brady violations.

Page 43
43

THE COURT: I got that part. I know what that is.

The question being posed is simply the DA is saying throw out all of Wood's testimony, not only what the cop said he said but what he said he said because it's so tainted. I need to read it first to see how tainted it was and see how leading the questions were, to see if King was putting words in his mouth.

Or if he says what happened and he said he shot him, that's coming in for me. You can appeal me. Anything that was not suggestive, not pressured, said by the witness, you could convince me that the detectives are lying when he couldn't sign it so they can't read it.

If he gets here in open court and said I watched that man shoot that man and nobody is forcing me to say it, and you want me to throw that out, I'm going to go big no.

MR. STEWART: Well, Your Honor, the witness didn't see anything --

THE COURT: I don't know. I haven't read it.

MR. STEWART: In this case.

THE COURT: I haven't read it yet. I'm going to look at what Woods said.

MR. STEWART: Yes.

THE COURT: If he saw, heard, smelled

Page 44
44

something, and it's of his own recollection, just because a detective lied on him doesn't mean he lied. Just because he lied in some other venue doesn't mean he lied.

You can be a convicted felon a hundred times over, being convicted of crimes and still be called to testify and then the jury can believe you or not.

MR. STEWART: Of course.

THE COURT: I'm not going to say X over everything he said. I'm not doing it. I will read it all. I'm not saying I was agreeing with Mr. George. I'm just saying I'm not agreeing without reading it.

MR. STEWART: Just note the cases cited in my brief especially Strickler and Bagnell (ph).

THE COURT: I will try to follow the law but I also will not follow the law where I think it was wrong and then have the law charged when they reread it.

MR. STEWART: That does happen.

THE COURT: It happened twice with me. One on hearsay where they did double hearsay and I said I'm not excepting that.

When they tried to overdo Rick and Branch and had some new law and I'm like I'm not following that and then it went back up and the Supreme Court said yes. And I did the same thing with gun cases.

So. I read it and I'll do what I think is

**Page 45**

45

fair and just. And I can't tell either side what I'm going to do is because I haven't read it yet.

So, we'll revisit that part.

What is the next Brady claim?

MR. STEWART: Your Honor, claim 4, there are more prior inconsistent statements from the same witness that were suppressed.

THE COURT: It's all about Woods?

MR. STEWART: Yes.

THE COURT: I'll read all of it. So let's move on.

Next?

MR. STEWART: Claim 5 is a Brady claim that relates to various suppressed pieces of evidence of alternate suspects.

THE COURT: Start with the first one.

MR. STEWART: Your Honor, without reading it from the brief --

THE COURT: Read it from the brief.

MR. STEWART: Your Honor, what I was going to suggest is that I heard Your Honor talking a case earlier this morning about tips, about neighborhood canvas things that were not developed. I would be prepared to submit --

THE COURT: Meaning?

**Page 46**

46

M[R. S]TEWART: An additional argument to what's in my bri[ef].

T[HE] COURT: So you're going to lose that one; is that rig[ht]?

M[R. S]TEWART: If that's what Your Honor thinks. You're the Judge.

T[HE] COURT: Well, a case I had earlier in the week, it was a home envision where four guys came in with a mask and they didn't know who it was. So, one of the detectives said hey check the Marone brothers, they are known [for do]ing that. It turned out that all the witness[es s]aid it was the DeClaudio brothers, not the Marone [brot]hers.

[So, t]hey're saying because the Commonwealth didn't d[isclo]se that to the defendant that they clearly develop[ed al]ternate suspects.

N[ow, i]f it's just the detective throwing out names o[f ba]d people, that's not really of any moment. If they sa[y wel]l it was the Marone brothers, I saw two of them d[rive] away from the scene of the crime, then that's s[ometh]ing that they should have told you about, an alterna[te susp]ect.

[If th]e Marone brothers wear similar jackets [ ] on the back, that's a suspect that you should [ ] [ab]out.

**Page 47**

47

But, just saying hey, the Marone brothers are bad people, the George people are bad people, the Roberts people are bad people, we should look into all of them when trying to solve this.

But, then before they look into the others there's a video camera with the guy driving away and they ran the license plate.

So, alternate suspects aren't just names that somebody threw out there early in the investigation. It's a suspect in my opinion, not a name.

Names don't have to be turned over of every bad person in the neighborhood. True suspects do.

Do you understand the difference there?

THE DEFENDANT: Yes, sir.

THE COURT: In a lot of detective files early on they are putting names down of who may have done it before they get their first real lead in development.

So, what I ruled in the past and I will consistently rule that just because a name is in the file, that somebody could have done it, isn't an alternative suspect. That's a name to investigate. Names to investigate who they never investigated because they didn't have to because a better lead came aren't something that's a Brady violation.

You watched me do other cases and that's why

**Page 48**

48

I'm cons[ider]e[d]. I think what Mr. Stewart is telling me that the[ ] [oth]er names haven't been developed, that they were r[ ] [susp]ects.

[ ] [hearin]ving all the claims on alternate suspec[t the]y are undeveloped, no specificity, no violati[on ] denied.

[S]TEWART: And just to be clear for the recor[d fo]r claim 5.

[THE C]OURT: Claim 5 is denied.

[S]TEWART: Claim 6 is accumulative Brady claim. [al]ready talked about that.

[THE C]OURT: Well, accumulative Brady claims we alread[y say] that there's at least one violation. I add them [at] the end. So far I only found one. So, there's [ n]o cumulative claim, one. It's all about Woo[ds] [n]ow.

[S]TEWART: Right.

[THE CO]URT: So, is there any other claim that's accum[ulative]?

[S]TEWART: Two more.

[THE C]OURT: Usually we do accumulative last.

[S]TEWART: When it's Brady and I file multip[le] claims I generally make it right after --

[THE CO]URT: I'm not going to find accumulative Brady [if] there's only one. It will be accumulative

51CR06025211989
Anthony Reid

Hearing (PCRA) Volume 1
April 03, 2024

## Page 49

within Woods.

MR. STEWART: Sure, sure.

THE COURT: It's of no moment how we do it. I'll address Woods.

So, let's say for both sides sometimes there's violations like sixteen violations. One about this witness, one about that piece of paper, one about that wanted poster. I found say eight out of sixteen I then look at all eight together. That's called accumulative. This is basically just Woods so I don't add them up.

So, accumulative is I'll look at the scenario of Darryl Woods and we'll move on to number 7.

MR. STEWART: Number 7 is a Batson claim, Your Honor, relating to Roger King's jury selection practices.

THE COURT: How many times was that appealed?

MR. STEWART: How many times was that appeared? In this case once.

THE COURT: Okay, I'm not going to overturn anything.

There's another Batson?

MR. STEWART: There is, Your Honor.

In the file review from the Commonwealths files we found -- jury selection notes where he's tracking race, he's tracking what the black people are, the white people are.

## Page 50

THE COURT: Can I see it, please?

MR. STEWART: Sure.

Your Honor, would you like me to approach or do you want ... to tell you where it is?

THE COURT: Batson is you're not allowed to use race as one of the reasons you strike someone. The common theory and there's been videos of DA's doing seminars saying you don't want black jurors, they're very liberal, you want the white jurors. Really, really you can't do ...

A Batson claim is claiming that the prosecutor was using ... as a criteria and it's very hard to prove because ... can just kind of know that you're going to strike ... because of race but then just use a different reason.

People back in the day would say I'll strike ... because I don't like his job. I don't like his hair ... don't like the clothes he's wearing. I ... tattoo. I don't like the shoes he's wearing ... had a book in his hand and I didn't like ... you just write that reason even though in ... you're using race and no one could ever know, ... when you write like the race on here. That ... believe that may be a factor.

... not going to find it in this case

## Page 51

because do you know why?

MR. STEWART: No.

THE COURT: All he wrote was white female, Hispanic female, black female, their section of the city. It's on the form.

If there's no specificity, if you wrote the word black next to the guys name but he wrote everybody, their gender, their race, their address, their section of the city in every form.

What we should do in the future is not put male and female in the form. But, it's on the juror form male or female.

So, he wrote white or black. There's white, black, Hispanic, you check a box. He just wrote down what was in the box that was handed to him. Every juror form in the top has name, white, black, male, female, married, not married. All he did was copy some of those blocks on to his jury. I can't find without any other information that he used race.

MR. STEWART: So, there is an enormous amount of other information before Your Honor?

THE COURT: On this case?

MR. STEWART: Yes.

THE COURT: Let me hear it. That's not enough.

MR. STEWART: I'll go through it briefly but

## Page 52

... ses of Rodger King's pattern of striking ... from his juries, an analysis --

... COURT: Do you have that? Let me see it.

... STEWART: Yes.

... COURT: Then again, not that I would ... but if I rule on that every prosecution ... is thrown out, all five hundred of them. ... used race statistically on all of them ... overturn everyone of them, Mr. Stewart?

... STEWART: Your Honor --

... COURT: That's a yes, right?

... STEWART: It would have to be -- no, it's

... COURT: Because he statistically --

... STEWART: It's a timely claim on each case

... COURT: You're saying he excluded blacks as ... practice. Mr. King can't be called, he's

... STEWART: Just for the record --

... COURT: He's still dead, right?

... STEWART: He's still dead.

... ition of striking blacks at a rate of ... percent while striking whites at a rate ... four percent. So, twice as likely to

Page 53

strike a black --

THE COURT: There's a lot of factors in that relation. I might sound like a racist but I'll give you reasons. One of the reasons that most prosecutors strike African Americans -- I'm surprised it's only that percentage and I'll tell you why.

As a prosecutor you don't want the jurors to have to relate to the defendant as they would one of their family members, i.e., the way I understand it it's about ten African Americans in jail for every one white in Philadelphia.

Statistically I think it's ninety percent to ten percent. We can say that because they commit more crimes or because we persecute them more.

So, if those African Americans have more family members statistically in jail, as a prosecutor if someone says I have a cousin in jail for murder, I have a brother who is accused of murder, I have a brother-in-law who is accused of a shooting, the prosecutor wouldn't necessarily want them on their jury. Not because the color of their skin, but because they might have a family member or friend -- have you ever have a police officer lie on you? Most African Americans say yes. Most whites say no.

So, if you really look at why that data was

Page 54

compiled I'm actually surprised it's 49/24. It should be more like 75/25 or 80/20 knowing a prosecutorial mindset that in and of itself a statistical analysis is woefully insufficient.

That claim is denied.

MR. STEWART: Your Honor, there was more evidence in support of it.

THE COURT: Do you want to give me the rest of it? I'll hear it, go.

MR. STEWART: I'll give it to you in two sentences.

THE COURT: Go.

MR. STEWART: Your Honor referenced the Jack McMahon tapes of training and culture in the Philadelphia District Attorneys Office --

THE COURT: Jack McMahon, I never even heard of him. He literally said on the training tape don't get white people on your jury like on the training type.

Was Rodger on one of those?

MR. STEWART: I'm sorry?

THE COURT: Was Rodger on one of those?

MR. STEWART: In the training?

THE COURT: You should probably go back to every McMahon conviction because I'll overturn most of them. He literally says do not ever put a black man on

Page 55

your jury in a DA training tape.

MR. STEWART: So the history and culture of the DA's Office is part of the claim.

THE COURT: Denied.

MR. STEWART: I'll move on.

THE COURT: Anything else?

MR. STEWART: Not on Batson.

THE COURT: There are bad prosecutors and good ones. Prejudice ones and not prejudice ones. Rodger King was African American himself.

MR. STEWART: Yes.

THE COURT: So I put that as part of the record. Statistically I think that is a low number.

I'm curious, do a number of all African Americans to whites getting struck as jurors.

MR. STEWART: I don't now.

THE COURT: I bet you that's a low number. I bet you it's more then forty-nine percent. And I can go on why African Americans get struck more then white people. Do you have anybody in jail? Yes, my cousin. Have you been a victim of a crime? Yes, me. He wants white people who are victims of crime. The jurors could say my brother got robbed at gunpoint. I bet you defense lawyers strike more whites because you don't want a white guy on a jury on a robbery when their brother was robbed

Page 56

at point of gun.

So, those numbers are irrelevant and do not show the same picture. I bet that's a low number. I bet Rodger thought that he could probably schmooze an African American more then a white person because he had that southern draw to him. I bet you that with all strikes I think forty-nine percent is low.

MR. STEWART: Well, there's no evidence in this record on that but --

THE COURT: Because you didn't do it, denied.

MR. STEWART: Because I can't get it.

THE COURT: Next.

MR. STEWART: Judge, the last claim that's before the Court relates to the reversal of the Wilkerson murder that happened last year.

In this case Mr. Reid was sentence to death in part because of a significant history of felony convictions. The Wilkerson murder conviction was part of it. That's been reversed. That's been dismissed --

THE COURT: You're asking me to vacate the death penalty?

MR. STEWART: That's right, to be --

THE COURT: What is your position on that?

MR. STEWART: There's one more aggravator --

MR. GEORGE: Your Honor, I agree that there's

Page 57

57

definitely an impact on the death penalty question when one of the murders isn't there anymore.

THE COURT: I actually overturned one of those where a guy had two third degrees and one of them got overturned and I had to by operation of law.

MR. STEWART: But here's the problem here --

THE COURT: But that was one of the aggravating circumstances which no longer exists.

MR. STEWART: Right.

MR. GEORGE: Here's the problem here --

THE COURT: What is the other aggravator?

MR. STEWART: Gregarious --

MR. GEORGE: Danger to others.

MR. STEWART: Gregarious.

THE COURT: Gregarious, that still exists, right?

MR. GEORGE: There's no mitigators and by statute --

THE COURT: So it's going to be 1-0 anyway?

MR. GEORGE: It's a bad statute.

MR. STEWART: It is.

I have arguments in my brief as to why you should reverse it anyway.

THE COURT: I'll go back to that one.

Two reasons that -- I'm trying to explain it to

Page 58

58

you guys so that's why I'm looking up.

Whenever one has a death penalty case -- there's the guilt phase and the death penalty phase.

On the death penalty phase it's like a baseball game. You actually count up the factors. Whatever number is more wins. They're calling it mitigating, meaning good for the defendant. And aggravating, bad for the defendant. If it's a tie he wins. A tie goes to the runner.

If there's one more aggravating circumstance then mitigating circumstance that penalty stands.

In this case the jury found two aggravating circumstances. One, the prior murder. Well, that doesn't exist anymore so they shouldn't consider it.

So, that aggravating factor takes away a run off the board so to speak.

But, there's a second aggravating factor, danger to others. If you shoot outside of a van and there's other people around that is an aggravating factor. The jury found that that was an aggravating factor.

I'm not going to change that. It goes to the Woods thing -- it's not going to talk him off of death row so I'm going to wind up denying this.

There were no mitigating factors. So, even if

Page 59

59

I except the argument the other conviction no longer exists -- it was 2-0, now it's 1-0. Aggravating factor being danger to others. Mitigating factors presented, zero. 1-0 is death. I don't want to say it like that.

How am I analyzing this really, Mr. Stewart?

MR. STEWART: Your Honor, what I'm looking at and in my brief is qualitatively when you are looking at -- so, the jury needs to look at the aggravating and mitigating factors. I disagree --

THE COURT: If I find that Woods, in theory -- mostly we're down to Woods, right?

MR. GEORGE: Yes.

THE COURT: If I find that woods has so tainted the jury that they would likely find a different --

MR. STEWART: Or a reasonable probability.

THE COURT: Reasonable probability of a likelihood of a different result then I don't care about the death penalty because he gets sentenced to death.

MR. STEWART: I agree completely.

THE COURT: Right?

MR. STEWART: I mean he doesn't get out but yes.

THE COURT: I overturn it.

MR. STEWART: Right.

THE COURT: If I find that Wood's testimony --

Page 60

60

well depending on how much I do or don't use, if there was enough evidence against him I could in theory go back and say Woods is the only person saying he is shooting into people I could say there's enough evidence to sustain a conviction with other things.

But, Woods was the main person that gave the jury the danger to others in theory, enough to take away death.

MR. STEWART: He wasn't even there.

THE COURT: So, I'm just saying in theory I could make a decision where I keep the verdict but under the death. But, if Woods wasn't there and they didn't use Woods for the danger to others then how do you win?

MR. STEWART: I understand.

It's in my brief, Your Honor.

THE COURT: You can't win.

MR. STEWART: I think I can.

THE COURT: Well, if other persons said that he was the shooter and danger to others and that's still in evidence and it's 1-0, you lose.

Denied.

MR. STEWART: Judge --

THE COURT: I'll reread it when I read the notes of testimony.

MR. STEWART: Thank you.

## Page 61

Just in general though, as the Court looks at this, the Commonwealth by bringing in the Woods stuff had a trial within a trial. They called eight people to the witness stand who talked about another murder --

THE COURT: Do you know what, how about if I read it all and decide if the Woods stuff what impact I believe that would have on a jury.

I tried more cases then both of you combined times ten. So, I'll know like what is thrown against the wall, subterfuge and what is real evidence and how respectfully they are also interrelated to the other case because the Judge let it in. So, there's got to be some relevance. But I will be able to sift through it, I assure you why that was brought in, how many affect, and how much of Woods stuff needs to be put in with that and did they consider Woods' testimony a little bit more because of that other stuff?

I'll be able to parse through it. And what other evidence there was and the value of that other evidence and the reliability of the evidence.

But, I can't analyze that yet because I don't have it yet.

MR. STEWART: Your Honor --

THE COURT: But, I think I'm at a point where now I'm good to go, right?

## Page 62

MR. STEWART: So the parties have addressed the ... that's the prejudice question.

THE COURT: We can't talk about it. I need to ... notes so I can have an intelligent --

MR. STEWART: I was going to suggest to the Court the ... that the Commonwealth laid out its position in a brief ... 12/19/22.

THE COURT: Right.

MR. STEWART: Mine is in our reply which is 5/31/23. ... also supplemental evidence from our side --

THE COURT: Fantastic.

MR. STEWART: -- in support of it.

THE COURT: None of which is going to stop me ... now got to go read the notes.

MR. STEWART: And do you have the notes?

THE COURT: I don't.

MR. STEWART: Shall I send them to Your Honor?

THE COURT: That's where I was going to go. The issues have been resolved. Some ... consider the Woods stuff. Some I've already ... not relevant or not helpful as alternate suspects ... going to not consider -- I think most

## Page 63

if not all of it is the Woods stuff. I denied Batson. I denied alternate suspects. I denied medical records.

MR. STEWART: You didn't deny that.

THE COURT: I didn't, I'm sorry.

Due process of unreliable scientific evidence --

MR. STEWART: I have claim 1 denied. Claim 2 abeyance.

THE COURT: So, I'll review my record, too, but mostly Woods if not all Woods and to evaluate that claim which the Commonwealth agrees.

What definitely needs review is the part where the jury considered what Woods told the detectives as substantive evidence.

Now I'm going to go back a little bit. Woods testified in court, that can be believed. But when the detectives read in the unsigned statements, the jury could have considered that back then. What he told the detectives, the detective then read into the record and the jury could consider but it was unsigned.

You can't consider unsigned. They can consider that it is unsigned because he's unable to sign it. But, me and the DA agree with the defense that it's bullshit -- give me one second.

The bottom line, I'm just going to explain the

## Page 64

... the detectives read in the words of Woods ... didn't sign it is now out because I don't ... was unable to sign it so I can't consider ... the jury have considered that. ... have to say let me see what they read in, ... see what's left. And that's what I'm

MR. STEWART: And Judge, what you need to ... whether it undermines competence.

THE COURT: I know what to consider.

MR. STEWART: It's not what's left. That's ... says you can't do. The US Supreme Court ... --

THE COURT: I'll use the right verbiage. For ... the vernacular of basically what's left. ... use other fancier words. But I'll take it ... left, see if that would likely change

... the exact verbiage?

MR. STEWART: It's whether the Brady violations ... competence --

THE COURT: Undermine the competence and would ... a different conclusion.

MR. STEWART: No, a reasonable probability --

THE COURT: A reasonable probability --

51CR06025211989
Anthony Reid

Page 65

65

MR. STEWART: Not likely.

THE COURT: Reasonable probability.

Isn't reasonable probability and likely the same?

MR. STEWART: Nope.

THE COURT: I'm going to use those words when I make my ruling. But, the bottom line is I'll reevaluate it.

Is that fair?

MR. STEWART: That's fair, Your Honor.

THE COURT: And I'll use the exact perfect verbiage and consider the exact things that the higher Courts tell me two consider.

MR. STEWART: Thank you.

THE COURT: The bottom line is I'm going to talk out the stuff they shouldn't have heard and see what's left.

MR. STEWART: Thank you for your patience. This is a death penalty case, it matters.

THE COURT: I think I addressed every single issue and now it's time for me to get the notes of testimony and give myself thirty days to get it, sixty days to read it. See everybody in ninety days.

Does everybody understand what I did today? Pretty much everybody? Do both sides understand? Yes?

Page 66

66

...esn't understand raise their hand. You ...nd? Are you being funny? You don't ...mething? You can stay and I'll explain it to you.

...OURT OFFICER: 6/20.

...OURT: 6/20.

...TEWART: Let me just check.

...at's a good date.

...OURT OFFICER: Thank you.

(HEARING CONCLUDED)

Page 67

67

C-E-R-T-I-F-I-C-A-T-I-O-N

I hereby certify that the audio proceedings were transcribed accurately, as heard by me, and this copy is a correct transcript of the same.

GARY PASTER

EXHIBIT 2

FILED
04/09/2024 11:23:43 A
Post Trial Unit
By: K. JOH

# IN THE PHILADELPHIA COURT OF COMMON PLEAS

## CP-51-CR-0208091-2004

## COMMONWEALTH OF PENNSYLVANIA

v.

## LAVAR BROWN
### PCRA Petitioner

## THIS IS A CAPITAL CASE

## COMMONWEALTH'S RESPONSE TO PETITION FOR POST-CONVICTION RELIEF
### (Decedent Robert Crawford)

Paul M. George, ADA
Office of the District Attorney
3 South Penn Square
Philadelphia, PA 19107
paul.george@phila.gov

## SUMMARY OF ARGUMENT

Defendant's pleadings are voluminous, as is the Commonwealth's Response. In this Section, the Commonwealth provides a summary of its position regarding defendant's post-conviction claims. In the Argument section below (page 26), the Commonwealth sets forth its position in greater detail.

### A. The non-disclosure of Detective Baker as the officer who discovered the murder weapon does not entitle defendant to a new trial.

In May 2005, after a trial conducted by the Honorable M. Teresa Sarmina, a jury convicted defendant Lavar Brown of first-degree murder, with respect to the shooting death of decedent Robert Crawford. After a penalty hearing, the jury sentenced defendant to death. Brown, 987 A.2d at 703. In his second PCRA petition, defendant now argues for a new trial based on information recently discovered during defense counsel's review of the Commonwealth's files. According to a recently discovered document, Detective David Baker was apparently the officer who discovered the murder weapon in the undercarriage of the parked car where defendant hid during his flight from the crime scene.

During defendant's trial, Baker did not testify and no witness named him as the person who retrieved the gun. Thereafter, during the 2012-2016 litigation of his first PCRA petition, defendant repeatedly asked the Commonwealth to identify the detective who discovered the gun. In addition, the PCRA court at one point directed the Commonwealth to provide this name.

7

Although there is evidence suggesting that the first PCRA prosecutor at some point realized that Baker was the officer who found the gun, that information was never provided to the defense. Thereafter, believing that the prosecutor had been unable to determine who found the gun, the defense focused its attention on other, unrelated post-conviction issues. *See* Brown, 196 A.3d at 140-41 (addressing the issues litigated during defendant's first PCRA petition and affirming the lower court's denial of post-conviction relief).

Now, having recently learned through file review that Baker was evidently the detective who recovered the gun, defendant claims that Baker's history of misconduct in other matters—including his alleged misconduct during the trial of defendant's other murder case—discredits his actions here and calls into question whether defendant truly hid the gun in the undercarriage of the car. Defendant also argues that the Commonwealth purposely withheld Baker's name during the first PCRA proceeding, to prevent the defense from employing Baker's history of misconduct to challenge Baker's credibility and the overall credibility of the investigation of the Crawford murder. Supplement to PCRA Petition (2/28/22) at 1-7.

Here, the Commonwealth acknowledges that the defense repeatedly requested the identity of the officer who recovered the gun and that Baker's identity was never disclosed. Nevertheless, for two reasons, we oppose relief on

this claim. First, despite Baker's misconduct in other cases, there remains persuasive evidence indicating that he did not plant the gun in the undercarriage of the car where defendant was hiding (the essential thrust of defendant's claim). Second, unrelated to any actions taken by Baker, there was powerful evidence of defendant's guilt, including: (1) the identification testimony of three eyewitnesses (two of whom recognized defendant from prior contacts), and (2) defendant's desperate, post-incident flight from the crime scene with police officers in immediate pursuit (whose repeated instructions to stop he ignored).

In many cases, the Commonwealth has sorely overused the word "overwhelming" to describe the evidence of a particular defendant's guilt. In this case however, as will be demonstrated, defendant's guilt of the unprovoked murder of decedent Robert Crawford is obvious. Accordingly, because he cannot establish prejudice, he is not entitled to a new trial.

## B.    Although we do not agree that it is necessary, the Commonwealth will not oppose a limited evidentiary hearing.

For the reasons summarized in the previous subsection, an evidentiary hearing is unnecessary. However, if this Court were to determine otherwise, the Commonwealth would not oppose a hearing to determine whether the first PCRA prosecutor chose to withhold Baker's identity, due to concerns about Baker's misconduct in other cases.

9

As will be seen, there is a colorable question whether, at some point, the first PCRA prosecutor decided to withhold the fact that Baker found the gun. The existing record is not dispositive and it would be unfair to draw conclusions, one way or the other, without an evidentiary hearing. However, prior to handling defendant's earlier PCRA petition in *this* case, the same prosecutor handled an earlier PCRA proceeding in defendant's *other* murder case. During those earlier unrelated proceedings, the same defense attorneys accused Baker of giving false testimony during *that* trial. Because of her familiarity with the defense's allegations against Baker in defendant's other case, defendant now claims that the first PCRA prosecutor intentionally withheld Baker's identity as the gun-finder here.

Nevertheless, it bears repeating: an evidentiary hearing to resolve this question is unnecessary. Even if defendant was able to prove all of his contentions, the persuasive evidence of defendant's guilt precludes a finding of prejudice.

## C.    The basis for the Commonwealth's opposition to penalty phase relief.

As will be detailed below, defendant received a death sentence from a jury that never learned that there was significant evidence supporting a recognized mitigating factor—organic brain damage. Instead, his own defense team provided the jury with what was, very probably, incorrect expert testimony to

10

the effect that defendant had "no significant brain damage." Brown, 196 A.3d at 152. Where the jury remained uninformed regarding potentially convincing indicia of organic brain damage (including physical evidence derived from neuroimaging tests), one can have little confidence that every person on a fully informed jury would still reject all mitigators.

In addition, defendant recently received a new trial with respect to his other murder conviction. If this decision is upheld, the most powerful aggravator presented to defendant's jury in this case will no longer be applicable. Under these unique circumstances, there is certainly a concern that defendant's sentencing proceeding was not "suitably directed and limited," in a way that "ensure[d] that the sentencing authority [was] given adequate information and guidance." Gregg v. Georgia, 428 U.S. 153, 188, 195 (1976).

Yet, despite the concerns presented by this unique set of circumstances, the Commonwealth must oppose defendant's claim for penalty phase relief. Where the jury found one additional (albeit less compelling) aggravator and no mitigators, Pennsylvania precedent precludes relief.

## FACTUAL HISTORY

With the above summary in mind, this Section outlines the facts relevant to the underlying offense and to defendant's claims for post-conviction relief. First, in order to clarify its position regarding defendant's claim for guilt phase

11

**EXHIBIT 3**



## COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

COMMONWEALTH of PENNSYLVANIA    :

           :     CP-51-CR-0605181-2004

      v.                :

           :     (PCRA)

DARIEN HOUSER            :

### COMMONWEALTH'S RESPONSE TO INEFFECTIVENESS CLAIM REGARDING THE § 9711(d)(1) AGGRAVATING FACTOR

TO: THE HONORABLE M. TERESA SARMINA:

The Commonwealth responds here solely to Petitioner Darien Houser's ineffectiveness claim regarding trial counsel's stipulation to the applicability of the § 9711(d)(1) aggravating factor.[1] Although no reported opinions specifically address its applicability to Judicial Warrant Officers, decedent Sergeant Joseph LeClaire—fatally shot here in the line of duty—should be included among the class of murder victims enumerated in 42 Pa.C.S. § 9711(d)(1).[2]

---

[1] The Commonwealth takes no position here, either for or against, Houser's other penalty phase claims. Importantly, in the open King's Bench Petition in Commonwealth v. Cox, 102 EM 2018, the Pennsylvania Supreme Court will consider the constitutionality of Pennsylvania's death penalty, as applied. In its Response to that Petition, the Commonwealth has argued that the death penalty, as it has been applied, violates the Pennsylvania Constitution. In accordance with its position in Cox, the Commonwealth does not continue to seek the death penalty here pending the outcome of the King's Bench Petition.

[2] The Commonwealth agrees with Houser that the submission of an inapplicable aggravating factor to a jury that finds at least one mitigating factor invalidates that penalty proceeding. See Commonwealth v. Jones, 876 A.2d 380, 383 (Pa. 2005) (granting penalty phase relief where counsel failed to object to the inclusion of an uncharged aggravating circumstance); Commonwealth v. Goins, 495 A.2d 527, 534 (Pa. 1985) (granting penalty phase relief where the trial court erroneously allowed the jury to consider an inapplicable aggravator); Commonwealth v. Harvey, 812 A.2d 1190, 1199–2000 (Pa. 2002) (death sentence vacated where Commonwealth failed to "present sufficient evidence to establish all of the elements" of the aggravator).

1.    For the 9711(d)(1) aggravator to apply here, Sergeant LeClaire would have to be either a:

> ... peace officer, public servant concerned in official detention, as defined in 18 Pa.C.S. § 5121 (relating to escape), ... local law enforcement official, ... or person employed to assist or assisting any law enforcement official in the performance of his duties, who was killed in the performance of his duties or as a result of his official position.[3]

2.    Judicial Warrant Officers (JWOs) such as Sgt. LeClaire are employees of the Philadelphia Court of Common Pleas.  They are authorized to seize and detain individuals on bench warrant status.  Such officers are armed and use handcuffs in the performance of their duties.  According to the 1975 United States Department of Justice Report cited in Houser's pleadings, such an officer "has police powers, including those of arrest, and ... are armed with handguns ..." USDOJ Report, at 25.  According to a report prepared by the Court of Common Pleas in the same year (also cited in Houser's pleadings), a JWO's tasks include "physical apprehension." Philadelphia Standards and Goals – An Exemplary Court Project (1975), at 13.

---

[3]    42 Pa.C.S. § 9711(d)(1) provides for an aggravating circumstance where the decedent is:

> ... a firefighter, peace officer, public servant concerned in official detention, as defined in 18 Pa.C.S. § 5121 (relating to escape), judge of any court in the unified judicial system, the Attorney General of Pennsylvania, a deputy attorney general, district attorney, assistant district attorney, member of the General Assembly, Governor, Lieutenant Governor, Auditor General, State Treasurer, State law enforcement official, local law enforcement official, Federal law enforcement official or person employed to assist or assisting any law enforcement official in the performance of his duties, who was killed in the performance of his duties or as a result of his official position.

2

3.      As a JWO, Sgt. LeClaire's duties were those of a "peace officer ... as defined by § 18 Pa.C.S. § 501", as set forth in § 9711(d)(1).  Among other things, § 501 defines a Peace Officer as:

> Any person who by virtue of his office or public employment is vested by law with a duty to ... make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses...[4]

Because a JWO's duties include making arrests for a specific offense—failing to appear for trial or hearing pursuant to a lawful subpoena—a JWO falls within the statutory definition of a "Peace Officer".

4.      As a JWO, Sgt. LeClaire's duties were also those of a "public servant concerned in official detention, as defined in 18 Pa.C.S. § 5121", as set forth in § 9711(d)(1).  Among other things, § 5121 defines "official detention" as:

> ... arrest, ... or any other detention for law enforcement purposes; but the phrase does not include supervision of probation or parole, or constraint incidental to release on bail.[5]

---

[4]      The full text of 18 Pa.C.S. § 501 defines a Peace Officer as:

**"Peace officer."** Any person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses, or any person on active State duty pursuant to 51 Pa.C.S. § 508 (relating to active duty for emergency). The term "peace officer" shall also include any member of any park police department of any county of the third class.

[5]      The full text of 18 Pa.C.S. § 501(e) defines Official Detention as:

**(e) Definition.**--As used in this section the phrase "official detention" means arrest, detention in any facility for custody of persons under charge or conviction of crime or alleged or found to be delinquent, detention for extradition or deportation, or any other detention for law enforcement purposes; but the phrase does not include supervision of probation or parole, or constraint incidental to release on bail.

3

Because a JWO's duties include detaining persons who fail to appear for trial or hearing pursuant to a lawful subpoena, a JWO makes arrests for law enforcement purposes.  In addition, a JWO does not supervise probationers or parolees.  Nor does a JWO constrain anyone "incidental to release on bail".  To the contrary, the JWO's sole task is to locate and detain individuals who have engaged in a particular category of misconduct: failing to come to court pursuant to a lawful subpoena.

5.    As a JWO, Sgt. LeClaire's duties were also those of "local law enforcement officer", as set forth in § 9711(d)(1).  Among other things, 18 Pa. C.S. § 6102 defines a "law enforcement officer" as

> ... any person employed by any ... organization of the Commonwealth or political subdivision thereof who is empowered to effect any arrest with or without warrant and who is authorized to carry a firearm in the performance of that person's duties.[6]

A JWO is employed by an organization (the Philadelphia Court of Common Pleas) that is part of a political subdivision of the Commonwealth of Pennsylvania (Philadelphia County).  Since JWOs are also authorized to carry firearms and make arrests in the performance of their duties, their job description fulfills the § 6102 criteria for local law enforcement officers.

---

[6]    The full text of 18 Pa.C.S. § 6102 defines a law enforcement officer as:

> **"Law enforcement officer."** Any person employed by any police department or organization of the Commonwealth or political subdivision thereof who is empowered to effect an arrest with or without warrant and who is authorized to carry a firearm in the performance of that person's duties.

4

6.    As a JWO, Sgt. LeClaire's was also a "person employed to assist or assisting any law enforcement official in the performance of his duties", within the meaning of § 9711(d)(1).

District attorneys are law enforcement officers.  *See* 71 Pa.C.S. § 732-206 (" ... the district attorney shall be the chief law enforcement officer for the county in which he is elected").  District Attorneys seek bench warrants, when a lawfully subpoenaed individual fails to appear for a trial or hearing.  Here, Sgt. LeClaire attempted to apprehend an individual who failed to appear for a rape trial. Commonwealth v. Houser, 18 A.3d 1128, 1131 (Pa. 2011).  In so doing, Sgt. LeClaire was assisting the District Attorney to bring to trial an accused person who failed to appear for a criminal proceeding.  As such, he was a "person employed to assist ... any law enforcement official in the performance of his duties", as defined by § 9711(d)(1).

7.    The Supreme Court has determined that, when an individual is acting in the capacity of a "police officer" in the performance of his/her duties and when that individual has been specifically empowered by the Court of Common Pleas to carry out a police function, that individual's duties fulfill the criteria set forth in § 9711(d)(1).  *See* Commonwealth v. Gibbs, 626 A.2d 133, 137 (Pa. 1993) (individual appointed as a night watchman by the Court of Common Pleas covered by § 9711(d)(1)).

5

Because Sgt. LeClaire belonged to the class of individuals enumerated in 42 Pa.C.S. § 9711(d)(1), trial counsel was not ineffective for stipulating to the (d)(1) aggravating circumstance.

/s/ *Paul M. George, ADA*
Paul M. George, ADA
Assistant Supervisor, Law Division
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5730
paul.george@phila.gov

$\mathcal{T}_e \mathcal{LF}$

FILED
12/05/2023 01:38:22 PM
Post Trial Unit
By: N. VAN

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA
## TRIAL DIVISION – CRIMINAL SECTION

COMMONWEALTH OF
PENNSYLVANIA

v.

DARIEN HOUSER

CP-51-CR-0605180-2004
CP-51-CR-0605181-2004

PCRA

Honorable Scott DiClaudio

## COMMONWEALTH'S PARTIAL MOTION TO DISMISS

TO THE HONORABLE SCOTT DICLAUDIO:

In 2006, a jury convicted defendant of first-degree murder and sentenced him to death. In the instant, timely PCRA petition, defendant has raised 18 separate claims for relief. Of these claims, only one is meritorious. In his eighth claim, defendant convincingly argues that his mitigation counsel rendered ineffective assistance by failing to investigate and present mental health evidence at defendant's capital sentencing proceeding. Second Amended Petition, 7/19/23, at ¶¶ 308-407. See infra at pp. 20-23.

It is the Commonwealth's position that because mitigation counsel was ineffective, defendant is entitled to penalty-phase relief only as to his first-degree murder conviction and resultant death sentence. The Commonwealth respectfully requests that this Court grant defendant resentencing on his first-degree murder conviction, but dismiss defendant's remaining claims as meritless.

On May 5, 2012, defendant filed a timely, *pro se* PCRA petition. From 2012 to 2023, defendant filed several counseled, amended petitions. Between these filings, defendant filed serial *pro se* petitions to remove counsel, alleging that his various counsel were ineffective for not raising issues in the manner he wished. As a result of defendant's repeated filings, he is still, over a decade later, litigating the same first, timely PCRA petition.

## II.    SUMMARY OF THE ARGUMENT

Defendant raises 18 claims for post-conviction relief in his over 300-page petition. Of these claims, the Commonwealth has identified a single, meritorious penalty-phase claim. In his eighth claim for post-conviction relief, defendant has established that his mitigation counsel was ineffective for failing to investigate and present mental health evidence at defendant's capital sentencing. See Second Amended Petition at ¶¶ 308-407. Consequently, the Commonwealth respectfully requests this Court to grant penalty-phase relief with respect to defendant's first-degree murder conviction.

Defendant raises a substantially similar guilt-phase claim in his first post-conviction issue. Defendant argues that his trial counsel was ineffective for failing to investigate and present mental health evidence to support his self-defense argument. See id. at ¶¶ 57-93. This claim is without merit because, as the Supreme Court has determined, defendant was the aggressor in his conflict with the warrant

13

unit and, thus, self-defense was unavailable to him. Since defendant's first and eighth claims share a factual basis, the Commonwealth will address them together.

Thereafter, the Commonwealth will address each of defendant's meritless guilt-phase claims (post-conviction claims 2-7, 14, 15, and 18). The Commonwealth will then address defendant's claim 16, which is a penalty-phase claim related to his sentence for aggravated assault. This claim is, likewise, meritless. Finally, because defendant's eighth claim is meritorious, it is unnecessary for the Commonwealth and for this Court to address defendant's remaining penalty-phase claims related to the imposition of death (claims 8-13, and 17), because even if they had merit, these claims could not entitle defendant to any additional relief.

## III.  ARGUMENT

To be entitled to PCRA relief, the petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa. C.S. § 9543(a)(2). Here, defendant asserts ineffective assistance of his trial and appellate counsels. Id. at § 9543(a)(2)(ii).

Counsel is presumed effective, and defendant bears the burden of proving otherwise. Commonwealth v. Fears, 86 A.3d 795, 804 (Pa. 2014). To prove that counsel was ineffective, defendant must plead and prove: "(1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act."

14

EXHIBIT 4



2018 WL 4559963 (Pa.) (Appellate Brief)
Supreme Court of Pennsylvania,
Eastern District.

COMMONWEALTH OF PENNSYLVANIA, Appellee,
v.
Lenwood MASON, Appellant.

No. 759 CAP.
May 22, 2018.

Appeal from the July 14, 2017 Order Of the Philadelphia Court of Common Pleas Denying Appellant's Petition for Post-Conviction Relief At CP-51-CR-0700431-1994.

**Brief for Appellee**

Paul M. George, Assistant Supervisor, Law Division (25722), Lawrence J. Goode, Chief, Appeals Unit, Nancy Winkelman, Supervisor, Law Division, Lawrence S. Krasner, District Attorney of Philadelphia, Three Penn Square South, Philadelphia, PA 19107, (215) 686-5730, paul.george@phila.gov.

**\*2 TABLE OF CONTENTS**

SCOPE AND STANDARD OF REVIEW 4

COUNTER-STATEMENT OF QUESTIONS INVOLVED 5

COUNTER- STATEMENT OF THE CASE 6

SUMMARY OF ARGUMENT 9

ARGUMENT

I. The PCRA court properly denied relief where Appellant successfully moved to represent himself and explicitly waived his only remaining claim. 10

CONCLUSION 12

**ADDENDA**

Averment of Accuracy and Complete Representation

Certification of Compliance with Rule 2135

Certification of Service

**\*3 TABLE OF AUTHORITIES**

*Atkins v. Virginia*, 536 U.S. 304 (2002) *passim*

*Commonwealth v. Edmiston*, 65 A.3d 339 (Pa. 2013) 4

*Commonwealth v. Fahy*, 959 A.2d 312 (Pa. 2008) 4

*Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998) 7

COMMONWEALTH OF PENNSYLVANIA, Appellee, v...., 2018 WL 4559963...

*Commonwealth v. Mason*, 741 A.2d 708 (Pa. 1999) 6

*Commonwealth v. Mason*, 130 A.3d 601 (Pa. 2015) *passim*

*Commonwealth v. Sepulveda*, 144 A.3d 1270 (Pa. 2016) 11

## *4 SCOPE AND STANDARD OF REVIEW

When reviewing the denial of PCRA relief, this Court must determine whether the PCRA court's findings are supported by the record and without legal error. *Commonwealth v. Edmiston*, 65 A.3d 339, 345 (Pa. 2013). This Court's scope of review is limited to the findings of the PCRA court and the evidence on the record, viewed in light most favorable to the prevailing party. *Commonwealth v. Fahy*, 959 A.2d 312, 316 (Pa. 2008). The petitioner must demonstrate his or her entitlement to relief by a preponderance of the evidence. 42 Pa.C.S.A § 9543.

## *5 COUNTER-STATEMENT OF THE QUESTIONS PRESENTED

I. Did the PCRA court properly deny relief where Appellant successfully moved to represent himself and explicitly waived his only remaining post-conviction claim?

*- Answered in the affirmative below.*

## *6 COUNTER-STATEMENT OF THE CASE

### I. Procedural History

In February 1996, a jury convicted Appellant Lenwood Mason of murdering Ms. Iona Jeffries and sentenced him to death. On direct appeal, this Court affirmed his conviction and sentence. *Commonwealth v. Mason*, 741 A.2d 708 (Pa. 1999).

Appellant filed a counseled PCRA petition raising claims of trial counsel's ineffectiveness. Citing *Atkins v. Virginia*, 536 U.S. 304 (2002), his petition also included a claim that he was ineligible for the death penalty because of an intellectual disability. *Commonwealth v. Mason*, 130 A.3d 601, 652 (Pa. 2015).

During the lengthy course of the ensuing PCRA proceedings, Mr. Mason objected to his counsel's attempts to demonstrate that he was *Atkins*-ineligible for the death penalty. The PCRA court ultimately permitted Appellant to veto his lawyer's strategy and waive his *Atkins* claim. *Mason*, 130 A.3d at 656. The court also denied Appellant's ineffective assistance claims.

On appeal, this Court affirmed the denial of PCRA relief in all respects but one. This Court determined that the lower court erred in ruling that a defendant can veto defense counsel's pursuit of an *Atkins* claim. *7 Mason*, 130 A.3d at 671. This Court remanded for the PCRA court to either conduct a counseled *Atkins* hearing or allow Mr. Mason to represent himself, if he was competent to do so.¹ If competent to proceed *pro se*, Appellant could permissibly waive his *Atkins* claims. *Id.* at 671 (Pa. 2015).²

On remand, Mr. Mason successfully moved to represent himself.³ Thereafter, he explicitly waived his *Atkins* claim. Since his *Atkins* claim was the only remaining, unresolved issue, the PCRA court again denied PCRA relief. *PCRA Court Opinion*, at 7-9.

This appeal followed. In his *pro se* Brief for Appellant, Mr. Mason raises various issues, all of which are unrelated to the only

cognizable issue left undecided by this Court's prior Opinion - whether Mr. Mason is ineligible for the death penalty under *Atkins*.

**\*8 II. Factual History - The Underlying Charge**

On June 19, 1994, Defendant went to decedent Iona Jeffries' home, pushed past her mother, went into Ms. Jeffries' bedroom, and stabbed her to death. Her four-year old son was in bed with her and witnessed the attack. *Mason, supra,* 741 A.2d at 712-713.

## \*9 SUMMARY OF ARGUMENT

The PCRA court properly denied relief. The only issue left unresolved by this Court's prior decision was whether Mr. Mason is ineligible for the death penalty because of an intellectual disability. *Mason,* 130 A.3d at 671. On remand, Mr. Mason successfully moved to represent himself. After doing so, he explicitly waived any claim under *Atkins.* Having waived the only issue left unresolved by this Court's prior Opinion, his current *pro se* Brief for Appellant raises no cognizable issues.

## \*10 ARGUMENT

### I. The PCRA court properly denied relief where Appellant successfully moved to represent himself and explicitly waived his only remaining claim.

Appellant Lenwood Mason raised numerous claims for post-conviction relief in his initial, counseled PCRA petition. With the exception of his *Atkins* claim, the PCRA court rejected them all. The court never addressed the merits of his *Atkins* claim because, over his attorney's objection, the court permitted Mr. Mason to waive it. *Commonwealth v. Mason,* 130 A.3d 601, 671 (Pa. 2015).

On appeal, this Court affirmed the PCRA court's denial of post-conviction relief on all but the *Atkins* claim. This Court held that a counseled PCRA petitioner cannot veto a defense attorney's decision to pursue such a claim. This Court then remanded the matter for one of two things to occur: (1) Appellant could proceed with a counseled *Atkins* claim or, (2) if he was competent to do so, Appellant could represent himself and waive that claim. *Id.* at 671. Thus, on remand, there was only one claim for relief that the lower court could potentially address: whether Appellant was ineligible for capital punishment due to an intellectual disability.

**\*11** After a competency examination conducted by John S. O'Brien II, M.D., J.D., the PCRA court determined that Mr. Mason was competent to represent himself. *PCRA Court Opinion,* at 4. Thereafter, the PCRA court "informed petitioner on the record ... multiple times and in no uncertain terms, that he would not be permitted to raise new claims and that the parameters of the Supreme Court's remand meant that, if petitioner was allowed to proceed *pro se* and subsequently withdrew his *Atkins* claim, his petition would be dismissed." *PCRA Court Opinion,* at 9 n.21. Despite the PCRA court's warning, Appellant explicitly waived his *Atkins* claims and the lower court dismissed his petition. *PCRA Court Opinion,* at 5.⁴

Under these circumstances, Mr. Mason's *pro se* Brief for Appellant does not raise any cognizable claims. As the PCRA court's Opinion notes, "a PCRA court does not have discretion to treat new claims by a PCRA petitioner ... following a remand of that petition from an appellate court, unless such amendment is *expressly authorized* in the remand order." *PCRA Court Opinion,* at 6, *citing Commonwealth v. Sepulveda,* 144 A.3d 1270, 1280-1281 (Pa. 2016) (emphasis in original). Appellant's Brief raises new claims of "ineffective assistance of PCRA counsel" and the PCRA court's alleged abuse of discretion in declining to address such claims. *Brief for Appellant,* at 1-8. Where the lower court properly determined that it could not entertain new arguments, this Court should affirm the denial of post-conviction relief.

## CONCLUSION

For the reasons set forth above, this Court should affirm the PCRA court's decision dismissing Appellant's Petition for Post-Conviction Relief.

Respectfully submitted,

/s/ *Paul M. George*

PAUL M. GEORGE

Assistant Supervisor, Law Division

NANCY WINKELMAN

Supervisor, Law Division

CAROLYN ENGEL TEMIN

First Assistant District Attorney

LAWRENCE S. KRASNER

District Attorney of Philadelphia

### *13 AVERMENT OF ACCURACY AND COMPLETE REPRESENTATION

I certify that the electronic copy of Appellee's Brief is an accurate and complete copy of the paper version.

/s/ *Paul M. George*

PAUL M. GEORGE, ADA

### Footnotes

1    See generally ▨*Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998)

2    Only Justices Saylor, Baer, Todd, and Stevens considered Mr. Mason's appeal. Justice Stevens authored the majority Opinion and Justices Baer and Todd joined him in voting for affirmance. Justice Saylor would have granted penalty phase relief.

3    Before permitting Appellant to proceed *pro se,* the PCRA court ordered John S. O'Brien II, M.D., J.D. to conduct a competency exam. Dr. O'Brien determined that Defendant did not "demonstrate cognitive limitations to the extent that he is not able to understand the nature and object of his current proceedings." *PCRA Court Opinion,* at 4.

4    Thus, once again, the PCRA court concluded the proceedings without determining whether Mr. Mason suffers from

COMMONWEALTH OF PENNSYLVANIA, Appellee, v...., 2018 WL 4559963...

an intellectual disability that makes him ineligible for the death penalty.

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**[J-52-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 759 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on July |
| | : | 14, 2017 in the Court of Common |
| | : | Pleas of Philadelphia County, Criminal |
| v. | : | Division, at No. CP-51-CR-0700431- |
| | : | 1994 |
| | : | |
| LENWOOD MASON, | : | SUBMITTED:  June 13, 2018 |
| | : | |
| Appellant | : | |

## ORDER

**PER CURIAM**

**AND NOW,** this 17th day of October, 2018, the Order of the Court of Common Pleas of Philadelphia County is **AFFIRMED.**



# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| Lenwood Mason, | Docket Number 17-3759 |
| Petitioner, | |
| v. | Honorable Wendy Beetlestone<br>United States District Judge |
| John Wetzel, Secretary, PA<br>Department of Corrections, *et al.*, | **Capital Habeas Corpus Proceedings** |
| Respondents. | |

FEB 21 2018

By____ ____.D. Clerk

## PETITION FOR A WRIT OF HABEAS CORPUS
### PURSUANT TO 28 U.S.C. § 2254

Law Office of Michael Wiseman
PO Box 120
Swarthmore, PA 19081
215-450-0903
wiseman_law@comcast.net

Counsel for Petitioner
Lenwood Mason

Dated:      February 21, 2018
            Swarthmore, PA

diagnosis of depression. Consequently, significant and compelling mitigation was not presented to the jury. In short, as a result of counsel's deficient performance, only a minute part of the story was presented. No expert testimony was sought pertaining to Petitioner's severe drug abuse and the impact it had on his existing significant mental illnesses. The lay witness testimony that was presented therefore actually became aggravating, because no one was not able to draw the necessary connections between Petitioner's background, drug and alcohol abuse and mental health deficiencies. Nor was expert testimony obtained to explain the significance of Mr. Mason's learning disabilities and other mental health infirmities. Most significantly, reasonable investigation would have led effective counsel to the inescapable conclusion that further testing was required, which in turn would have produced the compelling body of evidence presented at the PCRA hearing that Mr. Mason suffers from organic brain damage.

**Judge Sarmina** issued an opinion following the hearing. *TCO 2*. Petitioner appealed to the Pennsylvania Supreme Court which affirmed in all respects (*Mason 2*), accept for the remand on the *Atkins* question.

### GROUNDS FOR RELIEF

Based upon the above facts and the state court record, Petitioner requests that the Court grant habeas corpus relief on the following grounds.

49

As to each of the following grounds for relief related to trial counsel ineffectiveness, Petitioner contends that trial counsel's act and/or omissions violated Petitioner's right to effective counsel secured by the Sixth and Fourteenth Amendments to the United States Constitution. As to each claim of appellate counsel ineffectiveness, Petitioner contends that direct appeal counsel violated Petitioner's constitutional right to effective direct appeal counsel secured by the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Moreover, as to each such claim of appellate counsel ineffectiveness, Petitioner contends that appellate counsel was ineffective for failing to raise the substantive issue in question, or for neglecting to raise it properly, as well as trial counsel's ineffectiveness for also not raising it.

Each of the following grounds were presented to the state courts during initial state post-conviction litigation and on appeal to the Pennsylvania Supreme Court.

**Ground 1.** Trial counsel was ineffective under the Sixth and Fourteenth Amendments for failing to investigate and present available evidence, including mental health-related evidence, in support of the guilt-phase defenses of heat of passion and/or voluntary intoxication, and diminished capacity. Appellate counsel was also ineffective for failing to fully and properly investigate and litigate this set of claims on direct appeal.

50

**Ground 2.** Petitioner's rights under the Confrontation Clause of the Sixth Amendment was violated when the Commonwealth elicited hearsay testimony from Police Officer Brown; trial counsel ineffectively failed to properly object, and appellate counsel was ineffective for not raising this claim on direct appeal.

**Ground 3.** The Commonwealth exercised its peremptory strikes in a gender-discriminatory manner when it struck a host of otherwise eligible and acceptable petit jurors; trial counsel was ineffective for failing to object, and direct appeal counsel ineffectively failed to raise this claim on direct appeal.

**Ground 4.** Trial counsel was ineffective with regard to his penalty phase representation, including failing to investigate and present extant mitigating evidence; appellate counsel was ineffective for failing to properly investigate and fully present this claim on direct appeal.

**Ground 5.** Petitioner's rights under the Eighth and Fourteenth Amendments were violated when the trial court improper curtailed questioning of Dr. Allan Tepper, when it would not permit him to answer whether "the defendant in a situation might be able to form the specific intent to kill while not being able to control his conduct?"; trial counsel ineffectively failed to litigate this issue, and direct appeal counsel ineffectively failed to raise it on direct appeal.

**Ground 6.** The trial court's failure to instruct the jury in the penalty phase that "life imprisonment" in Pennsylvania means life without possibility of parole

51

violated Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution; trial counsel ineffectively failed to request such an instruction and appellate counsel ineffectively failed to raise it.

**Ground 7.** The trial court improperly granted the Commonwealth's challenge for cause in violation of *Witherspoon v. Illinois*; trial and appellate counsel ineffectively failed to raise and/or litigate this claim.

**Ground 8.** Petitioner is entitled to relief due to the trial prosecutor's improper guilt and penalty phase closing arguments; trial and appellate counsel were ineffective for failing to object and or litigate this issue.

**Ground 9.** Petitioner is entitled to relief as to his conviction and sentence, due to the cumulative prejudice of the above described errors.

### REQUEST FOR RELIEF

Based upon the above assertions and the full state court record of this litigation, Petitioner requests the following relief:

1.    That Petitioner be permitted to file a brief in support of the *Petition*;

2.    That the Commonwealth be required to response to the allegations set forth herein;

52

3.    That discovery be permitted;

4.    That an evidentiary hearing be conducted on all disputed materials

issues of facts;

5.    That the Court grant the Writ of Habeas Corpus as to Petitioner's

convictions and sentences.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
PO Box 120
Swarthmore, PA 19081
wiseman_law@comcast.net
215-450-0903

Dated:    February 21, 2018

FEB 21 2018
By_____
Dep. Clerk

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 21th day of February 2018 I served a copy of the foregoing upon the following person by email:

Max Kaufman, Esq.*
Chief, Federal Litigation Unit
Office of the Philadelphia District Attorney

/s/ Michael Wiseman

53

Case 2:22-mc-00050-PD    Document 46    Filed 05/13/25    Page 64 of 190
Case 2:17-cv-03759-WB    Document 39    Filed 10/05/18    Page 1 of 3
Case 2:17-cv-03759-WB    Document 31    Filed 08/07/18    Page 1 of 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| Lenwood Mason, | Docket Number 17-3759 |
| Petitioner, | |
| v. | Honorable Wendy Beetlestone<br>United States District Judge |
| John Wetzel, Secretary, PA<br>Department of Corrections, *et al.*, | **Capital Habeas Corpus Proceedings** |
| Respondents. | |

**FILED**
OCT - 5 2018
KATE BARKMAN, Clerk
By_____
_____Dep. Clerk

**SO-ORDERED STIPULATION**

Petitioner, Lenwood Mason, through his counsel Michael Wiseman, and

Respondents, through their counsel, Assistant District Attorney Kelly Wear, hereby

stipulate to the following.

**Preamble**

1.    Petitioner is currently under a sentence of death imposed by the Court

of Common Pleas, Philadelphia County, under docket number CP-51-CR-0700431-

1994 (Phila., CCP).

2.    It is the intent of the parties to see that Mr. Mason no longer face a

sentence of death when the case is returned to the state courts at the conclusion of

these habeas corpus proceedings. Thus, the Stipulation should be construed to

effectuate that intent: that Mr. Mason never again face a sentence of death for his convictions under the above docket number.

## Stipulation

3.    The Parties hereby stipulate and agree to the grant of a writ of habeas corpus as to petitioner's sentence of death. Although the grant of relief as to the petitioner's death sentence would, in theory, permit respondents to pursue a new capital sentencing proceeding in state court, respondents hereby agree not to do so. Respondents agree to relief as to petitioner's death sentence only, and do not agree to relief with respect to petitioner's underlying convictions.

4.    Neither the parties' agreement to the grant of relief as to the petitioner's death sentence, nor the Court's approval of the same, shall be argued or construed in any form to constitute a concession or admission that any of petitioner's claims have merit or that there was otherwise a violation of petitioner's legal rights in this case.

5.    Upon the Court's acceptance of this Stipulation, the remaining guilt-phase claims will be resolved by the Court during the remaining course of this litigation.

**SO Stipulated**

/s/ Michael Wiseman                          /s/ Kelly Wear

Michael Wiseman                              Kelly Wear
Counsel for Petitioner                       Counsel for Respondents

Dated:       August 7, 2018                  August 7, 2018

**SO ORDERED,**

Oct. 5, 2018       Wendy Beetlestone
United States District Judge

EXHIBIT 5

Filed 1/26/2024 1:54:00 PM Supreme Court Eastern District
808 CAP

NO. 808 CAP

IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

COMMONWEALTH OF PENNSYLVANIA

v.

DONTE THOMAS

## COMMONWEALTH'S BRIEF FOR APPELLEE

Defense Appeal from the May 31, 2023 Order of the Philadelphia Court of Common Pleas, Denying Post-Conviction Relief at CP-51-CR-0606781-2006.

DANIEL CASULLO
Assistant District Attorney
PAUL M. GEORGE
Assistant District Attorney
LAWRENCE J. GOODE
Supervisor, Appeals Unit
NANCY WINKELMAN
Supervisor, Law Division
LAWRENCE S. KRASNER
District Attorney of Philadelphia

Office of the Philadelphia District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499
(215) 686-7656
*dan.casullo@phila.gov*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

COUNTER-STATEMENT OF THE QUESTIONS INVOLVED ......................... 1

COUNTER-STATEMENT OF THE CASE ....................................................... 2

SUMMARY OF ARGUMENT ....................................................................... 12

ARGUMENT

I.      **The PCRA court properly denied each of Defendant's allegations of prosecutorial misconduct** ......................................... 13

          *a.*    *Allegedly presenting false and misleading evidence* ............... 16

          *b.*    *Subpoena of phone calls* ......................................................... 35

          *c.*    *Recorded prison calls* ............................................................ 37

II.     **The PCRA court properly denied each of Defendant's claims of ineffective assistance of trial counsel** ............................. 39

          *a.*    *Pre-trial consultation* ............................................................ 42

          *b.*    *Failure to call witnesses and present an alibi defense* ............................................................................................. 51

          *c.*    *Trial preparation* ................................................................... 55

          *d.*    *Allegedly prejudicial inferences* ............................................ 67

          *e.*    *Jury instruction concerning Samuel Taylor's testimony* ................................................................................. 70

          *f.*    *Jury instruction concerning witnesses' recreational use of marijuana* ................................................................... 74

          *g.*    *Counsel's penalty phase argument* ......................................... 76

i

CONCLUSION ....................................................................................................78

Certificate of Brief Length ...............................................................................79

Appendix A: Ronald James Affidavit

Appendix B: Tella Mercado Affidavit

ii

### g. *Counsel's penalty phase argument (Claim XI).*

Defendant claims that counsel was ineffective because he "began his closing argument during the penalty phase of the trial by chastising and berating the jurors for their swift verdict during the guilt phase" (Brief for Defendant, at 128). He goes further to suggest that counsel "belittled and alienated the jury." Id. at 129-30. His argument grossly exaggerates the record. The portions of the argument quoted by Defendant exhibit that Mr. Tinari pled for the jury to carefully deliberate sentencing and not to rush to a sentence of death. While Mr. Tinari did note that the jury found Defendant guilty after a relatively short deliberation, he in no way acted inappropriately or disrespected the jury members (N.T. 9/19/07, 60-74).

At the PCRA evidentiary hearing, Mr. Tinari discussed his perspective of his penalty phase argument:

> I really believed when we went to trial, after knowing what I knew, I fully believed that the jury should have acquitted Mr. Thomas. . . . So I was pretty confident that we were going to come out of the trial with an acquittal.

> I was disappointed. I can tell you I was disappointed because when they did return [with a guilty verdict], I think that I was a little bit not only disappointed, but a little bit angry.

> Not in the sense that I couldn't contain myself when I addressed the jury. I talked about trepidation, because they had come back so very quickly with a verdict that I told them to at least take their time when you talk about the life of an individual.

> I think when I read my closing in regards to the penalty, I think you could see exactly what the whole tenor of my closing. . . . Because

76

there's always a – its heartfelt when a jury returns a verdict in any case, but in this case, death, no question about it; it's quite disturbing.

(N.T. 11/13/19, at 98-99). The record supports Mr. Tinari's assessment that the tenor of his argument was heartfelt and emphasized trepidation when a person's life was on the line. Accordingly, Defendant's claim that counsel's penalty phase argument amounted to ineffectiveness facially lacks arguable merit.

77

[J-21-2024]
IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 808 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated May |
| | : | 31, 2023, in the Court of Common |
| | : | Pleas of Philadelphia County, |
| v. | : | Criminal Division, at CP-51-CR- |
| | : | 0606781-2006 |
| | : | |
| DONTE L. THOMAS, | : | SUBMITTED: February 12, 2024 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE DONOHUE**                                         **DECIDED: September 26, 2024**

In September 2007, Donte Thomas was convicted of the first-degree murder of Tyreese Gaymon ("Victim") and sentenced to death.[1]  On direct appeal, this Court affirmed the judgment of sentence. *Commonwealth v. Thomas*, 54 A.3d 332 (Pa. 2012). In October 2013, Thomas filed a timely petition pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546, which he amended multiple times.  Following four days of hearings that occurred over two and a half years, the PCRA court dismissed Thomas' petition. This appeal followed. *See* 42 Pa.C.S. § 9546(d) ("A final court order under this subchapter in a case in which the death penalty has been imposed shall be directly

---

[1] Thomas was also convicted of carrying a firearm on public streets, recklessly endangering another person and conspiracy.  18 Pa.C.S. §§ 6108, 2705, 903.  No sentences were imposed in connection with these convictions.

appealable only to the Supreme Court pursuant to its rules."). After careful consideration of the claims raised by Thomas, we affirm the order of the PCRA court.

## Background

In 2004, Tyreek Gaymon, Victim's cousin, was shot and killed. Victim identified Kareem Glass as his cousin's killer to the police. On February 3, 2006, while Glass was incarcerated and awaiting trial for Tyreek's murder, Victim was shot and killed while standing on a street corner at approximately ten o'clock in the morning. The investigation led the police to multiple witnesses who were present at the shooting and identified Thomas as Victim's assailant. Thomas was arrested for the murder on April 19, 2006. At the time of his arrest, Thomas waived his *Miranda* rights and gave a statement to the police in which he admitted knowing Glass, who he stated goes by the nickname "Gus," and buying a cell phone for Glass and giving it to a female corrections officer to smuggle into the corrections facility for him. He also told the police that he had visited Glass multiple times in prison and that he visited Glass on January 31, 2006, three days before Victim's murder. Thomas also indicated that when he visited Glass on that day, Glass introduced him to a man who he knows by the name "Wanted," who was present during his visit with Glass. Thomas stated that at that time, Glass was worried about a witness that was set to testify against him but when he spoke with Glass after Victim's murder, Glass was more relaxed. Thomas denied that Glass asked him to shoot Victim. Thomas denied shooting Victim or knowing who did.

Among the evidence the Commonwealth produced at trial was the testimony of two of the identifying witnesses, Maurice Gaymon ("Maurice")[2] and Stanley Battle ("Battle"), both of whom are Victim's cousins. They testified that they were standing on

---

[2] Because multiple people involved in the history of this case share the last name Gaymon, to avoid confusion we refer to Maurice and Tyreek Gaymon by their first names.

9.    Conduct During Penalty Phase of Proceedings

In his final challenge to Trial Counsel's performance, Thomas maintains that counsel inappropriately chastised and berated the jury for returning a swift verdict in the guilt phase of the trial. Thomas' Brief at 128. He points to the following comments:

> Good morning, once again, ladies and gentlemen. Of course, I come before you with trepidation, because you already made a determination and made it swiftly, quickly. You made it to the point that you didn't even have the time to deliberate, to talk about it, to think about it so I come before you with the thought, while I was walking into the courtroom, that you would go back into that jury room and just come running back again and say death.
>
> ***
>
> [D]on't […] jump to another conclusion as quickly as you did to come to the point that you must put him to death.
>
> ***
>
> [Y]ou are asking to be God-like under these circumstances and, of course, the law has given you that kind of power. It has also given you the power to review carefully what you're about to do here, to take the time to review each and every factor that has come into this courtroom … .

*Id.* at 128-29 (quoting N.T., 9/19/2007, at 60-61; 66-67). Thomas complains that through these statements, Trial Counsel "belittled and alienated the jury by accusing them of violating their sworn duty to deliberate." *Id.* at 129-30. Thomas argues that even if trial counsel had been trying to ensure that the jury would take its time when considering whether to sentence him to death, "there were better, less contemptuous way to express that to the jury[,]" *id.* at 129, yet he does not identify what those other, better ways would have been. He again presumes prejudice rather than establishing it, stating only that "[t]his had to have prejudicially impacted on the jury's penalty phase determination even if it was only subliminally. The jury would not have sentenced [Thomas] to death in this

case absent such conduct by counsel." *Id.* at 130. We cannot presume this to be the case. It was Thomas' burden to prove that Trial Counsel's comments caused the jury to render a death sentence, and he has not met this burden. We therefore conclude that Thomas has failed to meet the threshold requirements for a claim of ineffective assistance of counsel, precluding relief on this issue.

## Prosecutorial Misconduct

Thomas makes two overarching claims of prosecutorial misconduct. We first address his claim that ADA Barry induced the presentation of false testimony, thereby depriving him of a fair trial and entitling him to the attachment of double jeopardy as guaranteed by Article I, Section 10 of the Pennsylvania Constitution. Thomas' Brief at 90. Although Thomas' argument on this point is meandering and difficult to follow, we discern that the allegedly false evidence at issue is testimony elicited by ADA Barry from Detective Piree regarding the recovery of a cell phone from Glass' prison cell. *Id.* at 87-89. Thomas argues that the Commonwealth used records from a cell phone found in Glass' possession to establish a connection between Glass and Thomas, and inferentially, a connection between Thomas and the murder. *Id.* at 90.

The basis for Thomas' claim begins with Detective Jeffrey Piree's testimony at trial that when taking Thomas' statement subsequent to his arrest, Thomas admitted to buying a cell phone for Glass and giving it to a corrections officer to smuggle it into prison, and that Glass would call him from that cell phone. ADA Barry then proceeded with the following line of questioning, upon which Thomas bases this claim:

> **ADA Barry:** As a result of that information regarding the [Corrections Officer], did you refer to [sic] that information the prisons?
>
> **Detective Piree:**     Absolutely. I got a date and all, April 20. I spoke with internal security at the prison.

**EXHIBIT 2**

1. Ali v. Wetzel
2. Birdsong v. Wetzel
3. Gibson v. Wetzel
4. Gwynn v. Beard
5. Hannibal v. Wetzel
6. Murphy v. Wetzel
7. Mason v. Wetzel
8. Marshall v. Wetzel
9. Fletcher v. Beard

# POST-2018 KRASNER DAO CONCESSION CASES IN FEDERAL DISTRICT COURT

## 1.    Ali v. Wetzel, 11-cv-1812 (Robreno, J.)

The district court appointed the Attorney General ("AG") to investigate the case and to state a position on the concession.

### - The issue

Improper commentary on defendant's silence during the penalty phase.  At the penalty hearing, the defense called defendant's son; on cross, the prosecutor asked whether defendant had expressed remorse for the murder; son said that they didn't talk about that, the prosecutor argued, in closing, that the jury had not heard anything in the way of remorse from the defendant.

### - The district court's Order granting relief

The court issued an Order accepting the concession:

> [T]his Court must undertake an independent review of the merits of the constitutional claim…Upon an independent review of the privilege against self-incrimination claim, the Court finds that the prosecutor's comments during the penalty phase violated Ali's clearly established rights under the Fifth Amendment to the Constitution of the United States.

Order (8/13/20), Document 122, at 2.

### - The Commonwealth's agreement

The joint stipulation submitted to the court outlined the factual basis for the claim and the applicable reported opinions.  Amended Joint Motion (9/18/19)

Note: *Ali* is the case referenced in footnote DAO brief in Kings' Bench Petition that has been amended for clarification as to federal court's independent review.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Imanuel Bassil Ali, | : | CIVIL ACTION |
| | : | NO. 11-1812 |
| Plaintiff | : | |
| v. | : | |
| | : | |
| John E. Wetzel, et al., | : | |
| | : | |
| Defendants. | : | |

**ORDER**

**AND NOW**, this **13th** day of **August, 2020**, after

considering the petition for a writ of habeas corpus (ECF No.

26), Petitioner's memorandum in support of the petition (ECF No.

51), the Commonwealth's response in opposition to the petition

(ECF No. 64), Petitioner's reply in support of the petition (ECF

No. 72), the parties' joint amended motion for partial grant of

the petition (ECF No. 98), the Attorney General's memorandum of

law (as amicus) in opposition to the motion for a partial grant

of the petition (ECF No. 104), and Petitioner's response in

support of the motion for a partial grant of the petition (ECF

No. 108), and after a hearing on the record on December 16,

2019, it is hereby **ORDERED** that:

1. The parties' joint amended motion for partial grant of

   the petition for a writ of habeas corpus (ECF No. 98)

   is **GRANTED**;[1]

---

[1]     The parties bring a joint motion seeking a partial grant of the writ of
habeas corpus as to the capital sentence imposed in this case. Because the

2. The petition for a writ of habeas corpus (ECF No. 26) is **GRANTED in part** as to Claim XV, and the other claims in the petition remain before the Court pending the parties' resolution of discovery disputes and resentencing;

3. Petitioner's capital sentence is **VACATED**; and

---

joint nature of the motion deprived the Court of the adversarial context in which to consider the issues raised by the parties, the Court sought and received an amicus brief from the Office of the Pennsylvania Attorney General. The Court is thankful for their participation.

In the penalty phase of the case, the prosecutor made various comments regarding Ali's lack of remorse. These comments included asking Ali's son whether his father had expressed any remorse and asserting that the jury did not "hear" any remorse from Ali. Accordingly, the parties argue that the prosecutor's comments violated Ali's privilege against self-incrimination and rendered the sentence unconstitutional. See Estelle v. Smith, 451 U.S. 454, 462-63 (1981) ("We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned."); Griffin v. California, 380 U.S. 609, 615 (1965) ("We take that in its literal sense and hold that the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.").

To obtain habeas relief, a petitioner must (1) file a timely petition, (2) be in custody, (3) assert a violation of the Constitution or laws or treatises of the United States, (4) have exhausted state remedies, and (5) show that the violation overcomes the deference habeas provides to state court rulings. 28 U.S.C. §§ 2244(d), 2254. Here, there is no dispute that the petitioner filed a timely petition, is in custody, asserts a violation of the Constitution, exhausted state remedies, and asserts a violation that meets the deferential habeas standard of review. Yet, while the Commonwealth may waive the exhaustion requirement, Sharrieff v. Cathel, 574 F.3d 225, 229 (3d Cir. 2009), and the statute of limitations, Robinson v. Johnson, 313 F.3d 128, 134 (3d Cir. 2002), this Court must undertake an independent review of the merits of the constitutional claim. Wharton v. Vaughn, 371 F. Supp. 195, 200, 202 (E.D. Pa. 2019).

Upon an independent review of the privilege against self-incrimination claim, the Court finds that the prosecutor's comments during the penalty phase violated Ali's clearly established rights under the Fifth Amendment to the Constitution of the United States, Estelle v. Smith, 451 U.S. 454 (1981), and Griffin v. California, 380 U.S. 609 (1965).

2

4. The Philadelphia Court of Common Pleas shall

   **RESENTENCE** Petitioner in <u>Commonwealth v. Ali</u>, CP-51-

   CR-1103001-1990, by **December 11, 2020.**


   **AND IT IS SO ORDERED.**


                              _/s/ Eduardo C. Robreno_
                              EDUARDO C. ROBRENO, J.

3

### 2. Birdsong v. Wetzel, 11-cv-4240 (Schmehl, J.)

#### - The issue

Ineffective assistance in failing to present available mitigation evidence.

#### - The district court's Order granting relief

> The Court finds that Petitioner was deprived or the effective assistance of counsel at the sentencing phase of trial, based on counsel's failure to investigate and present available mitigating evidence

Order (1/2/20), Document 103.

#### - The Commonwealth's agreement

The parties filed a joint stipulation stating the reasons for the agreement:

> … trial counsel's deficient performance prejudiced Petitioner because the unpresented evidence of trauma, impairment, and childhood depravation was substantial.

Stipulation (8/12/19), Document 99, at 3.

The DAO's position reasonably reflected the views of Chief Justice Saylor who filed a lengthy dissent on the PCRA appeal criticizing trial counsel's lack of preparation for the penalty phase and the PCRA court's restrictions on defendant's ability to present evidence at the PCRA hearing.  Justice Todd joined in the dissent.

Commonwealth v. Birdsong, 24 A.3d 319, 356 (Pa. 2011)

2

### 3. Gibson v. Wetzel, 11-cv-4550 (Jones, J.)

#### - The issue

Ineffective assistance in failing to present available mitigation evidence.

#### - The district court's Order granting relief

The Order indicated that the Court accepted the Stipulation "upon consideration of … the full record in this case":

> [U]pon consideration of the Petitioner's Petition for Writ of Habeas Corpus … the parties' Stipulation …, and the full record in this case, it is **ORDERED** as follows:

> The Court finds that Petitioner was deprived of the effective assistance of counsel at the sentencing phase of trial based on counsel's failure to investigate, develop, and present available mitigating evidence.

Order (2/24/21) Document 110.

#### - The Commonwealth's agreement

The parties stipulated to death penalty relief, stating:

> A finding of prejudice is also appropriate in light of counsel's actual mitigation presentation at trial, which included no records or expert testimony and filled approximately forty pages of testimony.

Stipulation (1/28/21) Document 108.

The trial defense attorney entered his appearance a few days before trial and did not conduct any penalty phase preparation. Commonwealth v. Gibson, 951 A.2d 1110, 1118 (Pa. 2008). The trial PCRA court twice granted penalty relief, but the Supreme Court reinstated the death penalty. Commonwealth v. Gibson, 19 A.2d 512 (Pa. 2011).

3

## 4. <u>Gwynn v. Beard</u>, 08-cv-5061 (Tucker, J.)

### - The issue

Ineffective assistance in failing to present available mitigation evidence.

### - The district court's Order granting relief

The Court's Order accepted the Stipulation "upon consideration of ... the full record in this case":

> [U]pon consideration of the Petitioner's Petition for Writ of Habeas Corpus ... the parties' Stipulation ..., and the full record in this case, it is **ORDERED** as follows:

> The Court finds that Petitioner was deprived of the effective assistance of counsel at the sentencing phase of his trial based on counsel's failure to investigate, develop, and present available mitigating evidence

Order (1/13/21) Document 107.

### - The Commonwealth's agreement

> A finding of prejudice is also appropriate in light of counsel's actual mitigation presentation at trial, which consisted of brief testimony from a few witnesses who did not present material mitigating evidence.

<u>Stipulation</u> (12/18/20) Document 106.

Justices Saylor and Todd) would have remanded the case on the issue of ineffective of counsel for failure to properly prepare for the penalty phase. Justice Saylor stated:

> According to various witnesses, counsel spent less than an hour meeting with Appellant's family, did not explain the family's potential role as mitigation witnesses at the penalty phase of trial, and did not inquire about Appellant's childhood or background.

<u>Commonwealth v. Gwynn</u>, 943 A.2d 940, 953 (Pa. 2008).

4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

Daniel Gwynn,

        Petitioner,     )     Civil Number:  08-5061

                      )

     v.                )

                      )     *This is a Capital Case*

Jeffrey A. Beard, et al.,     )

                      )

        Respondents.     )

---

## STIPULATION TO PETITIONER'S ENTITLEMENT TO SENTENCING RELIEF

Petitioner Daniel Gwynn, through counsel, and Respondents, through the Philadelphia District Attorney's Office, respectfully stipulate to Petitioner's entitlement to sentencing relief based on Claim I of his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 5), as follows:

### Purpose of Stipulation

The parties agree that the terms of this Stipulation are in their respective interests.  The purpose of this Stipulation is to reflect the parties' agreement that Mr. Gwynn should be granted relief from his death sentence, and it is anticipated that the Commonwealth will not pursue the reimposition of a sentence of death upon the return of the case to the Pennsylvania courts. The parties do not intend this Stipulation to alter their respective positions on Mr. Gwynn's claims that he is entitled to relief from his convictions.

### Procedural History

Petitioner Daniel Gwynn is a death-sentenced Pennsylvania prisoner seeking habeas corpus relief under 28 U.S.C. § 2254. The crimes for which Mr. Gwynn was prosecuted occurred on

**A223**

November 20, 1994. Mr. Gwynn was convicted and sentenced to death in the Philadelphia Court of Common Pleas in November 1995.

The Pennsylvania Supreme Court affirmed his convictions and death sentence on direct appeal. *Commonwealth v. Gwynn*, 723 A.2d 143 (Pa. 1998). The state court subsequently denied his post-conviction challenges. *Commonwealth v. Gwynn*, 943 A.2d 940 (Pa. 2008); *Commonwealth v. Gwynn*, No. 644 CAP (June 17, 2013) (per curiam).

Mr. Gwynn filed a Petition for Writ of Habeas Corpus in federal court on March 7, 2009. In Claim I, Petitioner alleges that his trial counsel provided constitutionally ineffective assistance in failing to investigate, develop, and present available mitigating evidence at the capital sentencing phase of his trial. (ECF No. 5 at 4-27).

## Terms of Stipulation

The following constitute the terms of the parties' Stipulation:

1. This Court shall vacate Petitioner's death sentence by conditionally granting the Petition for Writ of Habeas Corpus as to Claim I, which alleged that trial counsel was ineffective for failing to investigate, develop, and present available mitigating evidence at the capital sentencing phase of Petitioner's trial.

2. Respondents decline to assert, and affirmatively waive, any procedural default defenses to Claim I. Petitioner and Respondents agree that the standards for review under 28 U.S.C. § 2254 do not bar relief as to Claim I.

3. Petitioner and Respondents agree that trial counsel's mitigation investigation and presentation were constitutionally deficient because, among other things, counsel failed to interview significant witnesses, collect relevant social history records, hire a mitigation investigator, and engage a mental health expert.

4. Petitioner and Respondents agree that trial counsel's deficient performance prejudiced Petitioner because the unpresented evidence of Petitioner's childhood abuse and neglect, his mental health impairments, and his history of substance abuse was substantial and of a similar nature to the unpresented evidence upon which the United States Supreme Court has granted relief on similar post-conviction claims. A finding of prejudice is also appropriate in light of counsel's actual mitigation presentation at trial, which consisted of brief testimony from a few witnesses whose only instruction was to beg for Petitioner's life.

**A224**

5. The parties anticipate that, upon acceptance of this Stipulation, the Court will treat Petitioner's other claims regarding his death sentence as moot (Claims VI, VII, IX, XI, and XII, as well as the sentencing phase aspect of Claims VIII and XIV), and proceed to consider Petitioner's remaining claims challenging his convictions only.

6. The parties further anticipate that the Court's conditional grant of the writ as to Petitioner's death sentence will form a part of its final order in these habeas proceedings.

7. A proposed order encompassing the terms of the Stipulation is attached for the Court's consideration.

## SO STIPULATED:

/s/ *Matthew Stiegler*
Matthew Stiegler
7145 Germantown Ave. Suite 2
Philadelphia, PA 19119
(215) 242-1450
Matthew@StieglerLaw.com

/s/ *Gretchen M. Engel*
Gretchen M. Engel
Center for Death Penalty Litigation
123 W. Main Street, Suite 700
(919) 956-9545
Gretchen@cdpl.org

*Counsel for Petitioner*

Dated December 18, 2020

/s/ *Max Kaufman*
Max Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-8000
Max.Kaufmann@phila.gov

**A225**

## 5. Hannibal v. Wetzel, 13-cv-0619 (McHugh, J.)

### - The issue

Ineffective assistance in failing to present available mitigation evidence.

### - The district court's Order granting relief

The Court accepted the Stipulation "upon consideration of … the full record in this case":

> The Court finds that Petitioner was deprived of the effective assistance of counsel at the sentencing phase of trial based on counsel's failure to investigate, develop, and present available mitigating evidence

(2/7/20) Document 41

### - The Commonwealth's agreement

> Petitioner and Respondents agree that trial counsel's deficient performance prejudiced Petitioner because defense counsel did not present material mitigating evidence of brain damage and borderline intellectual functioning.

Stipulation (2/4/20) Document 40

The PCRA courts denied relief by crediting the Commonwealth's mental health expert over the testimony of the defense expert. Commonwealth v. Hannibal, 156 A.3d 197, 228 (Pa. 2016).

However, under federal law, the proper issue was not whether the PCRA court believed one expert as opposed to the other, but whether one juror might have been convinced by the defense expert. See Saranchak v. Beard, 616 F.3d 292, 309 (3d Cir. 2010) (state supreme court erroneously considered the effect the new evidence would have had a particular factfinder "rather than considering, more abstractly, the effect the same evidence would have had on an unspecified, objective factfinder, as required by Strickland").

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SHELDON HANNIBAL, | : |
| Petitioner, | : |
|  | : CIVIL ACTION |
| v. | : No. 13-0619 |
| JOHN E. WETZEL, Secretary, Pennsylvania Department of Corrections; ROBERT GILMORE, Superintendent of the State Correctional Institution at Greene; MARK GARMAN, Superintendent of the State Correctional Institution at Rockview, | : Hon. Gerald A. McHugh |
|  | : **THIS IS A CAPITAL CASE** |
|  | : |
| Respondents. | : |
|  | : |

### STIPULATION TO PETITIONER'S ENTITLEMENT TO SENTENCING RELIEF

Petitioner, Sheldon Hannibal, through counsel, and Respondents, through their counsel, the Philadelphia District Attorney's Office, respectfully stipulate to Petitioner's entitlement to sentencing relief based on Claim VII of his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 5), as follows:

### PURPOSE OF STIPULATION

The parties agree that the terms of this Stipulation are in their respective interest. The purpose of this Stipulation is to reflect the parties' agreement that Mr. Hannibal should be granted relief from his death sentence, and it is anticipated that the Commonwealth will not seek to re-impose a sentence of death upon the return of the case to the Pennsylvania courts. The parties do not intend this stipulation to alter their respective positions on Mr. Hannibal's claims that he is entitled to relief from his convictions.

1

**A228**

## PROCEDURAL HISTORY

Petitioner Sheldon Hannibal is a death-sentenced Pennsylvania prisoner seeking habeas

corpus relief under 28 U.S.C. § 2254. The crimes for which Mr. Hannibal was prosecuted

occurred on October 25, 1992, and his capital trial was held in the Philadelphia Court of

Common Pleas in March 1994. Mr. Hannibal was convicted and sentenced to death.

On June 20, 2000, the Pennsylvania Supreme Court affirmed his convictions and

sentence on direct appeal. *Commonwealth v. Hannibal*, 753 A.2d 1265 (Pa. 2000). The court

subsequently denied his post-conviction challenges. *Commonwealth v. Hannibal*, 156 A.3d 197

(Pa. 2016).

On July 28, 2017, Petitioner filed his Petition for Writ of Habeas Corpus Pursuant to 28

U.S.C. § 2254 in this Court. In Claim VII, Petitioner alleged that his trial counsel provided

constitutionally ineffective assistance in failing to investigate, develop, and present available

mitigating evidence at the capital sentencing phase of trial. ECF No. 5 at 50-66.[1]

Petitioner filed a discovery motion on November 2, 2017. ECF No. 8. On October 4,

2019, the Commonwealth agreed to make the original files of the Philadelphia Police

Department and the Philadelphia District Attorney's Office available for review. That review

was completed in December 2019.

## TERMS OF STIPULATION

The following constitute the terms of the parties' Stipulation:

1.     This Court should vacate Petitioner's death sentence by conditionally granting the
Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 5) as to Claim VII,
which alleged that trial counsel was ineffective for failing to investigate, develop, and present
available mitigating evidence at the capital sentencing phase of trial.

---

[1] Pin cites to court documents refer to the page numbers printed on the submitted document, not
necessarily to the page number provided by the Court's ECF system.

2

**A229**

2.      Respondents decline to assert, and affirmatively waive, any procedural default defenses to Claim VII. Petitioner and Respondents agree that the standards of review under 28 U.S.C. § 2254 do not bar relief as to Claim VII.

3.      Petitioner and Respondents agree that trial counsel's mitigation investigation and presentation were constitutionally deficient because, inter alia, counsel failed to obtain and present available mitigation information from family members, lay witnesses, and professional witnesses; failed to obtain, review, and/or present available social history records; failed to consult with mental health experts; and failed to adequately consult with the client.

4.      Petitioner and Respondents agree that trial counsel's deficient performance prejudiced Petitioner because the unpresented evidence of brain damage and borderline intellectual functioning was substantial and of a similar nature to the unpresented evidence upon which the United States Supreme Court has granted relief on similar post-conviction claims. A finding of prejudice is also appropriate in light of counsel's actual mitigation presentation at trial, which included no records or other material evidence and filled a scant twenty-two pages of transcript—including testimony and argument. NT 3/11/94, 43-58.

5.      The parties anticipate that, upon acceptance of this Stipulation, the Court will treat Petitioner's other claims regarding his death sentence as moot (Claims VI, VIII, IX, X, XI, XII, and XIII) and proceed to consider Petitioner's remaining claims challenging his convictions only.

6.      The parties further anticipate that the Court's conditional grant of the writ as to Petitioner's death sentence will form a part of its final order in these habeas proceedings.

7.      A proposed order encompassing the terms of the Stipulation is attached for the Court's consideration.

**SO STIPULATED:**

/s/ Shawn Nolan
SHAWN NOLAN
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Unit
The Curtis Center, Suite 545W
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

*Counsel for Petitioner*


Dated: February 4, 2020

/s/ Max Kaufman
MAX KAUFMAN
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-8000

*Counsel for Respondents*

3

**A230**

6.    <u>Murphy v. Wetzel</u>, 99-cv-6362 (Surrick, J.)

**- The issue**

Defendant sentenced to death based, in part, on a conviction that was subsequently overturned.

**- The district court's Order granting relief**

The court entered the proposed Order, stating:

> Specifically, the Court finds that the sentencing jury based its death verdict at least in part on a criminal conviction in another case that was subsequently reversed on appeal.

Order (4/23/21) Document 33.

**- The Commonwealth's agreement**

As set forth in the Stipulation, (4/7/21) Document 32:

Evidence of a subsequently overturned murder conviction undermined the validity of the death sentence, even though defendant later ended up pleading guilty to that murder. New *convictions* entered after the present conviction cannot be the basis for an aggravator. <u>Commonwealth v. Karabin</u>, 559 A.2d 19, 23-24 (Pa. 1989).

The sentencing hearing was compromised when the Commonwealth offered evidence during the penalty phase that defendant was already facing a sentence of death for another murder. Although that was true at the time of the penalty hearing, it stopped being true when the other murder was vacated. At least one juror could incorrectly have viewed a new death sentence as redundant.

6

Case 2:22-mc-00050-RBD Document 46 Filed 05/13/25 Page 93 of 190
Case: 22-2839 Document: 18 Page: 176 Date Filed: 04/23/2023

Case 2:99-cv-06362-RBS Document 300-2 Filed 04/07/21 Page 125 of 659

IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRAIG MURPHY, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | No. 99-6362 |
| v. | : | |
| | : | **Hon. R. Barclay Surrick** |
| JOHN E. WETZEL, et al., | : | **United States District Judge** |
| | : | |
| Respondents. | : | |

## STIPULATION TO PENALTY PHASE RELIEF

The parties jointly submit this Stipulation to Penalty Phase Relief on Claim I of the
Petition for Writ of Habeas Corpus. (Doc. 10). Claim I alleges that Petitioner's death sentence is
invalid because the jury considered a sentence in another case that was subsequently reversed on
appeal in support of its finding of an aggravating circumstance. (*See* Doc. 10 at 9-31).

The parties hereby stipulate that this claim is properly before the Court. The parties
stipulate that there are no disputes of material fact as to this claim. The parties further stipulate
that Petitioner's entitlement to relief on this claim is clear. *See Johnson v. Mississippi*, 486 U.S.
578, 584-86 (1988) (holding that a death sentence based on a prior conviction that is
subsequently reversed violations the Eighth and Fourteenth Amendments); *Commonwealth v.
Karabin*, 559 A.2d 19, 22-24 (Pa. 1989) (affirming vacation of death sentence on facts materially
indistinguishable from this case).

1

**A240**

By and through this stipulation the parties intend to be—and are—legally bound by their

agreement. *See, e.g., Brown v. Tennessee Gas Pipeline Co.*, 623 F.2d 450, 454 (6th Cir. 1980)

*Combustion Sys. Servs., Inc. v. Schuylkill Energy Resources, Inc.*, No. 92-cv-4228, 1994 WL

229762, at *2 (E.D. Pa. 1994).

The Commonwealth concedes only that relief from the death penalty is appropriate and

does not concede relief with respect to any of Petitioner's guilt phase claims. The parties agree

that Petitioner's guilt phase claims will remain unaffected by this stipulation and will be litigated

in due course. A proposed order that effectuates this stipulation and orders re-sentencing by the

state court is attached.

IT IS SO STIPULATED.


Respectfully submitted,                          Respectfully submitted,


/s/ Loren D. Stewart                             /s/ Paul George
Loren D. Stewart                                 Paul George
David Zuckerman                                  Assistant Supervisor
Assistant Federal Defenders                      Law Division
Federal Community Defender Office                Philadelphia District Attorney's Office
  for the Eastern District of Pennsylvania       Three South Penn Square
Curtis Center, Suite 545 West                    Philadelphia, PA 19107-3499
601 Walnut Street                                (215) 686-5730
Philadelphia, PA 19106
(215) 928-0520

Dated: April 7, 2021


2

**A241**

7. <u>Mason v. Wetzel</u>, 17-cv-3759 (Beetlestone, J.)

**- The issue**

Ineffective assistance in failing to present available mitigation evidence.

**- The district court's Order granting relief**

The proposed agreement to penalty relief in this case does not explain the basis for the agreement:

> The Parties hereby stipulate and agree to the grant of a writ of habeas corpus as to petitioner's sentence of death.

Order (10/5/18) Document 39.

**- The Commonwealth's agreement**

Justice Saylor stated in dissent:

[I]t appears that this evidence could have been better developed, and there was a substantial quantity of other available mitigation.

For example, in his closing remarks, rather than focusing closely upon the impact of Appellant's intellectual disability upon his moral culpability, counsel ruminated on his personal role in defending against a death sentence.

[Counsel] stood in front of a death-qualified jury attempting to draw a comparison between modern-day capital proceedings and the Salem witch trials…Only a few short and somewhat disjointed passages from the closing touched upon the actual mitigation evidence developed on the record… Given such shortcomings, and in light of the availability of a more developed mitigation case, I find the representation to have been sufficiently deficient that a new penalty proceeding is implicated.

<u>Com. v. Mason</u>, 130 A.3d 601, 675 (Pa. 2015).

<u>Note</u>: DAO had opposed relief in the State Supreme Court.  See Exhibit 1 to Pre-Hearing Memorandum of Law

7

## 8. <u>Marshall v. Wetzel</u>, 03-cv-3308 (Leeson, J.)

The district court granted penalty phase relief following a joint Status Report filed by the parties. The court entered an Order stating the court had reviewed all of the documents filed by the parties before and after DA Krasner took office and found grounds for death penalty relief.

### - The issue

Ineffective assistance in failing to present available mitigation evidence.

### - The Commonwealth's agreement

PCRA counsel failed to present available expert mental health testimony supporting defendant's mitigating mental health claims. The Supreme Court rejected the claim on the erroneous ground that trial counsel did not have a rational basis for failing to do so:

> Assuming arguendo that Dr. Toomer's affidavit and Dr. Armstrong's report are sufficient to establish arguable merit and prejudice in connection with Appellant's instant ineffectiveness claim, Appellant still fails to prove, as is his burden, that his prior counsel had no reasonable basis for failing to investigate and present mental health mitigation in support of the mental health mitigating circumstances set forth at 42 Pa.C.S. § 9711(e)(2) and (3) at his 1984 penalty phase hearing and 1990 penalty phase rehearing.

<u>Commonwealth. v. Marshall</u>, 812 A.2d 539, 547 (Pa. 2002).

8

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEROME MARSHALL<br>**Petitioner** | : | **CIVIL ACTION** |
| v. | : | |
| JOHN E. WETZEL, et al.<br>**Respondents** | : | **NO. 03-03308.** |

## STATUS REPORT

1.  Petitioner is a Pennsylvania death-row prisoner who was convicted of three counts of first-degree murder and received two death sentences.

2.  Pending before this Court is petitioner's petition for a writ of habeas corpus pursuant to 28 U.C.S. § 2254.

3.  On May 9, 2018, the Court ordered that "on or before June 6, 2018 counsel for Respondents shall advise the Court and Petitioner's counsel [of] the status of the review of Petitioner's death sentences" (Doc. No. 170 at 1).

4.  Respondents hereby report that they intend to agree to the grant of a conditional writ of habeas corpus with respect to petitioner's death sentences only.[1]

5.  In addition, respondents intend to agree that, following the grant of a conditional writ as to petitioner's death sentences, they will not seek new death sentences in state court.

---

[1] Respondents do <u>not</u> intend to concede habeas relief as to petitioner's underlying convictions.

1

**A234**

Case 2:22-mc-00050-PD Document 18 Page: 168 Date Filed 01/23/2023
Case 2:22-mc-00050-PD Document 48 Filed 05/15/25 Page 98 of 190

Case 2:12-cv-03369-JD-JCF Document 300-21 Filed 06/10/22 Page 120 of 659

A235

6.    While it is respondents' intention to make these concessions in the near

future, they will not formally do so until the families of petitioner's victims have been

notified, or efforts at family notification have proved fruitless.

Respectfully submitted,

Max C. Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5747

2

**A235**

## 9. Fletcher v. Beard, 10-cv-3188 (Surrick, J.)

Prior to trial, the Commonwealth offered a third-degree charge and a 10–20 year sentence, which defendant rejected. The defense was that the decedent had initially drawn a firearm, they got into a struggle for control of the firearm, and it accidentally discharged during that incident.

Dr. Park from the Medical Examiner Office reported that the forensic findings were consistent with the defendant's version. At trial, however, because Dr. Park was supposedly unavailable, ADA Costanza called Dr. Ian Hood who testified that the forensic evidence was *not* consistent with defendant's struggle-over-the-gun version. Costanza relied on Dr. Hood's testimony in summation and the jury convicted and sentenced the defendant to death.

It later became clear that Dr. Park was, in fact, available to testify for the first two days of the Commonwealth's case in chief. He then left the country, after which Costanza called Dr. Hood. Commonwealth v. Fletcher, 896 A.2d 508 (Pa. 2006). In PCRA proceedings on the issue of ineffectiveness of trial counsel, Dr. Park testified that his report was consistent with the defense theory and that the shooting could have taken place during a struggle. Dr. Hood then filed an affidavit retracting his trial testimony and agreeing that the shooting could have taken place during a struggle. Fletcher, 896 A.2d at 514.

The Commonwealth offered a new trial contingent on a plea with a sentence of 17½-35 years. The defendant refused, the PCRA court, Younge, J., granted penalty phase relief, but was reversed on appeal on the ground that the claim was procedurally defaulted.

During these proceedings, ADA Susan Affronti wrote the following in a memo to file:

> Robin [Godfrey – former chief of the PCRA unit] and Jeff [Krulik?] feel that this is not only not a death case. This is actually a 3rd degree case. Based on what I know (it's not a lot), I agree with them.
>
> The problem is the charges that he was convicted on were just Murder and PIC, which gets us to a max of 25 years, which is now, and people are not happy with the idea of no probation or parole upon release.

9

## - The district court's Order granting relief

The district court entered an Order stating:

> Petitioner was deprived of the effective assistance of counsel at trial, based on counsel's failure to investigate the forensic evidence regarding whether the shooting took place during a struggle by either hiring a defense expert or interviewing the medical examiner who conducted the autopsy, Dr. Park.

Order (12/11/20) Document 99

## - The Commonwealth's agreement

The Commonwealth agreed to relief based on trial counsel's failure "to investigate the forensic evidence regarding whether the shooting took place during a struggle by either hiring a defense expert or interviewing the medical examiner who conducted the autopsy, Dr. Park."

Second Amended Stipulation (12/11/20) Document 98.

**EXHIBIT 3**

## Pre-2018 Grants of Death Penalty Relief on Concessions
## of the Commonwealth Pre-Krasner DAO

Attachment 1: *Lewis v. Horn*, No. 00-cv-0802 (E.D. Pa. July 25, 2011, Schiller, J.) – Philadelphia DAO had "determined not to contest the entry of an order granting a conditional writ of habeas corpus, as to the petitioner's death sentence only, with the Commonwealth retaining the ability to resentence the petitioner following a new capital sentencing proceeding. The respondents and the petitioner are in agreement that neither this disposition, nor their agreement to it, is to be interpreted as a concession by the respondents that the petitioner's sentencing claims have merit or a concession by the petitioner that the respondents' contentions are meritorious."

Attachment 2: *Marshall v. Beard*, No. 03-cv-795 (E.D. Pa. Apr. 25, 2007, Bartle, J.) -- "Thereafter, on January 11, 2007, the Commonwealth agreed to a new penalty phase hearing for Marshall in the state court. Therefore, we address only those claims in the petition that pertain to the guilt phase of his trial."

Attachment 3: *Meadows v. Beard*, No. 05-cv-0566 (E.D. Pa. Sept. 8, 2016, Robreno, J. – Stipulation between the defendant and the Montgomery County DA. "The parties agree to the terms of this Stipulation because each believes that the terms are in their respective interests. The purpose of this Stipulation is to ensure that in exchange for the termination of these habeas corpus proceedings, Petitioner will be sentenced to life imprisonment."

Attachment 4: *Rivers v. Horn*, No. 02-cv-1600 (E.D. Pa. 2005, McLaughlin, J.) – Stipulation between defendant and Philadelphia DA.

Attachment 5: *Santiago v. Beard*, No. 04-cv-1669 (W.D. Pa. June 3, 2009, Conti, J.) – Stipulation between defendant and Allegheny County DA.

Attachment 6: *Thomas v. Horn*, No. 00-cv-803 (E.D. Pa. Dec. 20, 2011, Pollak, J.) – On a Third Circuit remand for the district court to hold an evidentiary hearing on whether trial counsel had failed to do any pretrial investigation before granting sentencing relief, the Commonwealth conceded to penalty relief: "**AND NOW**, this 19th day of December, 2011, upon consideration of the above captioned *Petition for Writ of Habeas Corpus*, other documents and pleadings filed in the case, the opinion and judgment of the United States Court of Appeals for the Third Circuit, the denial by the United States Supreme Court of each party's *Petition for*

*Writ of Certiorari*, and the respondents' notification that they will no longer contest the grant of conditional relief as to petitioner's sentence of death, it is hereby **ORDERED** that petitioner's application for a writ of habeas corpus is conditionally **GRANTED AS UNCONTESTED** as to petitioner's sentence of death."

Attachment 7: *Crews v. Horn*, No. 3:98-cv-1464 (M.D. Pa. Aug. 28, 2006, Caputo, J.) – Penalty phase relief granted after a stipulation by the defendant and PA Attorney General.

*Attachment 8:* *Crawley v. Horn*, No. 99-cv-5919, Savage, J.
Parties stipulate that Crawley's guilt phase claims will be denied and that death penalty shall be vacated. Dated: 2/17/2015 ECF No. 46

*Attachment 9*: *Speight v. Beard,* No. 04-cv-4110. Quinones Alejandro, J.
Commonwealth concession not to oppose death penalty relief and not to seek death penalty on remand to state court. 2017 WL 914907, at 3. (E.D. Pa. March 7, 2017)

**Attachment 1**



**DISTRICT ATTORNEY'S OFFICE**
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
(215) 686-8000

R. SETH WILLIAMS
DISTRICT ATTORNEY

July 25, 2011

The Honorable Berle M. Schiller
United States District Court
13613 United States Courthouse
601 Market Street
Philadelphia, PA 19106

   *Re:*  Lewis v. Horn, *No. 00-CV-0802*

Dear Judge Schiller:

  The respondents write to advise the Court that, having conferred with counsel for the petitioner, the respondents have determined not to contest the entry of an order granting a conditional writ of habeas corpus, as to the petitioner's death sentence only, with the Commonwealth retaining the ability to resentence the petitioner following a new capital sentencing proceeding. The respondents and the petitioner are in agreement that neither this disposition, nor their agreement to it, is to be interpreted as a concession by the respondents that the petitioner's sentencing claims have merit or a concession by the petitioner that the respondents' contentions are meritorious.

  A proposed order follows.

            Respectfully submitted,

            JOSHUA S. GOLDWERT
            Assistant District Attorney

cc:  Billy H. Nolas, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGINALD LEWIS,  :  CIVIL ACTION
   Petitioner,  :
   :
v.  :
   :
MARTIN HORN, et al.,  :
   Respondents.  :  No. 00-CV-0802

## O R D E R

**AND NOW,** this     day of     , 2011, upon consideration of Petitioner's application for a writ of habeas corpus; the September 14, 2009 opinion and judgment of the United States Court of Appeals for the Third Circuit; the denial of Petitioner's petition for a writ of certiorari; and the Respondents' notification that they have determined not to contest the grant of conditional relief as to Petitioner's sentence of death, **IT IS HEREBY ORDERED** that Petitioner's application for a writ of habeas corpus is conditionally **GRANTED AS UNCONTESTED** as to Petitioner's sentence of death in Nos. 8302-0585, 8302-0586 (Ct. Com. Pl. Phila. Cty.).

The Commonwealth may initiate a new capital sentencing proceeding in connection with Petitioner's first degree murder conviction in Nos. 8302-0585, 8302-0586 (Ct. Com. Pl. Phila. Cty.) within 180 days of the date of this Order.

BY THE COURT:

_____

BERLE M. SCHILLER, J.

**Attachment 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JERRY MARSHALL, JR.              :        CIVIL ACTION
                                 :
          v.                     :
                                 :
JEFFREY BEARD, Commissioner of   :
Pennsylvania Department of       :
Corrections, et al.              :        NO. 03-795

MEMORANDUM

Bartle, C.J.                                April 25, 2007

This is a death penalty case. Petitioner Jerry Marshall, Jr. ("Marshall" or "Petitioner"), a state prisoner, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He contends that he is entitled to a new trial because of numerous violations of his constitutional rights.

I.

The grisly crimes for which Marshall was prosecuted are described in detail by the Pennsylvania Supreme Court in its opinion in Commonwealth v. Marshall, 633 A.2d 1100, 1102-03 (Pa. 1993) ("Marshall I"). On the morning of May 20, 1987, Marshall and his wife, Donna, had an argument when she awoke in their apartment to find him pilfering money from her purse so that he could purchase drugs.[1] Shanisha Dunbar, Donna's nine-year-old

_____

1. Marshall's drug addiction had been a source of ongoing disputes with his wife. She had threatened to leave him on many occasions including one month before her death if he did not break his habit. Marshall had stated several times to Donna in

(continued...)

daughter[2] overheard the dispute, woke her seven-year-old younger sister, Ayesha, and sent her to see what was happening.  Standing in the hallway and looking through the open bedroom door into her mother's bedroom, Ayesha saw her mother tied to the bedpost with a telephone cord and being strangled by her stepfather, Marshall.  When Ayesha returned to Shanisha in their bedroom and reported what she saw, Shanisha retrieved a knife from the kitchen, returned to their bedroom, and placed the knife under her pillow.  Unfortunately, Marshall saw Shanisha retrieve the knife and called out to her.  Shanisha thereupon ran out of the bedroom and fled into the kitchen where Marshall caught her after giving chase.  He picked her up and, despite her pleas, brought her back to her mother's bedroom and closed the door.  Lying in her bed in another room, Ayesha described the sounds that followed as "heads" or "weights" that were "hitting the floor" "real hard" and "a spit-up sound."  Ayesha saw Marshall wash blood from his hands after he had emerged from the bedroom.  Marshall told Ayesha that her mother was ill and that Shanisha was helping

---

1. (...continued)
the presences of others that he would kill her if she ever tried to leave him.  N.T. 10/4/89, 33-38, 94-95, 102, 155

2.  Shanisha and Ayesha were the biological daughters of Donna Marshall and stepdaughters of Marshall.  The Marshalls had two children together, Jerry and Jenieda.  At the time of the murders, the four children shared one room with two beds.  Shanisha and Ayesha slept in one bed; Jerry and Jenieda slept in the other.

her.[3]  He then left the apartment with Ayesha and his two children, Jerry and Jenieda.

Marshall drove the children to the home of Lyla Jenkins, a female friend, where he left them at sometime between 10:00 a.m. and noon.  He did not return to pick them up until the following day.  Ayesha testified that Marshall stopped the car on at least two separate occasions to stick a needle in his arm.

Upon leaving the children, Marshall met with Scotty Brecher ("Brecher"), a long-time friend with whom he regularly injected cocaine.  That afternoon, while taking drugs with Brecher, Marshall revealed that he had killed his wife when she caught him stealing money from her purse and that because his stepdaughter had witnessed the event he had been forced to kill her to "shut her the f**k up."  Id. at 1103.  He explained that he used a hammer which he had thoroughly sanitized when he had finished so as to remove any gore and fingerprints.

Later that evening, after injecting more cocaine, Brecher accompanied Marshall to the latter's apartment.  Marshall braced Brecher for the gruesome site before entering Donna's bedroom.  Then Marshall opened the door, revealing the bodies of Donna and Shanisha.  The pair stepped over the bodies to steal Donna's television so that they could sell it and purchase more drugs.  The next day Marshall and Brecher sold Donna's car for

---

3.  Presumably, Marshall was unaware that Ayesha had seen him in the act of murdering her mother.

-3-

money to purchase cocaine. Shortly thereafter, on Friday, May 22, Marshall fled to South Carolina.

That same morning police found the bodies of Donna Marshall and Shanisha Dunbar. Autopsies revealed that the former had been strangled and the latter had died due to a fractured skull, brain hemorrhage, cerebral swelling, and a laceration to her heart. Shanisha also had a puncture wound in her right cheek and had suffered several injuries to her neck. An arrest warrant was issued for Marshall the following day.

It was not until February, 1988 that authorities located Marshall in Charleston, South Carolina. He was returned to Philadelphia on April 12, 1988. Marshall was tried by jury in October, 1989 before the Honorable Albert F. Sabo in the Court of Common Pleas of Philadelphia County. On October 10, 1989, the jury found Marshall guilty of two counts of first-degree murder in the killing of his wife and stepdaughter. The next day, after a sentencing hearing, the jury found two aggravating and no mitigating circumstances and sentenced the defendant to death.

After his conviction, Marshall filed post-verdict motions in the Court of Common Pleas. Before Judge Sabo ruled on the motions, Marshall fired his trial counsel, Daniel Connor, Esquire, and filed a pro se motion arguing that he had been ineffective. The court appointed Marshall new counsel, William James, Esquire, who filed supplemental post-verdict motions. He also filed a motion labeled as one for relief under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons.

-4-

Stat. Ann. §§ 9541-46. Judge Sabo subsequently denied all relief. Marshall appealed to the Pennsylvania Supreme Court, which unanimously affirmed both the conviction and sentence of death in a unanimous opinion authored by Justice Frank J. Montemuro.[4] <u>Commonwealth v. Marshall</u>, 633 A.2d 1100 (Pa. 1993).

On July 30, 1997, Marshall filed a petition for relief under the PCRA. On December 3, 1997, Judge Sabo issued notice of his intent to dismiss Marshall's petition in twenty days pursuant to Rule 1507 of the Pennsylvania Rules of Criminal Procedure.[5] Without conducting a hearing, Judge Sabo summarily dismissed the petition without an opinion as stated in his notice of intent. Marshall again appealed. The Pennsylvania Supreme Court remanded the case to the Court of Common Pleas with directions for it to set forth its reasons for denying the petition. On remand, the case was reassigned to the Honorable Gary S. Glazer. Judge Glazer denied the PCRA petition without a hearing on April 20, 2000. He accompanied his Order with a written opinion.

Marshall appealed Judge Glazer's PCRA order to the Pennsylvania Supreme Court. <u>See</u> 42 Pa. Cons. Stat. Ann.

---

4. Justice Rolf Larsen did not participate in the decision, nor did newly-elected Justice Ronald D. Castille.

5. Rule 1507 is now Rule 902. Rule 902(A)(12)(b) requires a PCRA petitioner to attach "affidavits, documents, and other evidence" to support grounds of relief for which there is insufficient support in the record. As stated by the Pennsylvania Supreme Court, "the purpose of the notice rules is to alert counsel to deficiencies in the pleadings, so that counsel may amend the petition to cure them." <u>Commonwealth v. Clayton</u>, 816 A.2d 217, 220 n.3 (Pa. 2002) (citation omitted).

§ 722(4).  The Court handed down its decision on November 22, 2002.  Five justices voted to deny relief but offered different reasons for doing so.  <u>Commonwealth v. Marshall</u>, 810 A.2d 1211 (Pa. 2002) ("<u>Marshall II</u>").  Chief Justice Stephen A. Zappala announced the judgment of the Court and authored an opinion that was joined in part by Justices Ralph Cappy, Ronald D. Castille and J. Michael Eakin.  These four justices, however, agreed only that the PCRA petition before the court was Marshall's first, that three guilt phase claims had been "previously litigated" on direct appeal in <u>Marshall I</u> and were not therefore cognizable under the PCRA,[6] and that Marshall was not entitled to any PCRA relief.  <u>See</u> <u>id.</u> at 1229-30.  Aside from these narrow areas of agreement, no reasoning commanded a majority of the seven-member Court.

Justice Cappy filed a concurring opinion.  <u>Id.</u> at 1229. Justice Castille wrote an opinion concurring in part and dissenting in part in which Justice Eakin joined.  <u>Id.</u> at 1229-33.  Justice Russell M. Nigro concurred in the result but neither wrote nor joined in any opinion.  <u>Id.</u> at 1229.  Finally, Justices Thomas Saylor and Sandra Schultz Newman dissented on the ground

6.  Chief Justice Zappala's opinion stated the following claims in Marshall's PCRA appeal had been "fully and fairly" litigated in <u>Marshall I</u>:  (1) the trial court erred in failing to dismiss for cause prospective juror Karen Edith Poles; (2) Juror John M. Knauf should have been stricken for cause or peremptorily stricken by counsel; and (3) the prosecutor committed misconduct during his closing argument when he asked the jurors to close the eyes of the dead.  The opinion also referenced other claims arising out of the sentencing proceeding which are not relevant for present purposes.

-6-

that Marshall should be awarded an evidentiary hearing on his claims.  Id. at 1233.

Represented by new counsel, Marshall filed a timely petition for a writ of certiorari in the United States Supreme Court that focused on two issues under Brady v. Maryland, 373 U.S. 83 (1963) and Strickland v. Washington, 466 U.S. 668 (1984). The Supreme Court denied the petition on October 6, 2003.  See Marshall v. Pennsylvania, 540 U.S. 833 (2003).

Marshall filed the present petition under 28 U.S.C. § 2254 for a writ of habeas corpus on April 30, 2003 based on alleged constitutional violations at both the guilt phase and penalty phase of his trial.  After several rounds of voluminous briefing as well as numerous stipulated extensions of time, we held oral argument on the claims discussed in Sections IV-VI below.  Thereafter, on January 11, 2007, the Commonwealth agreed to a new penalty phase hearing for Marshall in the state court. Therefore, we address only those claims in the petition that pertain to the guilt phase of his trial.

II.

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which placed new restrictions on the power of federal courts to grant habeas corpus relief to state prisoners such as Marshall.  See 28 U.S.C. § 2254.  The law took effect on April 24, 1996 and governs all petitions filed thereafter.  Wertz v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2001); 28 U.S.C. § 2254(d).  Marshall filed his habeas petition in this

-7-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JERRY MARSHALL, JR.             :         CIVIL ACTION
                                   :
      v.                     :
                                   :
JEFFREY BEARD, Commissioner of  :
Pennsylvania Department of     :
Corrections, et al.         :         NO. 03-795

ORDER

AND NOW, this 25th day of April, 2007, for the reasons
set forth in the accompanying Memorandum, it is hereby ORDERED
that:

(1)   the petition of Jerry Marshall, Jr. for a Writ of
Habeas Corpus under 28 U.S.C. § 2254 is GRANTED with respect to
the penalty phase of his trial and is otherwise DENIED;

(2)   the Commonwealth of Pennsylvania shall conduct a
new sentencing hearing within 180 days of this Order;

(3)   should the Commonwealth of Pennsylvania not have
commenced a new sentencing hearing within 180 days, the writ
shall issue and the petitioner shall be deemed to be sentenced to
life imprisonment;

(4)   a certificate of appealability will not issue; and

(5)   if a certificate of appealability is sought from
or an appeal is taken to the United States Court of

Appeals for the Third Circuit, the entry of this Order will be stayed pending disposition of the proceedings in that Court.

BY THE COURT:

/s/ Harvey Bartle III
C.J.

**Attachment 3**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS MEADOWS,           :

                          :         CIVIL ACTION
                                    No. 05-cv-0566

        Petitioner,        :

    v.                      :

                        HON. EDUARDO C. ROBRENO
                        U. S. DISTRICT JUDGE

JEFFREY BEARD, *et al*,

**FILED**

SEP - 8 2016

LUCY V. CHIN, Interim Clerk
By _____ Dep. Clerk

        Respondents.

### STIPULATION AND ORDER

Petitioner, Thomas Meadows, through undersigned counsel, Capital Habeas Corpus Unit of the Community Federal Defender Office for the Eastern District of Pennsylvania, and Respondents through their counsel, the Montgomery County District Attorney's Office, hereby stipulate as follows:

### Purpose of Stipulation

The parties agree to the terms of this *Stipulation* because each believes that the terms are in their respective interests. The purpose of this *Stipulation* is to ensure that in exchange for the termination of these habeas corpus proceedings, Petitioner will be sentenced to life imprisonment. Accordingly, the terms of this *Stipulation* should be construed in accordance with that purpose.

### Procedural History

Petitioner was convicted and sentenced to death by a jury in the Court of Common Pleas in Montgomery County, Pennsylvania, on July 20, 1990. The Pennsylvania Supreme Court affirmed his conviction and sentence. *Commonwealth v. Meadows*, 633 A.2d 1081 (Pa. 1993).

After unsuccessfully litigating his request for post-conviction relief in the state courts, Petitioner filed a Petition for a Writ of Habeas Corpus in this Court. This habeas litigation was stayed for several years as Petitioner attempted to exhaust additional claims in the state courts. Following the conclusion of those state court proceedings, this Court reinstated these habeas proceedings, which are currently pending.

### Terms of the Stipulation

The following constitute the terms of the *Stipulation*:

1.      The Court shall conditionally grant the *Petition for a Writ of Habeas Corpus* as to the claim identified in the Petition as "Claim IV," to the extent that the claim raises ineffective assistance of trial counsel for failure to develop and present mitigating evidence (but not to the portion of the claim suggesting that the Commonwealth failed to turn over any materials).[1]

2.      The parties understand that granting the Writ as to that portion of Claim III will result in Petitioner's death sentence being vacated for the offense of first degree murder, while leaving intact all other portions of his convictions and sentences.

3.      The Court shall stay the execution of the Writ for a period of ninety days from the date of the acceptance of the *Stipulation* to permit the parties to secure a re-sentencing of Petitioner in state court to life without parole.

4.      Within thirty days of the acceptance of the *Stipulation*, Respondents will notify the Court of Common Pleas, Montgomery County, of their intent not to seek re-sentencing. Petitioner will then be sentenced to life imprisonment for first degree murder.

5.      In consideration of Respondent's agreement to not seek capital re-sentencing, Petitioner agrees to the dismissal of these habeas proceedings and waives any further appeals in state and federal court challenging these convictions and/or sentences.

---

[1] Counsel has filed this Corrected Stipulation to correct the erroneous identification of Claim III in this paragraph of the previously filed document.

6. If for any reason the terms of this *Stipulation* are not met, either party may reactivate the instant action in this Court. In that event, the parties will each return to the status quo existing on the date that this *Stipulation* was accepted by the Court.

7. Once executed by the parties and signed by this Court, this document will constitute both the agreement of the parties and the Order of the Court granting relief according to the terms set forth above.

8. Upon completion of the state court proceedings, the parties shall report to the Court at which time these federal habeas proceedings will be closed.

**So STIPULATED:**

**For Petitioner:**

/s/ Shawn Nolan
Shawn Nolan
Chief, Capital Habeas Unit
Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street, Suite 545W
Philadelphia, PA 19106
(215) 928-0520

**For Respondents:**

/s/ Robert Falin
Robert Falin
Deputy District Attorney
Chief, Appellate Division
Office of the District Attorney
Sweed and Airy Streets, 4th Floor
Norristown, PA 19404
(610) 278-3102

So ORDERED, this 8 day of September, 2016

_____
Honorable Eduardo C. Robreno
United States District Judge

① In Accordance with The Order dated August 12, 2016.

# FEDERAL COMMUNITY DEFENDER OFFICE
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### *Capital Habeas Unit*

FEDERAL COURT DIVISION - DEFENDER ASSOCIATION OF PHILADELPHIA

SUITE 545 WEST -- THE CURTIS CENTER
601 WALNUT STREET
PHILADELPHIA, PA 19106

| | | |
|---|---|---|
| *LEIGH M. SKIPPER*<br>CHIEF FEDERAL DEFENDER | PHONE NUMBER  (215) 928-0520<br>FAX NUMBER    (215) 928-0826<br>FAX NUMBER    (215) 928-3508 | *HELEN A. MARINO*<br>FIRST ASSISTANT FEDERAL DEFENDER |

## AFFIDAVIT OF THOMAS MEADOWS

I, Thomas Meadows, hereby affirm under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Petitioner in the case of *Meadows v. Beard*, Civil Action Number 05-cv-00566, in the Federal Court for the Eastern District of Pennsylvania. I was convicted and sentenced to death by a jury in the Court of Common Pleas in Montgomery County, Pennsylvania, on July 20, 1990.

2. I have been informed by my attorney, Shawn Nolan, Assistant Federal Defender with the Community Federal Defender Office for the Eastern District of Pennsylvania, that the Commonwealth has agreed that my death sentence will be vacated and I will be resentenced to a term of life in prison. In exchange, I agree to surrender any rights of appeal that I have, and I agree to the dismissal of all remaining claims in my Petition for a Writ of Habeas Corpus.

3. I have reviewed the proposed Stipulation with Mr. Nolan, in person, line by line, and have had the opportunity to confer with Mr. Nolan regarding its contents. I have had the opportunity to ask questions of Mr. Nolan regarding the Stipulation, and I fully understand the contents of the document. I understand the terms of the Stipulation, and the rights I am surrendering, including the right to appeal and/or the right to attack my conviction and/or sentence in both state and federal court.

4. I hereby consent to all of the terms of the stipulation.


_____          Dated: 9/2/16
Thomas J. Meadows


Witnessed by:

_____          Dated: 9-2-16
Shawn Nolan
Assistant Federal Defender

**Attachment 4**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DELORES RIVERS, | : |
| Petitioner, | : |
| | : CIVIL ACTION |
| v. | : (capital habeas corpus) |
| | : |
| MARTIN HORN, Commissioner, | : No.  02-1600 |
| Pennsylvania Department of Corrections and | : |
| DONALD L. KELCHNER, Superintendent | : |
| of the State Correctional Institution at | : |
| Muncy, | : Honorable Mary A. McLaughlin |
| | : |
| Respondents. | : |

### STIPULATION AND ORDER

Petitioner, DELORES RIVERS, through undersigned counsel, Defender Association of

Philadelphia, Federal Court Division, Capital Habeas Corpus Unit, and Respondents through

their counsel, the District Attorney of Philadelphia County, Pennsylvania, hereby *Stipulate* as

follows:

### Purpose of Stipulation

The parties agree to the terms of this *Stipulation* because each believe that the terms are

in their respective interests.  The purpose of this *Stipulation* is to insure that in exchange for the

termination of these habeas corpus proceedings, Petitioner will be sentenced to life

imprisonment.  Accordingly, the terms of this *Stipulation* should be construed in accordance with

that purpose.

## Procedural History

On February 26, 1988, Petitioner, Delores Rivers, was arrested for the murder of Violet Burt and charged under Philadelphia County, Criminal Section, March Term, 1988, Information Nos. 3519, 3521 and 3523. On March 15, 1989, a jury convicted Petitioner of first degree murder and related charges. The following day a capital sentencing hearing was held and Petitioner was sentenced to death.

On July 1, 1994, the Pennsylvania Supreme Court affirmed Petitioner's conviction and death sentence. Commonwealth v. Rivers, 644 A.2d 710 (Pa. 1994), cert. denied, 116 S.Ct. 1270 (1996).

Her timely filed state post-conviction (PCRA) petition was denied by the Philadelphia Court of Common Pleas and on December 20, 2001, the Pennsylvania Supreme Court affirmed the PCRA court's denial of Ms. Rivers' application for post-conviction relief. Commonwealth v. Rivers, 786 A.2d 923 (Pa. 2001).

On March 25, 2002, Petitioner filed her Petition for a Writ of Habeas Corpus.

## Terms of the Stipulation

The following constitute the terms of the *Stipulation*.

I.     The Court shall conditionally grant the *Petition for a Writ of Habeas Corpus* as to the claim identified in the *Petition* as "Claim IX" (this claim is contained on pages 36-50 and paragraphs 118-151 of the *Petition*). The Court will deny the remainder of the Claims in the *Petition*;

II.    It is the understanding of the parties that granting the Writ as to Claim IX will result in the vacation of Petitioner's death sentence for the offense of first degree murder, while leaving intact her convictions and sentences for the other offenses of which she was convicted;

III.   The Court shall stay the execution of the *Writ* for 90 days from the date of its acceptance of this *Stipulation* to permit Respondents to have Petitioner re-sentenced to life imprisonment in state court.

IV.     Within 90 days, Respondents will notify the Court of Common Pleas of their intent not to seek re-sentencing.  Petitioner will be sentenced to life imprisonment for first degree murder in Philadelphia County docket number 3519-23.

V.      In consideration of Respondents' agreement not to seek capital re-sentencing, Petitioner agrees to waive any further appeals in any court (state or federal) challenging her convictions and/or sentences under Philadelphia County docket number 3519-23;

VI.     If for any reason the terms of this *Stipulation* are not met, either party may reactivate the instant action in this Court.  In that event, the parties will each return to the status quo existing on the date that this *Stipulation* was accepted by the Court.

VII.    Once executed by the parties and signed by this Court, this document will constitute both the agreement of the parties and the Order of the Court granting relief to Petitioner on the terms set forth above.

VIII.   Upon completion of the state court proceedings (set forth above) the parties shall report the same to this Court, at which time this matter will be closed and final.

**STIPULATED:**

**For Petitioner:**                               **For Respondents:**

_____                     _____

Victor J. Abreu, Esq.                        Marilyn F. Murray, Esq.
Assistant Federal Defender                   Assistant District Attorney
David Wycoff, Esq.                           Thomas W. Dolgenos, Esq.
Assistant Federal Defender                   Chief, Federal Litigation Unit
Capital Habeas Corpus Unit                   Philadelphia County District Attorney's Office
Federal Court Division                       1421 Arch Street
Defender Association of Philadelphia         Philadelphia, PA 19102
Suite 545 West, The Curtis Center           (215) 686-5704
Philadelphia, PA 19106                       (215) 686-5725 (fax)
(215) 928-0520
(215) 928-0826 (fax)

Signed: _____, 2005              Signed: _____, 2005
Philadelphia, PA                             Philadelphia, PA


**SO ORDERED, this _____ day of _____, 2005**


_____
**HONORABLE MARY A. McLAUGHLIN**
United States District Judge

**Attachment 5**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SALVADOR SANTIAGO, | CIVIL ACTION (HABEAS CORPUS) |
| Petitioner, | No. 04-1669 |
| v. | Judge Conti |
| JEFFREY A. BEARD, Commissioner, Pennsylvania Department of Corrections, and WILLIAMS S. STICKMAN, Superintendent, State Correctional Institution at Greene, | **THIS IS A CAPITAL CASE** |
| Respondents. | |

## ORDER

Upon consideration of the stipulation of the parties and the full record in this habeas corpus action under 28 U.S.C. § 2254, the Court Finds and Orders as follows:

1. The Court has jurisdiction to address Petitioner's arguments for federal habeas corpus relief made on behalf of Petitioner Salvadore Santiago.

2. The stipulation resolving this action, signed by Billy H. Nolas, Esq., of the Defender Association of Philadelphia, and Ronald M. Wabby, Jr. Esq. of the District Attorney's Office, Allegheny County, is ratified by this Court. The provisions and terms of the stipulation are hereby accepted as the provisions and terms of this final order.

3. Relief is granted as to Claim 3 of the Petition (ineffective assistance of counsel at the capital sentencing). In effect, this vacates the Petitioner's death sentence. Relief is denied as to the guilt phase of the trial. Petitioner is to be resentenced to life imprisonment. All other non-capital sentences remain intact.

4. Petitioner Santiago is to be resentenced to life imprisonment in the Court of Common Please, Allegheny County.

5.        The federal action is hereby closed. However, there is no prejudice to either party's right to re-activate this action if the terms of the stipulation are violated.

SO ORDERED, this __1st__ day of __June_____ , 2009

/s/ Joy Flowers Conti
**HONORABLE JOY FLOWERS CONTI**
United States District Judge

**Attachment 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIAN THOMAS,

                         Petitioner,

      v.

MARTIN HORN, Commissioner,
Pennsylvania Department of Corrections,
et al.,

                         Respondents.

CIVIL ACTION

No. 00-803

## ORDER

**AND NOW**, this 19th day of December, 2011, upon consideration of the above-captioned *Petition for Writ of Habeas Corpus*, other documents and pleadings filed in the case, the opinion and judgment of the United States Court of Appeals for the Third Circuit, the denial by the United States Supreme Court of each party's *Petition for Writ of Certiorari*, and the respondents' notification that they will no longer contest the grant of conditional relief as to petitioner's sentence of death, it is hereby **ORDERED** that petitioner's application for a writ of habeas corpus is conditionally **GRANTED AS UNCONTESTED** as to petitioner's sentence of death in No. CP-51-CR-082716-1985.

The Commonwealth may initiate a new capital sentencing proceeding in connection with petitioner's first degree murder conviction within 180 days of the date of

this Order.  This time limitation may be extended upon a showing of reasonable cause.

BY THE COURT:

/s/ Louis H. Pollak
Pollak, J.

**Attachment 7**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAUL DAVID CREWS

    Petitioner

        v.

MARTIN HORN, et al.,

    Respondent.

CIVIL ACTION NO. 3:98-CV-1464

(JUDGE CAPUTO)

## ORDER

AND NOW, this 28th day of August, 2006, upon consideration of the stipulation and proposed order filed jointly by Petitioner Paul David Crews and Respondents (Doc. 75), in which Petitioner has agreed to withdraw Claims I-VIII and X-XV of his Petition for Writ of Habeas Corpus (Doc. 19) in exchange for Respondents' agreement that the Court shall conditionally grant the petition as to Claim IX, **IT IS HEREBY ORDERED THAT:**

(1)    The Petition for Writ of Habeas Corpus (Doc. 19) is **GRANTED** with respect to Claim IX.[1]

(2)    The remaining Claims in the Petition for Writ of Habeas Corpus (Doc. 19) are **DENIED**.

(3)    The execution of this Order is **STAYED** for ninety (90) days from the date of this Order to permit Respondents to have Petitioner re-sentenced to life imprisonment in state court on the two counts of first degree murder in

---

[1] Claim IX of the Petition asserts, "Counsel was ineffective at capital sentencing for failing to investigate, develop and present substantial mitigating evidence of Petitioner's sad and traumatic childhood; debilitating alcohol and drug abuse; severe mental and emotional impairments; and positive adjustment to incarceration." (Doc. 19).

Perry County Case No. 318 of 1990.

(4)   Within ninety (90) days of the date of this Order, Respondents shall notify

the Court of Common Pleas of Perry County of their intent not to seek to

have the death penalty reimposed at re-sentencing.

(5)   Within ten (10) days of completion of the state court proceedings, as set

forth above, the parties shall report the same to this Court, at which time

this matter will be closed.

A. Richard Caputo
United States District Judge

**Attachments 8 and 9**

## No. 8

*Crawley v. Horn*, 99-cv-5919, ECF 45-2, 2/2/2015

## No. 9

*Speight v. Beard*, 04-cv-4110, 2017 WL 914907 (attached)

THOMSON REUTERS
WESTLAW PRECISION    All content    Enter terms, citations,    Fed. Dist., ...    Parallel Search    Sign out
Advanced

## Speight v. Beard

United States District Court, E.D. Pennsylvania. • March 7, 2017 • Not Reported in Fed. Supp. • 2017 WL 914907  (Approx. 23 pages)

Document    Filings (44)    Negative Treatment (0)    History (68)    Citing References (2    Cited With (30)    Table of Authorities    Fullscreen

Go

LEGAL STANDARD

DISCUSSION

Objection One—Application of Martinez and Trevino to this Case

Objection Two—No Showing of Actual Innocence to...

Objection Three—Petitioner's Batson Claim (Claim I)

Objection Four—Claim IV— Ineffective Assistance of...

Objection Five—Claim V— Ineffective Assistance of...

Objection Six—Claim VI— Ineffective Assistance of...

Objection Seven—Claim VII— Denied Due Process by...

Objection Eight—Claim VIII— Prosecutorial...

Objection Nine—Claim IX— Improper Jury Instruction...

Objection Ten—Claim X— Insufficient Evidence

Objection Eleven—Claim XI— Petitioner is Innocent...

Objection Twelve—Claim XVII —Cumulative Prejudicial Errors

CONCLUSION

All Citations

Footnotes

2017 WL 914907
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

## Melvin SPEIGHT, Petitioner
v.
## Jeffrey BEARD, et al., Respondents

CIVIL ACTION NO. 04-4110
Filed 03/07/2017

Notes
Outlines
Quick Check

## Attorneys and Law Firms

Matthew C. Lawry, Timothy Patrick Kane, Helen A. Marino, Federal Community
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~er.

Philadelphia District Attorney's Office,

| Hon. Nitza I. Quinones Alejandro | |
| --- | --- |
| Dockets: | 3802 |
| Cases: | 822 |
| Trial Court Documents: | 216 |
| See Full Profile | |

M OPINION

NITZA I. QUIÑONES ALEJANDRO, USDC J.

### INTRODUCTION

*1 Petitioner Melvin Speight ("Petitioner"), a Pennsylvania state prisoner, filed a counseled petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, later amended, in which he asserts seventeen claims for relief. [ECF 8 and 31]. [1] The matter was initially filed as a death penalty case. However, once the death penalty aspect of the petition was no longer contested, in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 72.1.IV(c), the amended petition was referred to United States Magistrate Judge Linda K. Caracappa for a Report and Recommendation ("R&R"). [ECF 110]. [2] Magistrate Judge Caracappa issued an R&R, which recommended that the amended petition for a writ of *habeas corpus* be denied as to the guilt phase of Petitioner's claim and, by agreement of the parties, be granted with respect to Petitioner's death sentence. [ECF 115]. Petitioner filed extensive objections to the R&R, [ECF 120], to which Respondents have responded. [ECF 126]. The issues have been fully briefed and are ripe for disposition.

Upon a thorough and independent review of the state record, the relevant court filings, and a *de novo* review of Petitioner's objections, for the reasons set forth below, this Court overrules Petitioner's objections, approves and adopts the R&R, and denies the petition for a writ of *habeas corpus* as to the guilt phase of Petitioner's trial. With respect to Petitioner's sentence of death, upon agreement of the parties (as described herein), Petitioner's death sentence is vacated, and Petitioner is to be re-sentenced to a term of life imprisonment. Petitioner's corresponding motion for discovery and motion for oral argument are denied.

### BACKGROUND

The relevant evidence underlying Petitioner's conviction on numerous offenses was summarized by the Pennsylvania Supreme Court as follows:

Back to top

Testimony at trial established that at approximately 9:00 p.m. on August 31, 1992, Gary Carson, Allen Carson, William Wilson, Neal Carter and David Scott (referred to collectively as "Carson's group") were drinking beer at the corner of Wyalusing and Conestoga Streets in Philadelphia when they observed a man in an orange jumpsuit, known as "Inky Man," approach the corner along Conestoga Street and wave as if signaling to persons further up the street. Indeed, in response to Inky Man's signal, appellant and three other men, Shannon Faison, Lamar Douglas and Cornell Bennet, also known as "Junior" (referred to collectively as "appellant's group"), suddenly appeared at the corner and approached the group. Gary Carson testified that in the weeks preceding the encounter, one of the members of the appellant's group, Bennet, had repeatedly warned him to stay away from that particular corner because his presence was interfering with the drug operation Bennet ran at that location.

*2 Upon appellant's group's arrival at the corner, Faison said to Carson's group, "What's up with my man's corner?" However, before anyone could respond, appellant and his cohorts produced firearms and started firing at Carson's group. At the time of the shooting, appellant's group was standing on the sidewalk between Carson's group and the curb.

William Wilson was shot ten times, including a fatal shot to the left chest which pierced his heart and punctured his right lung.

Four of the shots hit Wilson from behind. Wilson was pronounced dead at the scene. Neal Carter was shot three times from behind, including a fatal shot which pierced his heart. He was pronounced dead upon arrival at the hospital. Allen Carson was shot once in the back, severing his spine and permanently paralyzing him. Gary Carson was shot eight times, but survived. Only David Scott was not hit. A ballistics expert testified that at least three and possibly four different firearms were used in the attack.

Gary Carson and Allen Carson both testified that appellant was standing between Faison and Bennet, but they did not know if he had a gun. David Scott testified that the person standing between Faison and Bennet had fired a gun, although he could not identify who that person was.

The day following the shooting, Gary Carson identified Bennet from a photographic array. A week later, he also identified Faison and Douglas from photographic arrays. Finally, on September 18, 1992, Gary Carson identified appellant as the fourth assailant from a photographic array. An arrest warrant was obtained on that date and officers went to appellant's house to arrest him. However, appellant's mother told the officers that appellant was working in Baltimore and she did not know how to reach him. As a result, appellant was listed as a fugitive in the National Crime Information Computer network. Appellant was arrested on a fugitive warrant in Mansfield, Massachusetts on September 25, 1992. At the time of the murders, appellant had a full head of hair, but when he was arrested his head was completely shaved.

*Commonwealth v. Speight*, 677 A.2d 317, 320-21 (Pa. 1996).

On June 24, 1993, a jury in the Court of Common Pleas of Philadelphia County, convicted Petitioner of two counts of first-degree murder, two counts of aggravated assault, one count of criminal conspiracy to commit murder, and one count of possession of an instrument of crime. Following the penalty phase of the trial, the jury imposed a sentence of death on each murder conviction. At the conclusion of trial, trial counsel was granted permission to withdraw and new counsel was appointed. Petitioner's new counsel filed post-verdict motions attacking the judgment and, following an evidentiary hearing, the trial court denied Petitioner's motions and formally imposed the jury's sentence. On May 20, 1996, the Pennsylvania Supreme

Back to top

Case 2:22-mc-00050-PD     Document 46     Filed 05/13/25     Page 140 of 190

Court affirmed Petitioner's conviction and judgment of sentence on direct appeal. *Speight*, 677 A.2d at 328. The United States Supreme Court denied a petition for writ of certiorari on February 18, 1997. *Speight v. Pennsylvania*, 519 U.S. 1119 (1997).

In the interim, on January 15, 1997, Petitioner filed a timely *pro se* petition for collateral review under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 *et seq.* ("First PCRA Petition"). PCRA counsel was appointed, who filed an amended petition, a supporting memorandum of law, and a supplemental memorandum of law. After Petitioner expressed dissatisfaction with his first court-appointed attorney, new counsel was appointed. Petitioner's second appointed PCRA counsel filed amended and supplemental pleadings on Petitioner's behalf. On December 12, 2000, the PCRA court denied relief as to Petitioner's convictions but granted a new penalty hearing. The Commonwealth moved for reconsideration and, in an opinion dated April 3, 2001, the PCRA court reversed itself and held that Petitioner was not entitled to a new penalty hearing. Petitioner appealed, and on July 22, 2004, the Pennsylvania Supreme Court affirmed the denial of Petitioner's First PCRA Petition. *Commonwealth v. Speight*, 854 A.2d 450, 454 (Pa. 2004).

*3 On August 30, 2004, Petitioner filed motions in this Court for the appointment of counsel and a stay of execution, both of which were granted. [ECF 1, 3]. On July 1, 2005, Petitioner filed a timely, counseled petition for a writ of *habeas corpus*. [ECF 8]. On January 13, 2006, Petitioner filed a motion to stay the instant federal proceedings pending the exhaustion of his state court remedies, [ECF 16]; the motion was granted on February 9, 2006. [ECF 18].

On January 12, 2006, Petitioner filed a second petition for post-conviction relief ("Second PCRA Petition") alleging a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Following an evidentiary hearing, the PCRA court denied the Second PCRA Petition on April 26, 2007. Petitioner appealed, and on December 28, 2009, the Pennsylvania Supreme Court affirmed the denial of relief, finding that Petitioner's Second PCRA Petition was untimely. *See Commonwealth v. Speight*, 986 A.2d 759 (Pa. 2009).

Following the reactivation of the federal *habeas* proceedings, Petitioner filed an amended petition for writ of *habeas corpus*, [ECF 31], and a memorandum of law in support. [ECF 70]. On November 2, 2011, Petitioner filed a motion for discovery, [ECF 38], which was denied, without prejudice, on December 22, 2011. [ECF 49]. Petitioner has since filed a second motion for discovery, [ECF 99], and a motion for oral argument on the discovery motion, [ECF 111], which are disposed of herein.

As stated, Petitioner asserts seventeen claims in his *habeas* petition. [3] On December 22, 2014, Respondents filed their response in opposition, [ECF 94], and advised this Court that they would:

> not [ ] contest a conditional grant of relief as to [Petitioner's] death sentence as part of the Court's final order disposing of [Petitioner's] claims attacking the guilt phase of [Petitioner's] trial, on the understanding that this will not be understood or argued to constitute a concession that any of [Petitioner's] claims have merit. The respondents also confirmed that although a condition of relief would, in principle, permit the Commonwealth to seek a new capital sentencing proceeding in state court, the Commonwealth will not do so. Thus, even if this Court denied relief as to [Petitioner's] claims challenging his convictions, i.e., the guilty phase of his trial, his death sentence would be vacated and the Commonwealth will not seek a new capital sentencing proceeding in connection with this case.

Back to top

[*See* ECF 94 at p. 10 n. 11]. As such, Respondents did not address any of Petitioner's claims that challenged his sentence.

The Magistrate Judge issued a comprehensive and soundly reasoned 70-page R&R in which she recommended that this Court deny relief to all of Petitioner's claims challenging his conviction for first-degree murder, criminal conspiracy to commit murder, aggravated assault, and related weapons possession offenses, and conditionally grant relief as to his death sentence. [ECF 115]. Petitioner filed objections to the R&R, [ECF 120], to which Respondents have responded. [ECF 126]. Petitioner also filed a notice of supplemental authority, [ECF 127], to which Respondents have responded. [ECF 128].

LEGAL STANDARD

Where objections to an R&R are filed, the court must conduct a *de novo* review of the contested portions of the R&R, *see Sample v. Diecks*, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989) (citing 28 U.S.C. § 636(b)(1)(C)), provided the objections are both timely and specific. *Goney v. Clark*, 749 F.2d 5, 6-7 (3d Cir. 1984). In making its *de novo* review, a court may accept, reject, or modify, in whole or in part, the factual findings or legal conclusions of the magistrate judge. 28 U.S.C. § 636(b)(1). Although the review is *de novo*, the statute permits the court to rely on the recommendations of the magistrate judge to the extent it deems proper. *United States v. Raddatz*, 447 U.S. 667, 675-76 (1980); *Goney*, 749 F.2d at 7. Objections which merely rehash an argument presented to and considered by a magistrate judge are not entitled to *de novo* review. *Becker v. Tennis*, 2011 WL 2550544, at *1 n.3 (E.D. Pa. June 23, 2011) (declining to address contentions included in petitioner's objections, concluding that they are "nothing more than a restatement of the underlying claims contained in his petition") (citing *Morgan v. Astrue*, 2009 WL 3541001, at *3 (E.D. Pa. Oct. 30, 2009)); *see also Nghiem v. Kerestes*, 2009 WL 960046, at *1 n.1 (E.D. Pa. Apr. 3, 2009) (declining to engage in additional review of objections where the objections merely re-articulated all the claims and theories for relief that were addressed and dismissed by the magistrate judge).

*4 As laid out in the R&R, the Antiterrorism and Effective Death Penalty Act ("AEDPA") amended the standards for reviewing state court judgments raised in federal *habeas corpus* petitions filed under 28 U.S.C. § 2254. *Werts v. Vaughn*, 228 F.3d 178, 195 (3d Cir. 2000). AEDPA increased the deference federal courts must give to the factual findings and legal determinations of the state courts. *Id.* at 196. In accordance with § 2254(d), a *habeas corpus* petition may only be granted if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

To establish that the state court decision was "contrary to" federal law, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir. 1999). Similarly, a federal court may only find a state court decision to be an "unreasonable application" of federal law if the decision, "evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id.* at 890. Further, factual determinations made by the state court are "presumed to be correct." 28 U.S.C. § 2254(e)(1). However, a petitioner may rebut this presumption with "clear and convincing evidence" of the state court's error. *Id.* Consequently, a *habeas* petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." ♨ *Mastracchio v. Vose*, 274 F.3d 590, 597-98 (1st Cir. 2001). As

Back to top

the Supreme Court has observed, this standard is "difficult to meet and highly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

In order to seek federal *habeas* relief, a petitioner must first exhaust the remedies available in state court. *See* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State ..."). To meet this exhaustion requirement, a petitioner must "fairly present his claim in each appropriate state court ... thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). If a state court has refused or would refuse to review a claim based on a state procedural rule that is independent of the federal question and adequate to support the judgment, the court may deny that claim as procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 729, 731-32 (1991); *Lark v. Sec't Pa. Dept. of Corrections*, 645 F.3d 596, 611 (3d Cir. 2011); *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). A federal court may consider the merits of a procedurally defaulted claim only if "the petitioner establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse the default." 🕐 *Holloway v. Horn*, 355 F.3d 707, 715 n.3 (3d Cir. 2004) (quoting *Coleman*, 501 U.S. at 750).

A claim is procedurally defaulted when "a state court declined to address a prisoner's federal claims because the prisoner failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 730. Federal review of the claim, however, is available if the procedural rule that the state court applied to bar a federal claim was not "independent" and "adequate." *Albrecht v. Horn*, 485 F.3d 103, 115 (3d Cir. 2007). A state procedural rule is not adequate to bar federal review on *habeas* if it was not firmly established and regularly followed by the state courts at the time it was applied. *Lark*, 645 F.3d at 611. Whether a procedural rule "was firmly established and regularly applied is determined as of the date the default occurred, and not as of the date the state court relied on it, because a petitioner is entitled to notice of how to present a claim in state court." *Albrecht*, 485 F.3d at 115.

DISCUSSION

*5 Here, Petitioner offers twelve objections (with various subparts) to the Magistrate Judge's R&R. Petitioner's objections, however, largely reiterate the arguments he presented to, and that were thoroughly considered and rejected by the Magistrate Judge. Petitioner, through appointed counsel, submitted over 200 pages of arguments in support of the seventeen claims he asserted in his *habeas* petition, all of which were comprehensively addressed in the Magistrate Judge's 70-page R&R. Notwithstanding the rehashing of these claims, Petitioner's objections will be addressed.

*Objection One—Application of Martinez and Trevino to this Case*

As set forth in the R&R, the Magistrate Judge found that many of Petitioner's claims were procedurally defaulted because they had either never been fairly presented to the state courts or were only raised in a Second PCRA petition which the Pennsylvania Supreme Court found was untimely and, therefore, procedurally barred. Petitioner acknowledges that many of his current federal *habeas* claims were not fairly presented to the state courts on either direct appeal or post-collateral appeal. Petitioner argues, however, that these otherwise procedurally defaulted claims are subject to a narrow exception to the procedural default doctrine recognized in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), and that the Magistrate Judge erred in concluding otherwise. This Court disagrees, and finds that the Magistrate Judge addressed, at length, the applicability of the *Martinez* and *Trevino* decisions and correctly determined that the narrow exception therein does not apply to Petitioner.

In *Coleman v. Thompson*, 501 U.S. 722 (1991), the United States Supreme Court held that ineffectiveness of state post-conviction counsel cannot satisfy the "cause" requisit[ for overcoming a procedural default because there is no federal constitutional right to

Back to top

counsel on post-conviction review. *Coleman*, 501 U.S. at 750-54. In *Martinez*, the Supreme Court carved out a "narrow" and "limited" exception to the rule in *Coleman*, and held that where state law requires claims of ineffective assistance of trial counsel to be raised for the first time in a collateral proceeding, a federal *habeas* petitioner may be able to establish "cause" sufficient to overcome a procedural default of a "substantial" claim of trial counsel's ineffectiveness if the collateral appeal counsel was also ineffective. *Martinez*, 132 S. Ct. at 1315-21. The *Martinez* exception, however, only applies when post-conviction collateral relief proceedings were the first opportunity to raise claims of ineffective assistance of trial counsel. *Id.* In *Trevino*, "the Supreme Court clarified that the *Martinez* rule applied not only to states that expressly denied permission to raise ineffective assistance claims on direct appeal ... but also to states in which it was 'virtually impossible,' as a practical matter, to assert an ineffective assistance claim before collateral review." *See Cox v. Horn*, 757 F.3d 113, 119 (3d Cir. 2014) (quoting *Trevino*, 133 S. Ct. at 1915).

Here, the record shows, and Petitioner readily admits, that with the benefit of new counsel following his trial, Petitioner asserted various ineffective assistance of trial counsel claims in his direct appeal *and* in his first post-conviction collateral appeal. These claims of ineffective assistance of counsel were considered and rejected by the state courts on their merits. *See Speight*, 854 A.2d at 454. Indeed, the trial court conducted evidentiary hearings on Petitioner's ineffective assistance of trial counsel claims, and the Pennsylvania Supreme Court ruled on the merits of the claims in its direct appeal decision. *Id.* The state courts also addressed but rejected on the merits the ineffective assistance of trial counsel claims that Petitioner raised during his First PCRA. Notably, even when Petitioner returned to state court to file and litigate his Second PCRA Petition, he still made no attempt to present many of his unexhausted claims. As the Magistrate Judge correctly concluded, in light of the above, Petitioner's allegation that the Pennsylvania system was similar to the Texas system in *Trevino* is without merit, since Petitioner had a meaningful opportunity to raise and litigate his claims of ineffective assistance of counsel on direct appeal. *Cf.*, *R.R. v. Beard*, 2015 WL 5730784, at *20 (W.D. Pa. Sept. 30, 2015) (declining to apply *Martinez* exception where petitioner asserted ineffective assistance claims prior to post-collateral proceedings).

*6 This Court also rejects Petitioner's argument that the *Martinez* exception should be extended to claims of ineffective assistance of direct appeal counsel, as opposed to trial counsel. Such an extension would require overruling the limits the Supreme Court itself imposed on the "narrow" exception recognized in *Martinez*, which extended only to claims for ineffectiveness of trial counsel. Though not yet addressed by the Third Circuit, with the exception of the Ninth Circuit, every federal appellate court that has considered argument for such an extension has rejected the argument. *See e.g.*, *Dansby v. Hobbs*, 766 F.3d 809, 833 (8th Cir. 2014) (collecting cases); *Gonzalez v. Bush*, 2015 WL 12591014, at *9 (E.D. Pa. Dec. 1, 2015). This Court will follow suit.

*Objection Two—No Showing of Actual Innocence to Overcome Procedural Defaults*
Petitioner objects to the Magistrate Judge's conclusion that he failed to make a sufficient showing of actual innocence to overcome his various procedural defaults. In his objections, Petitioner merely reasserts the same arguments he made to, and which were thoroughly addressed by, the Magistrate Judge. After a careful *de novo* review, this Court agrees with the Magistrate Judge's conclusions and finds that Petitioner has not met the high burden of showing actual innocence as an exception to overcoming his procedural defaults.

Petitioner contends that he meets the "innocence" exception to overcome any procedural default because he has presented "new" evidence that shows that he did not possess or fire a weapon at the crime scene. Specifically, this new evidence consists of expert ballistics and crime scene analysis that purportedly showed that no more than three, and possible two, guns were fired at the scene of the crime.

Back to top

As accurately noted by the Magistrate Judge, a *habeas* petitioner may obtain review of a procedurally defaulted claim by demonstrating that failure to consider the claim will result in a "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995). The United States Supreme Court has held that when a petitioner makes an extraordinary showing of "new reliable evidence," consideration of which makes it more likely than not that no rational juror would find him guilty, it would be a fundamental miscarriage of justice not to review his otherwise defaulted claims on the merits. *Id.* at 324. Thus, a showing of "actual innocence" may excuse a procedural default under the miscarriage of just exception. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013). The Supreme Court has cautioned, however, that "tenable actual-innocence gateway pleas are rare." *Id.* at 1928; *see also Schlup*, 513 U.S. at 321; *Houck v. Stickman*, 625 F.3d 88, 96 (3d Cir. 2010) (describing exception as " 'rare' remedy that is only available in an 'extraordinary' case"); *Johnson v. Pinchak*, 392 F.3d 551, 564 (3d Cir. 2004) (stating that the exception applies only in "rare" or "extraordinary" cases); *Hubbard v. Pinchak*, 378 F.3d 333, 338 (3d Cir. 2004) ("actual innocence" exception applied "only in the rarest of cases"). The Supreme Court has emphasized:

> The meaning of actual innocence ... does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*\*7 Schlup*, 513 U.S. at 329. A *habeas* petitioner "should be allowed to pass through the gateway and argue the merits of his underlying claims" only if the petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* at 316. "Actual innocence" refers to factual innocence and not mere legal sufficiency. *Bousley v. United States*, 523 U.S. 614, 623-24 (1998).

As the Magistrate Judge concluded, the evidence presented at trial was more than sufficient to show, and for a reasonable juror to conclude, that he possessed the intent to kill the victims as part of a conspiracy with the other assailants. The evidence presented at trial, and not challenged in any way by Petitioner's alleged "new" evidence, showed Petitioner standing between two of the assailants at the time of the shooting, and the person standing between these two assailants holding a gun. *Speight*, 677 A.2d at 321; (N.T. 6/24/93 at 67-68). Other evidence, again not challenged in any way by Petitioner's alleged "new" evidence, showed that one of the assailants in the group was carrying a large semiautomatic assault weapon with a magazine capable of holding at least 20 bullets. (N.T. 6/23/93, at 63-66). The victims were shot 22 times with all, but one, either fatally or gravely wounded.     *Speight*, 677 A.2d at 321. No member of the assailants' group was injured in any way, and there was no evidence presented that any one of the victims was armed. *Id.* Even if Petitioner's "new" evidence showed that he did not possess or shoot a gun, a reasonable juror could still conclude, based on all of the evidence presented, that Petitioner was present at the scene, had the intent to kill members of the victims' group based on Petitioner's actions in concert with the assailants, and knew of the concealed weapons the members of his group possessed. As such, this Court agrees with the Magistrate Judge's conclusion that Petitioner has not met the burden required to implicate an equitable exception to

Back to top

procedural default based on a claim of actual innocence because he has not shown that it is more likely than not that no reasonable juror would have convicted him in light of his "new" evidence.

*Objection Three—Petitioner's <u>Batson</u> Claim (Claim I)*

At Claim I of his *habeas* petition, Petitioner asserts that his constitutional rights were violated by the prosecution's racially discriminatory use of peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that trial counsel was ineffective for failing to make a *Batson* challenge. With respect to Petitioner's substantive *Batson* claim, the Magistrate Judge found that the claim had been forfeited because Petitioner did not assert a timely objection at trial or on direct appeal as required to preserve the claim. *See Clausell v. Sherrer*, 594 F.3d 191, 194-95 (3d Cir. 2010) (holding that "[a]s an initial matter, we can dispose of [petitioner's] substantive *Batson* claim, because in failing to raise an objection at trial to the prosecutor's use of challenges, [petitioner] forfeited his right to raise a *Batson* claim on appeal."). In his objections, Petitioner does not appear to object to this conclusion; and any such objection would be without merit.

With respect to Petitioner's *Batson*-based ineffective assistance of counsel claim, the Magistrate Judge found this claim to be procedurally defaulted because it has never been presented to the state courts, and Petitioner would be barred from doing so due to the applicable one-year statute of limitations. In his objection, Petitioner argues this conclusion was erroneous and argues that the claim was "fairly presented" in his second petition for state post-conviction relief. Petitioner acknowledges that the Pennsylvania Supreme Court found this claim was untimely, but states that the "state court's application of the time bar was not adequate to foreclose federal habeas review of the merits." (Petitioner's Objections at p. 12). As support, Petitioner merely cites to the Third Circuit's decision in *Lark v. Sec'y Pa. Dep't of Corrections*, 645 F.3d 596 (3d Cir. 2011), but provides no argument or analysis.

*8 Petitioner's unsubstantiated reliance on *Lark* is, however, misplaced. In *Lark*, the Third Circuit held that the PCRA's one-year procedural time bar was not firmly established as of January 16, 1996, when the petitioner in that case defaulted the *Batson* claim he sought to subsequently raise in his federal *habeas* petition. *Id.* at 612-613. As such, the *Batson* claim in *Lark* could be reviewed by the federal court on *habeas* review. *Id.* The petitioner in *Lark*, however, unlike Petitioner here, fully litigated his first and second PCRAs *before* the Pennsylvania Supreme Court made it clear that state procedural rules, including the one-year statute of limitations, would be strictly enforced in capital cases. *See Lark*, 645 F.3d at 612-13. In contrast, while Petitioner was litigating his First PCRA Petition in state court, the Pennsylvania Supreme Court made it clear that the one-year statute of limitations and other procedural rules would be strictly enforced, even in capital cases, and that there would therefore be one, and only one, round of state post-conviction review except when a petitioner could demonstrate entitlement to one of the limited exceptions to the procedural rules. *See Commonwealth v. Albrecht*, 720 A.2d 693, 700 (Pa. Nov. 23, 1998) (holding that the so-called "relaxed waiver rule" would "no longer [apply] in PCRA appeals."). The Pennsylvania Supreme Court confirmed in *Commonwealth v. Peterkin*, 722 A.2d 638 (Pa. Dec. 21, 1998), that the PCRA one-year time bar applied to capital cases and was not superseded by the relaxed waiver rule. *Id.* at 643. Further, in *Commonwealth v. Banks*, 726 A.2d 374 (Pa. Mar. 2, 1999), the Pennsylvania Supreme Court confirmed that the PCRA's one-year statute of limitations was to be regarded as jurisdictional in nature, with judges allowed to make exceptions only to the extent specifically permitted under the statute. *Id.* at 376.

Here, after being appointed new PCRA counsel, Petitioner was permitted to file an amended PCRA petition on June 29, 1999. By that point in time, the Pennsylvania Supreme Court had made clear that the one-year statute of limitations would be enforced in capital PCRA cases, just as in noncapital cases, and Petitioner was on notice

Back to top

that the Pennsylvania courts would not liberally consider or grant second or successive petitions unless a petitioner could show entitlement to one of the narrow exceptions to Pennsylvania's one-year statute of limitations. *See, e.g., Peterkin*, 722 A.2d at 643. As such, when Petitioner's PCRA counsel filed an amended petition on Petitioner's behalf, the one-year time bar for PCRAs was firmly established and regularly followed. Thus, as stated, Petitioner's reliance on *Lark* is misplaced.

Moreover, Petitioner's apparent attempt to distinguish his case from these other cases on the basis that he actually "presented" his claim of ineffective assistance of trial and direct appeal counsel to the state courts, *albeit* in a second and untimely PCRA, is without merit. As the U.S. Supreme Court has explained, a claim presented to the state courts, but only in a second and time-barred post-conviction appeal, has not been fairly presented to the state courts. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *see also Karnes v. Patrick*, 2009 WL 1026342, at *5 (W.D. Pa. Apr. 15, 2009) (collecting cases). This objection, therefore, is overruled.

*Objection Four—Claim IV—Ineffective Assistance of Counsel for Failing to Investigate, Develop and Present Evidence in Support of "Mere Presence" Defense, and Presenting Harmful Testimony*

In this objection, Petitioner contends that the Magistrate Judge applied an incorrect or wrong standard, and focuses on the Magistrate Judge's stated conclusion that Petitioner "has not shown by clear and convincing evidence that the factual determinations of the state court were incorrect or that trial counsel's determination to call Mr. Scott as a witness rose to the level of ineffective assistance of counsel under *Strickland*." (R&R at 32). Petitioner suggests that in reaching this conclusion, the Magistrate Judge mistakenly applied the applicable standard of review for a state court's factual findings to the state court's legal findings. This Court disagrees.

A plain reading of the R&R confirms that the Magistrate Judge applied the correct AEDPA standards to Petitioner's claim of ineffective assistance of counsel when considering his trial counsel's decision to call witness David Scott. Under AEDPA, a state court's factual determinations are presumed to be correct, but can be rebutted by the petitioner with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). A state court's legal determinations, on the other hand, are reviewed under the unreasonable application/determination standards of § 2254(d). As set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), however, "judicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. To succeed, "a defendant must overcome the 'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quoting *Strickland*, 466 U.S. at 689). In the R&R, the Magistrate Judge found that Petitioner had "not shown by clear and convincing evidence that the factual determinations of the state court were incorrect *or* that trial counsel's determination to call Mr. Scott as a witness rose to the level of ineffective assistance of counsel under *Strickland*." (R&R at p. 32) (emphasis added). This Court is satisfied that, in reaching this conclusion, the Magistrate Judge applied the appropriate standards of review to both the state court's factual and legal findings. [4]

*9 Next, Petitioner objects to the Magistrate Judge's conclusions with respect to his ineffective assistance of counsel claims premised on trial counsel's decision to call David Scott as a witness, which Petitioner contends turned out to be harmful. Specifically, Petitioner objects to the Magistrate Judge's finding that the state court's conclusion that trial counsel had a reasonable basis for calling Mr. Scott as a witness was reasonable and, therefore, trial counsel was not ineffective under *Strickland*. Mr. Scott testified on trial counsel's direct examination that he recalled three people wielding guns, including two that he recognized (Curnell Bennet and "Slim"), but that

he could not recognize anyone sitting in the courtroom, including Petitioner, as having been present at the scene of the shooting. When pressed by the trial judge to clarify if "you know whether or not [the third person] was this defendant?" Mr. Scott responded, "Not for sure. It could have been." Petitioner contends this testimony was harmful and that his trial counsel was ineffective for calling Mr. Scott to the stand without fully and adequately investigating Mr. Scott's potential testimony.

When addressing the merits of ineffective assistance of counsel claims on *habeas* review, the "clearly established federal law" applicable to such claims is the familiar two-pronged inquiry articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To sustain a claim for ineffective assistance of counsel, a petitioner must show that counsel's performance was objectively deficient and that this deficient performance prejudiced the defense. *Id.* at 687. Prejudice has been defined as a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*; *see also Frey v. Fulcomer*, 974 F.2d 348, 358 (3d Cir. 1992) ("[A] petitioner must demonstrate a reasonable probability that, but for the unprofessional errors, the result would have been different."). The court must defer to counsel's tactical decisions, avoiding "the distorting effects of hindsight," and give counsel the benefit of a strong presumption of reasonableness. *Strickland*, 466 U.S. at 689; *Gov't of the Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1431 (3d Cir. 1996).

The Magistrate Judge concluded (as did the state courts) that trial counsel had a reasonable basis for calling Mr. Scott to testify. At the PCRA hearing, trial counsel testified that he called Mr. Scott to testify in order to undermine the testimony of other witnesses who placed Petitioner at the scene, standing between two of the shooters. Petitioner essentially argues that trial counsel should have anticipated the possibility that Mr. Scott's testimony would "go south" for Petitioner and that counsel should have conducted a more thorough investigation of Mr. Scott's potential testimony and not have limited it, as he did, to a review of Mr. Scott's statements to police and to a single interview of Mr. Scott outside the courtroom.

As the Magistrate Judge concluded, this Court finds that the state court's conclusion that trial counsel had a reasonable basis for calling Mr. Scott is sound. Trial counsel testified that he was aware that Mr. Scott had been unable to identify Petitioner in his statement to police, and that he had failed to make an identification of Petitioner at a pre-trial lineup. With this knowledge, prior to calling Mr. Scott to the witness stand, trial counsel interviewed Mr. Scott outside the courtroom to confirm that he could not identify Petitioner as having been present at the scene of the shooting. As trial counsel explained, such testimony would refute that of other witnesses who placed Petitioner at the scene standing between two of the identified assailants. Given that two other witnesses had already testified that Petitioner was standing between two of the shooters, it was reasonable for trial counsel to call Mr. Scott whose testimony could call into question the testimony of the other eyewitnesses. This Court agrees with the conclusion of the Magistrate Judge that trial counsel's decision to call Mr. Scott as a witness under these circumstances does not amount to ineffective assistance of counsel under *Strickland*.

*10 Petitioner also objects on the basis that neither the state court nor the Magistrate Judge addressed his contention that his trial counsel could have: (1) called the lineup detective rather than Mr. Scott to verify that Mr. Scott had not identified Petitioner at the lineup; and (2) impeached Mr. Scott with the descriptions he gave to police of the three men with guns, none of which matched Petitioner. These arguments, however, equally fail because the state courts reasonably found that Petitioner's trial counsel had a reasonable strategic reason for calling Mr. Scott.

Back to top

Petitioner also argues that his trial counsel should have investigated the possibility that Mr. Scott himself was carrying a gun on the day of the incident and requested that the jury be instructed to treat Mr. Scott's "inconclusive" testimony with caution. The Magistrate Judge found these claims to be procedurally defaulted. This Court agrees since the claims were never fairly presented to the state courts. Petitioner's argument that his procedural default of these claims can be overcome by the limited *Martinez* exception discussed above, fails for the same reasons previously discussed. *See* discussion of *Marinez supra* at pp. 9-11.

Petitioner also objects to the Magistrate Judge's adverse findings with respect to Petitioner's ineffective assistance of counsel claim premised on his challenge to the method by which his counsel chose to impeach the testimony of Allen Carson. In a statement given to police prior to Petitioner's trial, Mr. Carson stated that Petitioner had "leaned against [a street] pole" while the attack was taking place. During trial, Mr. Carson testified that Petitioner was slightly closer to the events and did not mention him leaning against the pole. Trial counsel attempted to impeach Mr. Carson with his prior statement, but after a single objection was sustained, counsel abandoned the effort. Trial counsel then called Detective Kenneth Curcio to read Mr. Carson's prior statement into evidence. That statement, however, also included Mr. Carson's statement that Petitioner and another man "acted as lookouts." Petitioner contends that trial counsel's decision to impeach Mr. Carson's statement through Detective Curcio rather than by impeaching Mr. Carson with his own statement while he was on the stand constitutes ineffective assistance.

As noted by the Magistrate Judge, the state courts addressed this argument and found that trial counsel had a reasonable basis for calling Detective Curcio. Specifically, the Pennsylvania Supreme Court found: "[g]iven the choice between testimony which placed [Petitioner] in the midst of the group of assailants or testimony that placed [Petitioner] apart but speculated that he may have been acting as a lookout, it was reasonable for counsel to opt for the second alternative."     *Speight*, 677 A.2d at 323. This Court agrees. Because trial counsel had a reasonable basis for calling Detective Curcio, the Pennsylvania Supreme Court's determination was not contrary to or an unreasonable application of Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

#### Objection Five—Claim V—Ineffective Assistance of Counsel for Failing to Call a Crime Scene Expert for Ballistics Evidence

In his *habeas* petition at Claim V, Petitioner asserts that his trial counsel was ineffective for failing to call a crime scene ballistics expert. The Magistrate Judge found this claim to be procedurally defaulted. Petitioner objects to this finding based on his reliance on *Martinez* to overcome the procedural default. For the reasons discussed above, and at length in the R&R, Petitioner's reliance on the narrow *Martinez* exception is misplaced. *See* discussion of *Martinez supra* at pp. 9-11. This claim is procedurally defaulted.

#### Objection Six—Claim VI—Ineffective Assistance of Counsel for Failing to Investigate and Prepare to Meet Commonwealth's Evidence, and to Object to Inadmissible Evidence

*11 At Claim VI of his *habeas* petition, Petitioner asserts that his trial counsel was ineffective in failing to investigate and present evidence that would have impeached the Commonwealth's witnesses, contradicted the Commonwealth's theory of the case, and exculpated Petitioner. The Magistrate Judge found that these claims were procedurally defaulted because they were not fairly presented to the state courts. Petitioner objects to the Magistrate Judge's conclusion essentially arguing that the claim is subject to the narrow exception set forth in *Martinez*. The Magistrate Judge addressed and rejected this argument. For the reasons set forth above, this Court agrees. *See* discussion of *Martinez supra* at pp. 9-11. Petitioner's objection, therefore, is overruled.

Back to top

*Objection Seven—Claim VII—Denied Due Process by Commonwealth's False Arguments and Presentation and Suppressed Material and Exculpatory Evidence*

At Claim VII of his petition, Petitioner asserts that his due process rights were violated by the prosecution's failure to turn over various *Brady* materials; specifically: that one or more members of the victims' group had a gun at the time of the shooting; that David Scott had failed to identify Petitioner and his co-defendants; and that of the criminal activities by members of the victims' group, including their violent intimidation of passers-by on the street corner where the crime occurred. The Magistrate Judge found this claim to be procedurally defaulted. In his objections, Petitioner argues that he has shown the "cause and prejudice" requisite to overcome the procedural default and has met this burden by effectively substantiating his underlying *Brady* claims.

The Supreme Court has recognized that the "cause and prejudice" analysis for a procedurally defaulted claim in a *habeas* matter based on *Brady* parallels two of the three components of the underlying alleged *Brady* violation. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004). "[I]n the specific context of a *Brady* claim, 'a petitioner shows cause when the reason for his [default] in state-court proceedings was the State's suppression of the relevant evidence." *Johnson v. Folino*, 705 F.3d 117, 128 (3d Cir. 2013) (citations omitted). "[P]rejudice ... exists when the suppressed evidence is 'material' for *Brady* purposes." *Id.* (citations omitted). Thus, to demonstrate the "prejudice" necessary to excuse a "procedural default of a *Brady* claim, a *habeas* petitioner must show that the undisclosed evidence is material." *Id.*

As the Magistrate Judge found, and this Court agrees, Petitioner has failed to show cause for his admitted procedural defaults. Notably, in his original memorandum of law, Petitioner relied solely on his general arguments as to "cause" and the narrow *Martinez* exception on which he relied to overcome other procedural defaults. (*See* Petitioner's Memorandum of Law at p. 75). For the reasons discussed above and at length in the R&R, Petitioner's reliance misplaced. *See* discussion of *Martinez supra* at pp. 9-11.

In his objections, Petitioner baldly argues for the first time that he has met the "cause" requirement by substantiating his underlying *Brady* claims. While the "cause" requirement can be satisfied where a petitioner shows that the default was caused by the state's suppression of relevant evidence, *see Johnson*, 705 F.3d at 128, here Petitioner has made no attempt to show that the Commonwealth's purported suppression of the alleged evidence was the cause of his default. Indeed, most of the information to which Petitioner points to substantiate his allegation that the Commonwealth suppressed evidence is contained in declarations obtained from individuals who either gave statements to the police (which were provided to Petitioner before his trial), or who testified at his trial in 1993. Petitioner brought and litigated two separate PCRA petitions and failed to raise a *Brady* claim in either petition. Indeed, this federal *habeas* action was stayed to allow Petitioner to litigate his Second PCRA Petition. Petitioner offers no reason why this information could not have been obtained and presented to the state courts. Nor does he support any connection between the Commonwealth's purported failure to produce the evidence and his procedural default of the claims. Having failed to do so, Petitioner cannot overcome his procedural default. *See id.*

*12 Even if Petitioner could overcome the procedural default of his *Brady* claims, these claims lack merit. To obtain a new trial for a *Brady* violation, Petitioner must show: (1) the evidence at issue is favorable to the accused; (2) the evidence was suppressed by the state; and (3) the evidence is material. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The Third Circuit Court of Appeals summarized the "materiality" requirement of *Brady* as follows:

Back to top

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal ... Rather, the touchstone of materiality is a reasonable probability of a different result. The question is ... whether in [the evidence's] absence [the petitioner] received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state. Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for *Brady* purposes. Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration.

*Johnson*, 705 F.3d at 128-29 (citations and quotations omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Here, Petitioner has not shown, nor can he show, that the allegedly suppressed evidence is material, *i.e.*, a reasonable probability that the result would have been different had the suppressed evidence been disclosed. Even accepting Petitioner's interpretation of the evidence, at best this evidence suggests the victims' group was armed and sought to protect its drug distribution territory from competitors. It does not diminish or refute, in any way, Petitioner's presence at the time of the incident, or his conspiratorial participation in the shootings. Moreover, it is far from a reasonable probability that this evidence would have changed the outcome in light of: other evidence that showed that at least one member of the assailants' group went to confront the members of the victims' group carrying a submachine gun; the absence of any other evidence that any member of the victims' group was armed or brandished a weapon; the undisputed fact that every member of the victims' group (except for David Scott) was fatally or gravely wounded and no weapons were found on any of the victims; and the fact that none of the members of the assailants' group was injured in any way. Petitioner's objection, therefore, is overruled.

*Objection Eight—Claim VIII—Prosecutorial Misconduct and Ineffective Assistance of Counsel for Failing to Object*

**\*13** At Claim VIII, Petitioner asserts that the trial prosecutor committed misconduct during closing arguments and that Petitioner's counsel was ineffective for failing to object. The Magistrate Judge found most of the aspects of this claim to be procedurally defaulted. In his objections, Petition contends that these procedural defaults can be overcome by the narrow *Martinez* exception. For the reasons discussed above (and by the Magistrate Judge), Petitioner is wrong. *See* discussion of *Martinez supra* at pp. 9-11.

The Magistrate Judge found that Petitioner had presented only one claim of prosecutorial misconduct to the state court; *to wit*: that trial counsel was ineffective for failing to object when the prosecutor impermissibly stated during closing argument that the jury should convict Petitioner because the prosecutor believed Petitioner was

Back to top

guilty. Addressing the merits of this exhausted claim, the Magistrate Judge found that the state court's conclusion that the prosecutor's statement during closing was not an expression of personal opinion, but rather an expression of the evidence presented at trial, was reasonable. In his objections, Petitioner merely cites to the arguments he presented to the Magistrate Judge by way of his memorandum of law, but provides no argument as to how the Magistrate Judge's conclusion was incorrect. Notwithstanding, this Court finds the Magistrate Judge's conclusion, and that of the Pennsylvania Supreme Court, to be sound. This objection, therefore, is overruled.

*Objection Nine—Claim IX—Improper Jury Instruction and Ineffective Assistance*
At Claim IX, Petitioner asserts that the trial court's jury instructions unconstitutionally relieved the prosecution of its burden of proving each and every one of the elements of the first degree murder charge, and that counsel was ineffective for failing to raise and litigate this claim. In the R&R, the Magistrate Judge found that the Pennsylvania Supreme Court's rejection of this claim was not unreasonable. In his objections, Petitioner contends that the Magistrate Judge applied the wrong standard. Specifically, Petitioner asserts that "[i]nstead of applying the *Francis* standard regarding instructions that are themselves 'constitutionally infirm,' the court applied a standard for reviewing an 'ambiguous' instruction, i.e., 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.' *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)." (Petitioner's Objections at 32).

Petitioner's objection with regard to the standard applied by the Magistrate Judge is without merit and premised upon Petitioner's rearrangement of snippets taken from the *Francis* decision. Contrary to Petitioner's argument, *Francis v. Franklin*, 471 U.S. 307 (1985) does not articulate one standard to be applied to jury instructions that are found to be "constitutionally infirm," and another standard to be applied to jury instructions that are merely ambiguous. Rather, to the extent *Francis* outlined different standards or analyses, those two differing analyses pertain to whether the challenged jury instruction is deemed mandatory or permissive, an issue not raised or discussed by Petitioner. *Id.* at 313-314. Indeed, nowhere in any of his briefing on his original *habeas* petition does Petitioner make the argument he now makes in his objections. To the contrary, Petitioner argued for the same "reasonable likelihood" standard applied by the Magistrate Judge that he now contends was wrong. (*See* Petitioner's Memorandum of Law [ECF 70] at 83).

*14 Here, both the Magistrate Judge and the Pennsylvania Supreme Court applied the proper analysis to the challenged jury instructions. Jury instructions violate due process when they relieve the state of its obligation to prove every element of an offense beyond a reasonable doubt. *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979). "To show that a jury instruction violates due process, a habeas petitioner must demonstrate both (1) that the instruction contained some 'ambiguity, inconsistency, or deficiency,' and (2) that there was 'a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.' " *Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (quoting *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009)). This "two-part inquiry requires a federal habeas court to 'focus initially on the specific language challenged,' and then to review the challenged instruction in the context of the entire charge and in light of the evidence and arguments presented at trial." *Id.* (citations omitted). Contrary to Petitioner's argument otherwise, the state courts *and* the Magistrate Judge assessed the challenged jury instructions under this standard. As such, Petitioner's objection is overruled.

In his objections, Petitioner takes issue with the Magistrate Judge's reliance on the Third Circuit's decision in *Bronshtein v. Horn*, 404 F.3d 700 (3d Cir. 2005), and distinguishing the holding of *Laird v. Horn*, 414 F.3d 419 (3d Cir. 2005). Again, Petitioner's contentions are misplaced.

Back to top

As described in the R&R, the Pennsylvania Supreme Court concluded that when viewing the jury instructions in this case as a whole, the jury could only convict Petitioner for conspiracy to commit murder if it found that he specifically intended to promote or facilitate the offense of murder. *Speight*, 854 A.2d at 459-61. When reviewing the state court's decision, the Magistrate Judge found that it was consistent with the Third Circuit's holding in *Bronshtein*, wherein the Third Circuit concluded that when a jury convicted a defendant of conspiracy to commit murder, the jury necessarily found that the defendant, and not merely one or more of his co-conspirators, had the necessary intent to kill sufficient to sustain a conviction for first-degree murder. *Bronshtein*, 404 F.3d at 713-14. As such, the Third Circuit therein concluded that the error in the jury instruction for first-degree murder was harmless in light of the correct instruction on conspiracy to commit first-degree murder. *Id.* Here, as in *Bronshtein*, the jury convicted Petitioner of conspiracy to commit murder, as well as first-degree murder. In convicting Petitioner of conspiracy to commit murder, the jury necessarily found that Petitioner, and not merely one or more of his co-conspirators, possessed the necessary intent to kill. As such, contrary to Petitioner's argument, the Magistrate Judge's reliance on *Bronshtein* was appropriate.

The Magistrate Judge also correctly distinguished this case from *Laird*. In *Laird*, the inchoate liability instruction told the jurors that Laird was guilty as an accomplice if he had solicited, commended, encouraged, or requested the commission of "a crime" with the intent to promote or facilitate it. The Third Circuit, however, determined that the instruction did not make sufficiently clear that murder had to have been the "crime" Laird intended to promote or facilitate. 414 F.3d at 422. The *Laird* jury was also incorrectly instructed that it could convict Laird of a substantive offense even if the "particular crime ... differ[ed] from the agreed crime," if it was committed by the co-conspirator in furtherance of his and the defendant's common plan and design. *Id.* at 428. In light of these unclear instructions, the Third Circuit concluded that given the jury instructions and the particular facts of that case, "the jury could easily have convicted Laird of first-degree murder based on his conspiring with Chester to kidnap or assault Milano even if jurors were not convinced beyond a reasonable doubt that Laird intended to kill him." *Id.* at 427. In addition, the Third Circuit noted that Laird was convicted of first-degree murder, second-degree murder, third-degree murder, and criminal conspiracy, leading the Third Circuit Court to conclude that it was unable to determine what crime the jury found Laird had intended to promote or facilitate. *Id.* at 429.

*15 In contrast to the jury instructions in *Laird*, the instructions in this case told the jury that Petitioner was charged with conspiracy to commit murder, for which he would have had to "agree[ ] with another person or persons that they or one of them would engage in conduct which constitutes the *crime of murder* or agreed to aid another person or persons in the planning or commission of the *crime of murder*" and that he did so with the intent to promote or facilitate the commission of that crime, rather than some other possible crime. (N.T. 6/24/93, at 148-49) (emphasis added). As correctly noted by the Magistrate Judge, in light of the material differences between this case and *Laird*, Petitioner's reliance on *Laird* is misplaced.

As noted, the conspiracy to commit murder charge in the present case similarly instructed that Petitioner could only be found guilty of conspiracy to commit murder if it was proven "beyond a reasonable doubt" that Petitioner acted "with the intent of promoting or facilitating the commission of that crime." While the Pennsylvania Supreme Court found the first-degree murder charge was incorrect, this Court finds that the state court's conclusion that the remainder of the charges sufficiently explained to the jury that it had to find that Petitioner intended the killing in order to find him guilty under the theory of accomplice liability and conspiracy to commit murder was reasonable. Accordingly, this objection is without merit. As such, this Court agrees with

Back to top

the conclusion of the Magistrate Judge that it was not unreasonable for the Pennsylvania Supreme Court to conclude that the trial court's jury instructions, when viewed as a whole, made it clear that Petitioner could be convicted for conspiracy to commit murder only if he specifically intended to promote or facilitate the offense of murder.

*Objection Ten—Claim X—Insufficient Evidence*

At Claim X, Petitioner asserts that his conviction on all charges violates the due process clause because there was insufficient evidence to prove beyond a reasonable doubt that he committed, conspired to commit, or aided or abetted those who committed the charged crimes. In her R&R, the Magistrate Judge found that a jury could reasonably have found Petitioner was part of a conspiracy and possessed the requisite intent to commit first-degree murder. In his objections, Petitioner merely "objects to the magistrate judge's conclusion," and repeats the same arguments presented to and considered by the Magistrate Judge in her 70-page R&R. As such, Petitioner's inappropriate general objection, without more, is overruled.

Notwithstanding, as set forth in the R&R, the United States Supreme Court has noted that due process claims of insufficient evidence, like Petitioner's claim here:

> face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.

*Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (internal citations and quotations omitted). Evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

*16 In reviewing the evidence at Petitioner's trial, the Pennsylvania Supreme Court found:

> Here, the evidence the Commonwealth presented sufficiently established that [Petitioner] and his co-conspirators approached Carson's group to remove them, once and for all, from their location, so that Bennet's drug business would not be hampered. The evidence further demonstrates that [Petitioner's] group acted together in firing numerous shots at Carson's group and that the middle person, identified by one eyewitness as [Petitioner], had personally fired shots at the group. Such evidence clearly demonstrated that the killings were committed with malice aforethought sufficient to sustain [Petitioner's] convictions for first degree murder.

*Speight*, 677 A.2d at 321. At the very least, Petitioner was identified at trial as a member of the group that shot and killed members of the victims' group.

As he has argued before the state courts and the Magistrate Judge, Petitioner contends this evidence was insufficient to show that he either knew that his co-conspirators possessed the weapons that they, in fact, carried, or that he knew of their intent to use

Back to top

them to kill. Based on the evidence presented at trial, however, the jury reasonably could have found, as it did, that Petitioner was not a mere passive spectator but that he shared the other assailants' intent to use their weapons to kill. As such, this Court is unable to conclude that the Pennsylvania Supreme Court's determination was unreasonable in light of the totality of evidence presented at trial. Petitioner's sufficiency of the evidence objection, therefore, is overruled.

*Objection Eleven—Claim XI—Petitioner is Innocent of First Degree Murder*
At Claim XI of his *habeas* petition, Petitioner asserts that because he is actually innocent of first degree murder, it would violate the Constitution to execute him. (Petitioner's Mem. of Law at 107). Because this claim as asserted pertains only to Petitioner's death sentence, and Respondents have agreed to the conditional grant of relief as to Petitioner's death sentence, the Magistrate Judge did not address this claim. In his objections, however, Petitioner contends that this claim is still viable because it pertains to his convictions for first degree murder and conspiracy and not just his death sentence. Petitioner is mistaken.

The United States Supreme Court has "assumed without deciding that 'in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim.' " *House v. Bell*, 547 U.S. 518, 554 (2006) (quoting *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). Free standing "actual innocence" claims, however, have only been deemed cognizable on federal *habeas* review when the petitioner is challenging a death sentence. *See e.g.*, *Herrera*, 506 U.S. at 400; *Fielder v. Varner*, 379 F.3d 113, 122 (3d Cir. 2004) ("It has long been recognized that '[c]laims of actual innocence based on newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.' ") (quoting *Herrera*); *Peace v. Superintendent SCI-Cresson*, 2011 WL 7112287, at *3 (E.D. Pa. Oct. 17, 2011) ("The Supreme Court has held that free-standing claims of actual innocence—*i.e.*, those not attached to an independent constitutional claim—are inappropriate for federal habeas relief."); *Woodard v. Tennis*, 2009 WL 1858237, at *10 (W.D. Pa. June 29, 2009) (noting that the "Third Circuit repeatedly has emphasized that in non-capital cases," free-standing claims of factual innocence "are never grounds for federal habeas relief absent an independent constitutional violation."); *Colon v. Ericson*, 2008 WL 5003476, at *3 (E.D. Pa. Nov. 20, 2008) (holding that free-standing claim of factual innocence "fails to present an issue cognizable on federal habeas review"). Because Respondents have agreed not to contest a grant of relief as to Petitioner's death sentence, and because Petitioner no longer faces the prospect of being executed, his claim of actual innocence is no longer cognizable on federal *habeas* review as an independent claim. Petitioner's objection is, therefore, overruled.

*Objection Twelve—Claim XVII—Cumulative Prejudicial Errors*
*17 At Count XVII of his *habeas* petition, Petitioner asserts that even if he is not entitled to relief on any individual claim, he is nevertheless entitled to relief because the cumulative effect of all of the alleged errors denied him a fair trial. In the R&R, the Magistrate Judge found that this claim was procedurally defaulted and that as with Petitioner's other procedurally defaulted claims, he has not met his burden to overcome the default. Notably, Petitioner acknowledged that this claim was procedurally defaulted in his original memorandum of law. Notwithstanding, in his objections, Petitioner contends he can overcome the procedural default for the reasons previously articulated by Petitioner, but rejected above. For the reasons discussed above, and in the Magistrate Judge's R&R, Petitioner has not met his burden to overcome his procedural defaults. *See* discussion of *Martinez supra* at pp. 9-11. Therefore, this objection is overruled.

CONCLUSION

For the reasons stated herein, Petitioner's objections to Magistrate Judge Caracappa's Report and Recommendation are overruled, the Report and Recommendation is

Back to top

Case 2:22-mc-00050-PD    Document 46    Filed 05/13/25    Page 155 of 190

approved and adopted. Consequently, Petitioner's petition for a writ of *habeas corpus* as to the guilt phase of his trial is denied and dismissed. With respect to Petitioner's sentence of death, by agreement of the parties, the petition for a writ of *habeas corpus* is granted, and Petitioner is to be re-sentenced. Because reasonable jurists would not debate this Court's disposition of Petitioner's claims, a certificate of appealability is denied. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Finally, this Court has found no merit to Petitioner's underlying *habeas* claims, therefore, his motions for discovery and for oral argument are denied.

An Order consistent with this Memorandum Opinion follows.

## All Citations

Not Reported in Fed. Supp., 2017 WL 914907

---

### Footnotes

1    This *habeas* matter was originally assigned to the Honorable Anita B. Brody and reassigned to the undersigned on September 3, 2013.

2    This matter was assigned to Magistrate Judge Caracappa *only* after Respondents advised this Court that they no longer opposed a grant of relief as to the death penalty.

3    Petitioner withdrew his third claim on July 3, 2013. [*See* ECF 70 at p. 37].

4    Notably, in support of her conclusions in this respect, the Magistrate Judge cited to *Wheeler v. Rozum*, 410 Fed.Appx. 453, 459 (3d Cir. 2010), wherein the Third Circuit recites the appropriate standards of review to be applied under AEDPA.

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

## Related documents

Selected topics      Secondary Sources      Briefs      Trial Court Documents

United States Magistrates
Review and Supervision by District Court
  United States Magistrate Judge Report

 
Back to top

**EXHIBIT 4**

# DEATH SENTENCES OVERTURNED IN FEDERAL COURT PRE-2018 KRASNER DAO

**1. <u>Commonwealth v. Lee Baker</u>, CP-51-CR-0405062-1984**

The federal district court held that trial counsel's failure to object to defective jury instructions constituted ineffective assistance of counsel. <u>Baker v. Horn</u>, 383 F. Supp. 2d at 765, 777-779 (E.D. Pa. 2005).

**2. <u>Commonwealth v. Jesse Bond</u>, CP-51-CR-2217781-1992**

Trial counsel was ineffective for failing to prepare for the penalty phase. <u>Bond v. Beard</u>, 539 F.3d 256, 291 (3d Cir. 2008) *as amended* (Oct. 17, 2008) ("Counsel performed an inadequate and tardy investigation into Bond's childhood like the counsel in *Williams* [*v. Taylor*, 529 U.S. 362 (2000).").

**3. <u>Commonwealth v. Henry Fahy</u>, CP-51-CR-0222831-1981**

Relief granted for failure to prepare mitigation. <u>Fahy v. Horn</u>, 2014 WL 4209551, at *1 (E.D. Pa. Aug. 26, 2014) ("The petition will be granted for: (1) ineffective assistance of trial counsel for failing to develop and present available and compelling mitigating evidence and for suggesting Fahy would likely be released on parole; and (2) the erroneous jury charge that prevented the jury from considering non-statutory mitigating evidence.").

**4. <u>Commonwealth v. Donetta Hill</u>, CP-51-CR-0518391-1991**

The federal court agreed with Defendant's ineffectiveness claim. <u>Hill v. Wetzel</u>, 279 F. Supp. 3d 550, 566 (E.D. Pa. 2016) ("In clear contravention of prevailing professional norms at the time of trial, Petitioner's trial attorney did not conduct a social history investigation").

**5. <u>Commonwealth v. William Holland</u>, CP-51-CR-1014291-1984**

The federal court determined that Defendant was denied his 5th Amendment right to a court-appointed defense expert for help in developing defenses in support of mitigation at the penalty phase. <u>Holland v. Horn</u>, 150 F. Supp. 2d 706, 729, 749 (E.D. Pa. 2001) ("We nevertheless find that Petitioner's appellate counsel on direct appeal to the Pennsylvania Supreme Court was constitutionally deficient. He did not raise any claims regarding Petitioner's lack of a court-appointed psychiatric expert to assist the defense.") *aff'd*, 519 F.3d 107, 119 (3d Cir. 2008) ("In any event, exercising plenary review, we conclude that Holland is entitled to penalty phase relief on the *Ake* claim essentially for the reasons the District Court stated.").

**6. <u>Commonwealth v. Arnold Holloway</u>, CP-51-CR-0613051-1985**

The District Court concluded that Holloway's counsel provided ineffective

assistance in failing to investigate mental-health issues and request the assistance of a mental-health expert. Holloway v. Horn, 355 F.3d 707, 713 (3rd Cir. 2004). On appeal, the Third Circuit, gave additional relief on defendant's Batson claim. Holloway v. Horn, 355 F.3d at 730 (remanding the case for retrial).

## 7. Commonwealth v. Joseph Kindler, CP-51-CR-0827471-1982

The Third Circuit granted penalty phase relief based upon counsel's ineffectiveness. Kindler v. Horn, 642 F.3d 398, 405 (3d Cir. 2011) ("Kindler was denied effective assistance of counsel during the penalty phase.").

## 8. Commonwealth v. Robert Lark, CP-51-CR-0120121-1980

The Third Circuit affirmed the federal district court's grant of a writ of habeas corpus. Lark v. Sec'y Pennsylvania Dep't of Corr., 566 F. App'x 161, 162 (3d Cir. 2014). This conviction was overturned due to a Batson violation.

## 9. Commonwealth v. Reginald Lewis, CP-51-CR-0205851-1983

The federal district court determined that counsel provided ineffective assistance at the penalty phase. Defendant claimed penalty phase ineffectiveness. Lewis v. Horn, 2006 WL 2338409, at *11 (E.D. Pa. Aug. 9, 2006) (finding no reason ... for trial counsel's failure to investigate and present mitigating evidence"). On appeal, the Third Circuit remanded the case for an evidentiary hearing on Defendant's ineffectiveness claim. Lewis v. Horn, 581 F.3d 92, 117 (3d Cir. 2009). On July 25, 2011, the Commonwealth notified the district court that it would not contest the grant of conditional relief as to Lewis's death sentence. Order, Lewis v. Horn, 00-cv-802 (E.D. Pa. July 26, 2011), ECF No. 80.

## 10. Commonwealth v. Kelvin Morris, CP-51-CR-0704091-1982

The federal court ruled that "defense counsel's failure to conduct a reasonable investigation of mitigating evidence in anticipation of Morris's capital sentencing hearing, failure to present available mitigating evidence at that hearing, and failure to make a sufficient argument at that hearing violated Morris's Sixth Amendment right to effective assistance of counsel." Morris v. Beard, 2012 WL 4757868, at *1 (E.D. Pa. Oct. 5, 2012). The Commonwealth did not challenge the federal court's Order vacating Defendant's death sentence. Morris, 2012 WL 4757868, at *2.

## 11. Commonwealth v. Otis Peterkin, CP-51-CR-0207841-1982

The federal district court granted a new trial. Peterkin v. Horn, 176 F. Supp. 2d 342, 376–377 (E.D. Pa. 2001), amended on reconsideration in part, 179 F. Supp. 2d 518 (E.D. Pa. 2002) ("We therefore find that trial counsel's representation of the Petitioner was blatantly deficient"). This case was decided on the basis of deficient jury instructions during the penalty phase to which defense counsel failed to object.

**12. Commonwealth v. Michael Rainey, CP-51-CR-0419613-1990**
The Supreme Court determined that counsel failed to present mitigation. Commonwealth v. Rainey, 928 A.2d 215, 237-238, 240-241 (Pa. 2007). The Court determined that an evidentiary hearing was required to "allow Appellant the opportunity to develop this claim and challenge the reasonableness of counsel's actions." On remand, with the Commonwealth's agreement, the Homicide Calendar Judge sentenced Defendant to Life. Online Docket Entry, p.12, 3/10/09.

**13. Commonwealth v. Delores Rivers, CP-51-CR-0335191-1988**
The federal district court vacated Defendant's sentence and granted penalty phase relief because "trial counsel was ineffective at the penalty phase in failing to investigate and present mitigating evidence." Federal Docket Entry, 5/10/05; Commonwealth's Memorandum of Law, Rivers v. Horn, 02-cv-1600; Docket Entry, CP-51-CR-0335191-1988, 6/30/05 (noting that Defendant's death sentence was "vacated by Federal Court on 3/10/05").

**14. Commonwealth v. Saharris Rollins, CP-51-CR-0405851-1986**
The Third Circuit granted penalty phase relief. Rollins v. Horn, 386 F. App'x 267, 270 (3d Cir. 2010) ("Rollins' attorney performed deficiently by failing to adequately investigate and present evidence of mitigating circumstances").

**15. Commonwealth v. Brian Thomas, CP-51-CR-0827161-1985**
The Third Circuit remanded the matter for an evidentiary hearing "concerning the extent, if any, of Thomas' counsel's pre-sentencing investigative efforts to obtain mitigating evidence." Thomas v. Horn, 570 F.3d 105, 130 (3d Cir. 2009). On remand, the Commonwealth notified the court that it would no longer contest the grant of conditional relief as to Thomas's death sentence. Thomas v. Horn, 00-cv-803-CMR (E.D. Pa. Dec. 20, 2011), ECF No. 98.

**16. Commonwealth v. Mumia Abu-Jamal, CP-51-CR-0113571-1982**
The Third Circuit granted relief on a jury instruction issue. Abu-Jamal v. Horn, 520 F.3d 272, 298 (3d Cir. 2008). Thereafter, the Third Circuit granted death penalty relief on its finding that the Pennsylvania Supreme Court unreasonably applied Mills v. Maryland, 486 U.S. 367 (1988). Abu-Jamal v. Sec'y PA DOC, 643 F.3d 370 (3d Cir. 2011)

**17. Commonwealth v. Ernest Porter, CP-51-CR-0622491-1985**
The federal district court determined that the trial court's jury instruction violated Mills v. Maryland, 486 U.S. 367 (1988). Porter v. Horn, 276 F. Supp. 2d 278, 311 (E.D. Pa. 2003).

**18. Commonwealth v. James Dennis, CP-51-CR-0104841-1992**
The Third Circuit granted Defendant a new trial due to a Brady violation. Dennis v. Sec'y Dept. Corrs., 834 F.3d 263 (3d Cir. 2016) (en banc).

**19. <u>Commonwealth v. Donald Hardcastle</u>, CP-51-CR-0632881-1982**
The federal court awarded a new trial due to a <u>Batson</u> violation. <u>Hardcastle</u>
<u>v. Horn</u>, 332 F. App'x 764, 766 (3d Cir. 2009).

**20. <u>Commonwealth v. James Lambert</u>, CP-51-CR-0803432-1983**
The Third Circuit granted a new trial on the basis of <u>Brady</u> violations.
<u>Lambert v. Beard</u>, 537 F. App'x 78, 80 (3d Cir. 2013).

**21. <u>Commonwealth v. Anthony Washington</u>, CP-51-CR-1210371-1993**
The federal district court granted a new trial due to <u>Brady</u> violations and the
prosecutor's improper closing argument. <u>Washington v. Beard</u>, 2015 WL
234719, at *1 (E.D. Pa. Jan. 16, 2015).

**22. <u>Commonwealth v. Zachary Wilson</u>, CP-51-CR-0929501-1986**
The Third Circuit granted a new trial because the Commonwealth withheld
<u>Brady</u> material. <u>Wilson v. Beard</u>, 589 F.3d 651, 667 (3d Cir. 2009).

**EXHIBIT 5**

## DEATH PENALTY CASES WHERE RELIEF GRANTED BY AGREEMENT AT A POST-CONVICTION STAGE (PRE-2018)

**1. Commonwealth v. Samuel Carson, CP-51-CR-0228371-1994**

The Supreme Court remanded this matter to the PCRA court for an evidentiary hearing concerning Defendant's claim that trial and appellate counsel were ineffective in failing to investigate and present mitigation evidence. Commonwealth v. Carson, 913 A.2d 220, 267-268 (Pa. 2006).

On remand from the appellate court, the Commonwealth stipulated to penalty-phase relief due to counsel's failure to investigate and present mitigating evidence. Commonwealth Response to Petition for Writ of Habeas Corpus, No. 11-1845, at p.8 ("the Commonwealth agreed to relief on the claim of counsel ineffectiveness").

**2. Commonwealth v. Bernard Cousar, CP-51-CR-0607431-1999**

At the PCRA stage, the parties agreed that appellant was entitled to a new penalty hearing. Commonwealth v. Cousar, 154 A.3d 287, 293 (Pa. 2017).

**3. Commonwealth v. Junious Diggs, CP-51-CR-0709781-2002**

At the PCRA stage, with the Commonwealth's agreement, the PCRA court vacated Defendant's sentence and the Commonwealth agreed to a life sentence. Secure Docket Entry, p.19, 8/14/12

**4. Commonwealth v. Daniel Dougherty, CP-51-CR-0705371-1999**

At the PCRA stage, the Commonwealth conceded that trial counsel was ineffective at the penalty phase "for failure to investigate and present certain mitigation evidence". Online Docket Entry, p.23, 2/7/12.

**5. Commonwealth v. Joseph Elliott, CP-51-CR-0410911-1994**

At the PCRA stage, "the Commonwealth agreed not to oppose Elliott's request for a new penalty hearing." Commonwealth v. Elliott, 80 A.3d 415, 424 n.5 (Pa. 2013).

**6. Commonwealth v. Lester Fletcher, CP-51-CR-0709931-2001**

At the PCRA stage, The Commonwealth agreed to penalty phase relief. Online Docket Entry, p. 11, 2/7/11.

**7. Commonwealth v. Ronald Hanible, CP-51-CR-0409021-1999**

The Commonwealth agreed that Defendant was entitled to a new penalty Hearing. Commonwealth v. Hanible, 30 A.3d 426, 438 (Pa. 2011) ("The Commonwealth filed a motion to dismiss the PCRA petition, but subsequently

1

agreed that a new penalty hearing was warranted due to trial counsel's failure to present available mitigating evidence").

**8. Commonwealth v. Steven Hutchinson, CP-51-CR-0408581-1998**
Defendant filed a PCRA petition, raising numerous guilt and penalty phase claims. Commonwealth v. Hutchinson, 25 A.3d 277, 284 (Pa. 2011). "[W]ith with the agreement of the Commonwealth, the PCRA court entered an order ... granting Appellant a new penalty phase hearing." Hutchinson, 25 A.3d at 284.

**9. Commonwealth v. Kareem Johnson, CP-51-CR-1300424-2006**
"At the PCRA stage, the Commonwealth conceded that Defendant was denied effective assistance of counsel ... and therefore the parties stipulated that Appellant was entitled to a new trial." Commonwealth v. Johnson, 2018 WL 3133226.

**10. Commonwealth v. William Johnson, CP-51-CR-0936052-1991**
At the PCRA stage, the Commonwealth agreed that Defendant should have a new penalty phase hearing. (N.T. 5/22/14 at 4).

**11. Commonwealth v. Steven McCrae, CP-51-CR-0204521-1999**
Defendant filed a PCRA petition claiming that trial counsel was ineffective for failing to investigate and present mitigation evidence. Written Agreement Colloquy, at p.2. The Commonwealth "agreed that [the PCRA] Court may vacate [Defendant's] two death sentences and impose two consecutive life sentences." Written Agreement Colloquy, 4/13/06 at p.2.

**12. Commonwealth v. Bernard McGill, CP-51-CR-0339201-1990**
Defendant claimed "that trial counsel was ineffective for failing to investigate fully, possible mitigating circumstances for his penalty phase." Commonwealth v. McGill, 832 A.2d 1014, 1025 (Pa. 2003). The Supreme Court remanded the matter to the PCRA court to conduct an evidentiary hearing regarding Defendant's penalty phase claims. McGill, 832 A.2d at 1026. On remand, with the Commonwealth's agreement, the Homicide Calendar Judge resentenced Defendant to Life. Online Docket Entry, p.15, 1/7/13.

**13. Commonwealth v. Nathaniel McNair, CP-51-CR-1224591-1987**
Defendant received penalty phase relief at the PCRA stage after a hearing. By agreement, the Commonwealth did not appeal the grant of penalty phase relief and Defendant did not appeal the denial of guilt phase PCRA claims. Online Docket Entry, p.4, 4/4/02.

2

**14. <u>Commonwealth v. Mikal Moore</u>, CP-51-CR-0701141-1998**

At the PCRA stage, the Commonwealth agreed to Life. <u>Online Docket Entry</u>, p.22, 3/27/17 ("Order - Sentence/Penalty Imposed By Agreement this court Vacates previous sentence of DEATH and reimposes a sentence of LIFE as to Murder 1st Degree").

**15. <u>Commonwealth v. Wilfredo Ramos</u>, CP-51-CR-0100891-1999**

The PCRA court vacated Defendant's death sentence "based upon the Commonwealth's agreement not to contest [Appellant]'s request for a new penalty hearing based upon ineffective assistance of trial counsel at the penalty hearing for failure to investigate and present certain mitigation evidence." <u>Commonwealth v. Ramos</u>, 2017 WL 4286386, at *7 (Pa. Super. Ct. Sept. 27, 2017).

**16. <u>Commonwealth v. Timothy Rice</u>, CP-51-CR-0906231-1996**

At the PCRA stage, the Commonwealth agreed that the PCRA court should grant Defendant's motion to vacate his death sentence. <u>Commonwealth v. Rice</u>, 2013 WL 11256379, at *2 (Pa. Super. Aug. 5, 2013).

**17. <u>Commonwealth v. James Melvin Smith</u>, CP-51-CR-0717891-1983**

At the PCRA stage, defense counsel and the Commonwealth stipulated that Appellant would be granted a new penalty phase hearing based on the ineffectiveness of trial counsel. <u>Commonwealth v. Smith</u>, 17 A.3d 873, 882 (Pa. 2011).

**18. <u>Commonwealth v. LeRoy Thomas</u>, CP-51-CR-1207001-1994**

At the PCRA stage, the Commonwealth agreed to a new penalty hearing. <u>Commonwealth v. Thomas</u>, 44 A.3d 12, 16 n.3 (Pa. 2012).

**19. <u>Commonwealth v. Andre Thompson</u>, CP-51-CR-0221931-1993**

After Defendant filed a PCRA petition, the Commonwealth agreed to penalty phase relief. <u>Online Docket Entry</u>, p.12, 9/20/05.

**20. <u>Commonwealth v. Louis Thompson</u>, CP-51-CR-0436071-1990**

At the PCRA stage, the Commonwealth agreed that Defendant received ineffective assistance at his penalty phase. <u>Docket Entry</u>, 5/21/04 ("Commonwealth is in agreement with petitioner's PCRA claims AS TO PENALTY PHASE ONLY") (emphasis in original).

**21. <u>Commonwealth v. William Tilley</u>, CP-51-CR-1210781-1985**

At the PCRA stage, the Commonwealth agreed that Defendant was entitled to a new penalty phase. (N.T. 5/1/07 at 7-8) ("[T]he Commonwealth determined that it was appropriate to agree to a new penalty phase based on [trial counsel's] admissions in that affidavit that he essentially did nothing in preparation for the penalty phase hearing; he didn't really think about it; he didn't think his client could get the death sentence and basically started

3

prepping at the end of the guilty phase or, worse, didn't prep at all.  That is the basis for our agreement").

## 22.  Commonwealth v. Vinson Washington, CP-51-CR-0310321-1994
On appeal from the denial of post-conviction relief, the Pennsylvania Supreme Court remanded the matter for an evidentiary hearing.  Commonwealth v. Washington, 880 A.2d 536, 546 (Pa. 2005).  On remand, the Commonwealth agreed that Defendant was entitled to a new penalty phase hearing. Online Docket Entry, p.9, 7/15/08 ("Commonwealth agrees to stipulation to grant the defendant a new penalty phase").

## 23.  Commonwealth v. Craig Williams, CP-51-CR-0525631-1987
At the PCRA stage, the Commonwealth consented to the grant of a new capital penalty hearing.  Commonwealth v. Williams, 980 A.2d 510, 513 (Pa. 2009).

## 24.  Commonwealth v. Cam Ly, CP-51-CR-1125561-1986
When Defendant filed a PCRA petition, the Commonwealth agreed to Life. Online Docket Entry, p.10, 12/12/13 ("re-sentenced to life without parole. ... By agreement there are no appellate and post-conviction rights").

## 25.  Commonwealth v. Melvin Howard, CP-51-CR-0304271-1988
The Commonwealth agreed to vacate Defendant's death sentence, pursuant to Atkins. Online Docket Entry, p.11, 6/10/11.

## 26.  Commonwealth v. Neil Ferber, CP-51-CR-0710481-1981
After conviction and death sentence, Defendant "ultimately was released from custody after law enforcement authorities conceded that he, in fact, had nothing whatsoever to do with these murders." Neil Ferber & Annette Ferber, h/w v. City of Philadelphia, Sergeant Daniel Rosenstein & Officer Dominic Frontino, 1994 WL 1251179 (Pa. Com. Pl. Oct. 3, 1994), aff'd in part, rev'd in part sub nom. Ferber v. City of Philadelphia, 661 A.2d 470 (Pa. Commw. Ct. 1995).

## 27.  Commonwealth v. Jose DeJesus, CP-51-CR-1103501-1997
At the post-conviction stage, the PCRA court vacated Defendant's sentence and imposed Life. Secure Docket Entry, p.24, 1/4/18 ("Order Granting Motion to Vacate Sentence Listed Today for Re-Sentencing. Commonwealth agrees that PCRA petition is granted as to the death penalty sentences ... Re-sentenced to Life without the possibility of parole").

## 28.  Commonwealth v. DeJesus, CP-51-CR-1103511-1997
The Commonwealth agreed to PCRA relief and a sentence of Life and the Defendant agreed to forgo all future appeals. (N.T. 1/4/18 at 16).

4

### 29. <u>Commonwealth v. Reginald Lewis</u>, CP-51-CR-0205851-1983

The federal district court determined that counsel provided ineffective assistance at the penalty phase. Defendant claimed penalty phase ineffectiveness. <u>Lewis v. Horn</u>, 2006 WL 2338409, at *11 (E.D. Pa. Aug. 9, 2006) (finding no reason ... for trial counsel's failure to investigate and present mitigating evidence"). On appeal, the Third Circuit remanded the case for an evidentiary hearing on Defendant's ineffectiveness claim. <u>Lewis v. Horn</u>, 581 F.3d 92, 117 (3d Cir. 2009). On July 25, 2011, the Commonwealth notified the district court that it would not contest the grant of conditional relief as to Lewis's death sentence. <u>Order</u>, <u>Lewis v. Horn</u>, 00-cv-802 (E.D. Pa. July 26, 2011), ECF No. 80.

### 30. <u>Commonwealth v. Brian Thomas</u>, CP-51-CR-0827161-1985

The Third Circuit remanded the matter for an evidentiary hearing "concerning the extent, if any, of Thomas' counsel's pre-sentencing investigative efforts to obtain mitigating evidence." <u>Thomas v. Horn</u>, 570 F.3d 105, 130 (3d Cir. 2009). On remand, the Commonwealth notified the court that it would no longer contest the grant of conditional relief as to Thomas's death sentence. <u>Thomas v. Horn</u>, 00-cv-803-CMR (E.D. Pa. Dec. 20, 2011), ECF No. 98.

### 31. <u>Commonwealth v. Marcus Lloyd</u>, CP-51-CR-0501982-1998

On direct appeal, the Commonwealth agreed that the trial court improperly submitted the history of violent felony aggravator to the jury. <u>Commonwealth's Petition to Remand for Resentencing</u>, at p.1 ("[T]he Commonwealth is obliged to note that ... the aggravating circumstance of 'significant history of felony convictions involving use or threat of violence to person' was incorrectly submitted").

5

**EXHIBIT 6**



**DISTRICT ATTORNEY'S OFFICE**
1421 ARCH STREET
PHILADELPHIA, PENNSYLVANIA 19102
686-8000

FEB 22 1990

RONALD D. CASTILLE
DISTRICT ATTORNEY

February 20, 1990

Honorable Albert F. Sabo
Court of Common Pleas
538 City Hall
Philadelphia, Pennsylvania 19107

      Re:  Commonwealth v. Matthew Connor
          C.P. November Term, 1978, Nos. 1679-1682

Dear Judge Sabo:

Enclosed please find the original and one copy of a Petition In The Nature Of A Petition For Relief Under The Post Conviction Relief Act in the above matter. By this petition the District Attorney, as a consequence of a reexamination of this case which brought to light additional evidence which may be helpful to defendant Connor, and in the interests of justice, asks this Court to enter a new trial order so as to permit the case against Mr. Connor to be submitted to a second finder of fact. It is further respectfully requested that such an order be entered forthwith so that a retrial may be promptly commenced.

Thank you for your consideration.

Respectfully yours,

BARBARA CHRISTIE
Assistant District Attorney
Chief, Homicide Unit

/ec

cc  Dennis Cogan, Esquire
    Reverend James McCloskey

Enclosures

www.centurionministries.org

IN THE COURT OF COMMON PLEAS OF PHLADELPHIA COUNTY
TRIAL DIVISION, CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA      :      NOVEMBER TERM, 1978

            V.             :

MATTHEW CONNOR      :      NOS. 1679-1682

## O R D E R

AND NOW, this 26th day of February, 1990, upon consideration of the attached petition for relief under the Post Conviction Relief Act (42 Pa. C.S.A. §9541 et seq.), it is hereby ORDERED AND DECREED that a new trial is granted in the above-captioned matter.

BY THE COURT:

*Albert F. Sabo*

SABO, J.

..EREBY CERTIFY the foregoing ..
true and correct copy of the origin..
_____ as filed of record
n this office.

PRO CLERK
QUARTER SESSIONS COURT

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
TRIAL DIVISION, CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA          :          NOVEMBER TERM, 1978

                        V.                          :

MATTHEW CONNOR                        :          NOS. 1679-1682

PETITION IN THE NATURE OF A PETITION FOR RELIEF UNDER
THE POST CONVICTION RELIEF ACT (42 PA. C.S.A. §9541 ET SEQ.)

TO THE HONORABLE ALBERT F. SABO, JUDGE OF THE SAID COURT:

RONALD D. CASTILLE, District Attorney of Philadelphia County, by his Assistants, RAYMOND J. HARLEY, Deputy District Attorney, BARBARA CHRISTIE, Chief, Homicide Unit, and HILARY CONNOR, Assistant District Attorney, respectfully requests that a new trial be granted to defendant Matthew Connor, with respect to the charges as captioned above, and in support thereof respectfully represents:

1. On March 15, 1980, defendant Matthew Connor was convicted of first degree murder and rape in connection with a 1978 killing. As a consequence of that conviction, he is now serving a life sentence at the State Correctional Institution at Dallas.

2. Your Honor presided at the trial which resulted in defendant Connor's conviction, as well as at a prior trial which ended in the declaration of a mistrial because of a hung jury.

3. Recently members of this office, with the cooperation and assistance of the Philadelphia Police Department, have reexamined and reinvestigated aspects of this case.

(                              (

4.  As a result of that reexamination and reinvestigation, information has come to light which might be helpful to the defendant and which might affect any eventual verdict.

5.  The District Attorney's Office, which is prepared promptly to retry defendant Connor, believes that the previously-cited evidence warrants having the case against Mr. Connor submitted to a second finder of fact.  Because of that belief, and in the interests of justice, the District Attorney of Philadelphia County asks this Court to enter an order granting a new trial to Mr. Connor and thereby to allow the case against him to be presented to a second fact finder.

FOR THE FOREGOING REASONS, it is respectfully requested that a new trial order be entered in this case.

Respectfully submitted,

RONALD D. CASTILLE
District Attorney

By: _____
RAYMOND J. HARLEY
Deputy District Attorney

_____
BARBARA CHRISTIE
Chief, Homicide Unit

_____
HILARY CONNOR
Assistant District Attorney

www.centurionministries.org

**EXHIBIT 7**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT WHARTON, <br><br> Petitioner, <br><br> v. <br><br> DONALD T. VAUGHN, <br><br> Respondent. | CIVIL ACTION <br><br> No. 2:01-cv-06049-MSG <br><br> CAPITAL CASE |

### Expert Report of Professor Bruce A. Green

I have been retained on behalf of the Office of the Philadelphia District Attorney ("Office") to render objective expert opinions on the questions of professional conduct raised in the Court's May 11, 2022 Memorandum Opinion ("Opinion"). Specifically, I have been asked to address whether the Court should impose sanctions in connection with the Office's filing of the Notice of Concession of Penalty Phase Relief ("Notice").

The Court's Opinion (at pp. 35-40) identifies "two critical issues." the first regarding the Office's nondisclosure of Wharton's escape attempt, and the second regarding the Notice's statement that it was preceded by "communication with the victims' family," when in fact the Office communicated with only one family member. For purposes of rendering opinions on these two issues, I rely on Max C. Kaufman's Affidavit dated May 21, 2002, and other material already before the Court. My opinion is that the Office's lawyers did not violate any ethical duty or engage in sanctionable misconduct for the reasons discussed below.

### Qualifications

I am the Louis Stein Chair at Fordham University School of Law and Director of the Louis Stein Center for Law and Ethics. I have been admitted to practice law in New York, the United States District Courts for the Southern and Eastern Districts of New York, and the Supreme Court of the United States. My qualifications to provide expert opinions on questions of lawyers' professional conduct are set forth more fully in my curriculum vitae, which is available here: https://www.fordham.edu/download/downloads/id/1503/bruce_green.pdf.

I have been a full-time law professor at Fordham University since 1987. After graduating from Columbia Law School in 1981, I served as a law clerk to Judge James L. Oakes of the United States Court of Appeals for the Second Circuit, and then as a law clerk to Justice Thurgood Marshall of the Supreme Court of the United States. I then became an Assistant United States Attorney for the Southern District of New York, eventually serving as Deputy Chief and then Chief of the Criminal Division's appeals unit.

1

I have regularly taught courses in legal ethics since 1987. I teach a survey course on Professional Responsibility and a seminar on Ethics in Criminal Advocacy. In the survey course, I assign a casebook that I co-authored: Jefferson, Pearce, Green et al., *Professional Responsibility: A Contemporary Approach* (4th ed. 2020). I am responsible for the casebook's section on prosecutors' professional conduct.

I have organized or co-organized numerous conferences and programs for academics and practitioners on issues of legal ethics, and I speak frequently at Continuing Legal Education and academic programs regarding legal ethics issues in litigation generally and criminal advocacy in particular. I have written extensively – well over 150 book chapters and articles in law reviews and other legal periodicals, mostly on legal ethics issues.

I have engaged extensively in various professional work relating to legal ethics, primarily involving drafting, interpreting, or enforcement of professional conduct rules. In New York, I am the immediate past chair of the New York City Bar's Committee on Professional Ethics; on the New York State Bar Association, I am a member and past chair of the Committee on Professional Ethics, and I serve on the Committee on Standards of Attorney Conduct; and I previously served on the Departmental Disciplinary Committee of the First Department. On the national level, I chair the Multistate Professional Responsibility Examination drafting committee; I previously served on the American Bar Association ("ABA") Standing Committee on Ethics and Professional Responsibility, to which I am now a liaison; I chaired the ethics committees of the ABA's Litigation and Criminal Justice Sections; I served on the ABA Litigation Section's Task Force on Settlement Ethics; I was Reporter to the ABA Commission on Multijurisdictional Practice; and I chaired the Section on Professional Responsibility of the Association of American Law Schools. In recognition of my work in the field of legal ethics, I was the 2018 recipient of the Michael Franck Professional Responsibility Award.

Among the subjects on which I have addressed in my teaching, scholarship and professional service are lawyers' duty of candor to the court,[1] including in the context of criminal prosecution and defense.[2]

I occasionally testify as an expert witness, give advice, draft amicus briefs, and render other professional services on lawyers' professional conduct. As an expert witness, I render opinions in my individual capacity and do not speak on behalf of any of the entities with which I am, or have been, associated.

## Relevant Factual Basis

For purposes of rendering opinions, I have received and reviewed the documents listed in the attached List of Documents Reviewed.

---

[1] *See* Bruce A. Green, *Resolving Ethics Questions in Good Faith*, LITIGATION, vol. 46, no. 2, Winter 2020, p. 39; Bruce A. Green, *Deceitful Silence*, LITIGATION, Winter 2007, p. 24.

[2] *See* Bruce A. Green, *Candor in Criminal Advocacy*, 44 HOFSTRA L. REV. 1105 (2016).

2

## Opinions

*1. The Notice's failure to identify extra-record evidence of an escape attempt that was potentially contrary to Wharton's* Strickland *claim was not sanctionable misconduct.*

The Court concluded that although the prosecution did not offer evidence of Wharton's escape attempt at Wharton's capital sentencing proceeding, the prosecution could have introduced it in support of the imposition of the death penalty if Wharton had introduced evidence of good adjustment in prison following the first death penalty hearing; that the Court could consider this extra-record evidence in connection with Wharton's *Strickland* claim; that this evidence was significantly contrary to Wharton's *Strickland* claim in that it tended to show that Wharton was not prejudiced by his counsel's inadequate representation, since, with the addition of this evidence, the jury would likely have imposed the death penalty in any event; and that, because the escape attempt was not in the record, the Office should have disclosed Wharton's escape attempt in its Notice to enable the Court to make an adequately informed ruling on Wharton's claim.

For purposes of this opinion, I assume that the Court was correct about the eventual importance of the evidence of Wharton's escape attempt to the *Strickland* claim, once the Court concluded that it could and should undertake an independent determination rather than simply accepting the Office's concession, as courts in the Eastern District had previously done. I further assume that pursuant to its supervisory authority over the conduct of lawyers appearing before the Court and/or over criminal proceedings before the Court, the Court has authority to require the prosecution in future habeas cases before the Court to disclose extra-record evidence that is contrary to a claim that the prosecution does not contest. Even so, in filing the Notice in February 2019, the Office's lawyers did not violate their candor obligations under the professional conduct rules or federal decisions relating to litigation sanctions, because they stated nothing that was false in the Notice, and they did not intend to mislead the court or to withhold information that they knew the court expected to receive.

As Max Kaufman's affidavit explains, he did not intend to deceive the Court in omitting reference to Wharton's escape attempt from the Notice. Kaufman, who drafted and signed the Notice, was not aware of the escape attempt at the time he filed it. He did not learn of it until it was called to the Court's attention by the Attorney General several months later. Further, neither Kaufman nor other prosecutors in the Office would reasonably have known that, in general, the Court would have expected the Notice to include factual or evidentiary information contrary to Wharton's *Strickland* claim. It appears that neither Judge Goldberg nor any other judge before whom the Office appeared had previously expressed that expectation when the Office does not contest a criminal defendant's claim in habeas or other proceedings, and the Office was not aware of decisions (and I know of none) issued by courts outside the jurisdiction that announced this sort of expectation.

Indeed, the Office could reasonably have assumed at the time that courts did *not* expect a discussion of the evidence, whether supporting or contrary, in a prosecutor's barebones Notice conceding relief sought by the defendant. As the Commonwealth's Post-Hearing Brief notes at

3

page 22, it had been the practice since before the current District Attorney took office for state and federal courts to accept the Office's concessions of death penalty relief without requiring a full explanation of the facts supporting/weighing against the concession. *See also* Commonwealth's April 3, 2019 Brief in response to the Court's March 4, 2019 order at 4-5 (observing that: "[T]he concession procedure followed in this case repeatedly has been approved by the courts of this district. . . . Indeed, as far as this Office is aware, there has not been a prior instance where a court in this district has declined to accept a concession of relief by the Commonwealth in a pending habeas case.") (citations omitted).

In general, lawyers should not be subject to sanction for failing to disclose facts to a court where, as here, the lawyers did not intend to mislead the court and were unaware that the court expected disclosure in the situation or that the court would be misled by the lawyers' silence. The relevant professional conduct rules do not provide for sanctioning lawyers who unwittingly or unintentionally mislead the court or fail to disclose information that the court would have considered to be important. The relevant rule is Rule 3.3 of the Pennsylvania Rules of Professional Conduct ("Pennsylvania Rules"), which is titled "Candor Toward the Tribunal." It is based on Rule 3.3 of the ABA Model Rules of Professional Conduct, which is the basis of other states' candor rules as well. Rule 3.3(a)(1) provides: "A lawyer shall not *knowingly* . . . make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." (Emphasis added.)[3] Comment [3] to Rule 3.3 recognizes that "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."[4] The rule's *mens rea* requirement of knowledge applies to misleading nondisclosures covered by the rule no less than to affirmative misrepresentations.[5] The rule would not apply to an innocent nondisclosure even if, in retrospect, the court was misled.

---

[3] For purposes of the Pennsylvania Rules, "knowingly" is defined in Rule 1.0(f) to denote "actual knowledge of the fact in question" which "may be inferred from circumstances."

[4] *See, e.g., Matter of Piccone*, 2016 USPTO OED LEXIS 102, *133 (U.S. Dep't of Commerce, Patent & Trademark Office 2016) ("Although it is certainly possible that Respondent intended to deceive the district court by not revealing his suspension, the OED Director has not presented clear and convincing evidence that Respondent's actions were anything more than negligent, and they were arguably truthful."). *Piccone*, which illustrates that a negligent omission is not sanctionable, involved a lawyer's failure to reveal his suspension to practice law and inability to appear before the tribunal. In my view, the omission in the case before this Court – the prosecution's nondisclosure of evidence relating to its internal decision giving rise to its Notice – is entirely different, in that it is not obvious that a tribunal would expect the prosecution to disclose relevant evidence in a Notice filed consistent with notice pleading under the Federal Rules of Civil Procedure.

[5] *See* Green, *Candor in Criminal Advocacy, supra*, at 1109-1110 ("authorities have interpreted both the rule proscribing false statements and the rule proscribing "conduct involving dishonesty, fraud, deceit or misrepresentation" to the text of the note to forbid lawyers' silence in other

4

The Court's Opinion refers to Rule 3.3(d), which concerns lawyers' disclosure obligations in *ex parte* proceedings, as another potential source of a disclosure obligation. In my judgment, Rule 3.3(d) does not require prosecutors to make evidentiary submissions contrary to a habeas petition. First, I do not believe that a habeas proceeding in which the State decides not to contest the petition is an *ex parte* proceeding within the meaning of the rule. *Cf.* NYC Bar Ass'n Comm. on Prof'l Ethics, Op. 2019-1 (2019) ("Opinion 2019-1") (concluding: "Rule 3.3(d) does not apply to adversarial proceedings in which both sides are present, but one appears *pro se.* Nor does the rule apply to proceedings in which an adverse or other interested party received notice sufficiently in advance to provide a reasonable opportunity to appear but has simply chosen not to do so. Such a proceeding is, by its nature, an adversarial proceeding, not an ex parte one, as the standard definitions of the term reflect.").[6] I recognize that there may be room for disagreement on this question, however.[7] Second, to the extent that the rule might require the introduction of evidence that is contrary to an uncontested habeas petition, it should apply only to counsel for the petitioner, who is the proponent of the motion and who has the evidentiary burden, and not to the prosecutor's office which has elected not to contest the motion.[8]

Assuming that Rule 3.3(d) might generally apply to a prosecutor's office that does not contest a habeas motion, the rule would not have applied to the nondisclosure of Wharton's escape attempt. Like Rule 3.3(a), Rule 3.3(d) has a knowledge requirement. *See* Opinion 2019-1 ("Under the rule, in addition to any disclosures that must be made under other law, a lawyer appearing, or making an application, on behalf of a party in an 'ex parte proceeding' must disclose material facts known to the lawyer *if the lawyer knows that the facts are significant to the tribunal's decision* – i.e., that the facts will facilitate an 'informed decision.'") (emphasis

---

situations where their declarations or conduct would otherwise be intentionally or knowingly misleading").

[6] I chaired the Committee at the time it issued this opinion, participated in all of the Committee's discussions of the opinion, and participated in drafting it.

[7] The Court's Order identified two decisions suggesting that Rule 3.3(d) applies when adverse parties agree on a matter. The first, *Eagan by Keith v. Jackson*, 855 F. Supp. 765 (E.D. Pa. 1994), is addressed in the footnote that follows. In the other, *Pa. Env't Def. Found. v. U.S. Dep't of Navy*, No. 94-cv-1486, 1995 WL 56602 (E.D. Pa. Feb. 3, 1995), a lawyer was sanctioned for inducing opposing counsel to make a false statement in a joint application for a continuance (unwittingly false on the part of opposing counsel, who was deceived along with the court). The opinion took the view that this was an *ex parte* proceeding because there was a joint application and therefore no adversariness, but the more obvious and straightforward justification for discipline would have been that the sanctioned lawyer violated Rule 8.4(a) by inducing another to make a false statement to the court in violation of Rule 3.3(a).

[8] In *Eagan by Keith v. Jackson, supra*, 855 F. Supp. at 790, the court found that plaintiff's counsel's fee application was *ex parte* under the rule because the defendants had no adversarial interest in opposing it. The decision might support imposing a disclosure obligation on the habeas petitioner when the prosecution does not oppose the petition, but not on the State, which was in the position analogous to that of the adversarially indifferent defendants.

5

added).  Here, Kaufman was unaware of Wharton's escape attempt, much less that evidence of the escape attempt would be significant to the Court's decision.

The same is true for the supervisors who directed Kaufman to submit the Notice to the Court.  These lawyers would not reasonably have anticipated that extra-record evidence contrary to Wharton's *Strickland* claim would be significant to the Court, regardless of their knowledge of the escape evidence, given most courts' practice of accepting simple notices of concession of penalty phase relief without requiring further explication or conducting evidentiary hearings.  Nor could the Office have anticipated that the Court would infer from the Notice's silence that there was no evidence outside the record that might be contrary to the habeas claim.  The Notice contained no discussion of the evidence relevant to Wharton's claim and no representation regarding the adequacy of the evidence.  It was simply a concession, not an implied representation that there was no extra-record evidence contrary to Wharton's claim.

In 2019, the Office filed the Notice.  The Court then filed its March 4, 2019 Order and Opinion requesting briefing on two discrete issues: (1) "May a Court grant habeas relief based only on the District Attorney's Concession, or must it independently evaluate the merits of the conceded claim"; and (2) "Can an independent evaluation of the merits of the remaining sentencing claim be made on the current record" (Memorandum Opinion dated March 4.)[9]  At the time of its Notice, the Office might reasonably have expected the Court to order evidentiary submissions or conduct an evidentiary hearing (as it eventually did) if the Court thought it necessary to inquire into the evidentiary basis of Wharton's claim.  But the Office would not have expected the Court to draw inferences about the evidence from the Notice; nor would the Office have anticipated that the Court expected the Notice to include evidentiary disclosures.  Likewise, the Court did not make that request in its Order of March 4.  In other words, this was not a situation where the Office deliberately created a judicial misconception or failed to correct a known judicial misunderstanding.

That said, professional conduct rules do not establish the limits of lawyers' duty of candor to the court.[10]  Wholly apart from the rules, courts have supervisory authority to establish certain disclosure obligations and then to sanction lawyers appearing before them who knowingly disregard these obligations.  I assume for purposes of this opinion that the District

---

[9] The Court's March 4, 2019 Order requested materially the same, asking the DAO brief "(1) whether I have the authority and/or the obligation to grant habeas relief to Petitioner based solely on the District Attorney's concession of the remaining habeas claim, or whether I must independently review, and determine the merits of, that now-conceded claim; and (2) if I must make an independent determination on the merits, whether that is possible on the current record, without conducting the evidentiary hearing as directed by the United States Court of Appeals for the Third Circuit."

[10] *See, e.g., United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-58 (4th Cir. 1993); *see also* Green, *Candor in Criminal Advocacy, supra*, at 1110-1111.

Court has authority to require that when prosecutors do not contest a criminal defendant's application in general, or a post-conviction petition in particular, the prosecution must disclose extra-record evidence that it knows to be contrary to the application.[11] Such a disclosure rule might be justified by the Court's conclusion that it is obligated to make an independent evidentiary determination, not just accept factual allegations of the uncontested habeas petition, by the prosecutors' heightened (though not necessarily enforceable) candor duty as "ministers of justice," or by other considerations. To the extent that the Court has now established such a disclosure obligation by its Opinion in this case, it can enforce the disclosure obligation going forward. However, it would not be appropriate for the Court to impose sanctions for a nondisclosure prior to its Opinion, because neither this Court nor any other court in the jurisdiction had previously expressed such an expectation. Nor should the prosecutors reasonably have anticipated it. On the state of the law and procedure when the Office filed its Notice in Wharton's case, the Office would not reasonably have perceived that its two-page Notice, summarizing procedural steps but entirely omitting any discussion of relevant evidence, was incomplete, and that, as a matter of candor, the Notice was required to identify extra-record evidence that might contradict the petitioner's claim.

2. *The Notice's reference to "communication with the victims' family," when only one family member was contacted, was not sanctionable misconduct.*

The Office's Notice stated in part: "Following review of this case . . ., communication with the victims' family, and notice to petitioner's counsel, respondent hereby reports to the Court that it concedes relief on petitioner's remaining claim of ineffective assistance . . . and does not contest the grant of a conditional writ of habeas corpus with respect to petitioner's death sentences." The Court has expressed concern that it was misled regarding the victims' family members' knowledge of, and reaction to, the Office's concession. In its view, the phrase implied that the victims' family members had been told of the Office's position and did not oppose it. This would have been relevant, in the Court's view, not only to the Court's statutory obligations to treat the victims fairly and to give them an opportunity to be heard, but also to deciding what weight to give to the Office's concession. In fact, the Office's representative had communicated with only a single family member (albeit with the expectation that he would spread the word to others). Later, family members objected to the Office's concession.

Even so, the phrase in the Notice would not warrant professional discipline or sanction because, as Max Kaufman's May 21, 2022 affidavit expresses, no one realized that the phrase might be misleading much less intended to mislead the Court. When Kaufman filed the Notice, he meant only to communicate that the Office's decision to concede penalty phase relief had been communicated to the victims' family, which he believed to be the case. He did not intend to imply that every member of the victims' family had been contacted or that the family agreed

---

[11] Insofar as the Court has now established this obligation, a question remains about the timing of the requisite disclosure, i.e., whether it must be made when the prosecution first gives notice that it will not contest the habeas petition or may await a later time when the Court is receiving evidence.

with the Office's decision.[12]  There is no reason to believe that he or anyone else in the Office anticipated the Court's reading of the phrase and its significance to the Court.  And Kaufman apologized in his affidavit for the Notice's lack of clarity.

I hereby submit this Expert Report in the captioned matter.

s/Bruce A. Green

June 22, 2022

---

[12] As of September 2021, when the Office filed the post-hearing brief, its understanding was that its representative had contacted a family member who said that he did not oppose penalty phase relief and who said that he would inform other surviving victims, which the representative later assumed he had done.  Commonwealth's Post-Hearing Brief at p. 23.

8

**EXHIBIT 8**

**Benjamin Lerner**

**2323 Race Street**

**Philadelphia PA 19103**

**Retired Judge: Court of Common Plea**

April 4, 2025

Attention: David Rudovsky

718 Arch Street

Philadelphia PA 19106

**Re: Paul George**

Dear Mr. Rudovsky:

I have been asked to provide information about my professional interactions with your client Paul George, and my opinion regarding his professional reputation and I am pleased to be able to do so.

I have known Paul Geroge for more than forty years, first as a colleague at the Defender Association of Philadelphia and, later, as an attorney appearing before me in the Court of Common Pleas for the First Judicial District of Pennsylvania.

I first met Mr. Geroge in 1982, when I hired him as an Assistant Defender. During my tenure as Chief Defender (1975-1990), I observed him develop into a first-rate trial and appellate lawyer who provided rigorous, highly effective representation. He was appropriately zealous in his representation of Defender clients, and at the same time he was always mindful of his ethical responsibilities as an officer of the court. His professional conduct was outstanding, reflecting high ethics and respect for the court and for the Rule of Law. He practiced with civility and respect for his adversaries, and in turn, he was universally respected for these qualities, as well as for his legal knowledge and trial skills.

I was appointed to the Common Pleas Bench in June 1996 and in 2001, I became the Court's Homicide Calendar and Supervising Judge, a position I held through March 2016. In this assignment, all Common Pleas homicide cases came through my courtroom, and many of them were disposed of by bench trial, guilty plea or pre-trial motions. For cases going forward on a jury trial track, I presided over pre-trial preparation, including supervision of discovery.

Paul George appeared before me frequently during that time, first as an Assistant Defender and then as private defense counsel. He was always well prepared and effective in his representation. More to the point here, he was always candid, respectful to the court and opposing counsel and completely ethical and honorable. I know from contacts with assistant

district attorneys, defense counsel, and Common Pleas judges that he was held in high esteem for his legal abilities and professional conduct.

I had limited contact with Mr. George between the time he began his work at the District Attorney's office and the date of my mandatory, age-related retirement at the end of 2019. However, during my last two years on the Bench, I heard several of my colleagues talk about Paul George with admiration and respect for his legal skills, his professionalism and his integrity. His reputation for honesty, candor with the Court, and adherence to the Rules of Professional Conduct was unblemished.

Thank you for the opportunity to provide these views and opinions.

Respectfully,

Judge Benjamin Lerner (Ret.)



Two Commerce Square, 2001 Market Street
Suite 1700
Philadelphia, PA 19103
☎ 215.299.2000 🖶 215.299.2150
WWW.FOXROTHSCHILD.COM

PATRICK J. EGAN
Direct No: 215.299.2825
Email: pegan@foxrothschild.com

April 1, 2025

David Rudovsky
718 Arch Street
Philadelphia, PA 19106

**Re: Paul George**

Dear Mr. Rudovsky:

This letter sets forth my opinion regarding the professional ethical reputation of Mr. George for your submission in an ongoing legal proceeding. I have been a member of the bar for over thirty-eight years. I am a Fellow of The American College of Trial Advocacy. I have been an adjunct professor of Trial Advocacy in the School of Law at both Temple University and the University of Pennsylvania. I have lectured on Professional Responsibility at the Pennsylvania Association of Criminal Defense Lawyer's annual seminar on White Collar Crime. I am Associate General Counsel at my firm. I have been a member of the CJA panel for the Eastern District of Pennsylvania since 1990.

I have known Mr. George for over thirty years, and I have interacted with him in almost every facet of our profession. I can state unequivocally that he is among the finest lawyers I have known in the Philadelphia area and his integrity and dedication to justice and the rule of law is unimpeachable. I first met Mr. George when he practiced as an Assistant Defender at the Defender Association of Philadelphia. I was in private practice and many of my criminal defense cases were litigated in the Philadelphia Court of Common Pleas. I worked with Mr. George on several cases in which he represented a co-defendant. Mr. George was, and continues to be, a zealous and talented advocate and, as has always been respectful and forthright with opposing counsel and the Court.

Several years later, my office was in the same suite as Mr. George, after he had moved to the private practice of law. I frequently sought his advice and counsel, and he never suggested any strategy or course of action that could be considered improper. We also co-counseled in criminal cases and he continued to demonstrate excellent legal skills, along with good character, ethical judgment, and integrity. More recently, I represented a defendant in a criminal case in which

A Pennsylvania Limited Liability Partnership

California    Colorado    Delaware    District of Columbia    Florida    Georgia    Illinois    Massachusetts    Minnesota    Missouri
Nevada    New Jersey    New York    North Carolina    Oklahoma    Pennsylvania    South Carolina    Texas    Washington

170210199.1



April 1, 2025
Page 2

Mr. George was the opposing appellate counsel for the Commonwealth. He was open-minded and fair in his interactions with the defense team, but he was steadfast in defending the propriety of the underlying conviction.

During my career, I have been fortunate to meet many talented lawyers with high ethical standards. I have also met, and represented on occasion, several lawyers whose integrity was lacking. Mr. George is clearly among the former group and his reputation among criminal defense counsel and prosecutors for high ethical standards is excellent. He has never been motivated by personal ambition or monetary gain. He could have made substantially more money in commercial practice, but he chose to serve the interests of justice and the underserved in this community. First, as a public defender, then as a small firm practitioner with a practice that included court appointments, and for the past six years as Assistant Supervisor of the Law Division of the Philadelphia District Attorney. Our community and profession would be well served if there were more lawyers like Paul George. I consider it an honor to be his colleague.

Sincerely,

Patrick J. Egan

PJE:PT

**LAW OFFICE OF PETER GOLDBERGER**
P.O. Box 645
Ardmore, PA 19003-0645

*Of Counsel:*
Anna M. Durbin

(610) 649-8200
FAX (610) 649-8362
E-mail peter.goldberger@verizon.net

Peter Goldberger

April 9, 2025

David Rudovsky, Esq.
Kairys, Rudovsky, Messing, Feinberg & Lin, LLP
The Cast Iron Bldg., Suite 501 South
718 Arch Street
Philadelphia, PA  19106

Re:  Paul George, Esq.

Dear Mr. Rudovsky:

You have asked that I provide a character reference for Paul George in connection with a proceeding in federal court. I have not investigated the circumstances involved in that matter, and this letter expresses no view on the merits of that case or the issues therein. But I am more than happy to share my opinion of Mr. George, both personal and professional, based on having known him for more than 30 years.

I had the pleasure of first meeting Paul George in April 1993, when I hired his late wife, Candace Putter, as my paralegal and office manager. (To my regret, Ms. Putter remained in my employ for only a little over a year, before entering graduate school and obtaining a degree that allowed her to begin a much-admired career in juvenile justice administration and training.) At that time, Mr. George, I believe, was still practicing with the Defender Association. My wife and I visited their home a few times, and we readily observed and appreciated the gentleness and understanding they demonstrated as parents of children a little older than our own.

My own practice – founded in 1986 and now winding down – focused on the post-conviction aspects of federal criminal defense, including sentencing, appeals and collateral proceedings. After graduating from Haverford College and Yale Law School, I clerked on the U.S. District Court for the Eastern District of Pennsylvania (for the late Hon. Edward R. Becker), served two years as an assistant federal public defender, was an associate in a boutique criminal defense firm, and taught criminal law and procedure as a professor at two law schools for six  years before starting my own practice. I was a founding board member of the Third Circuit Bar Association

and later its President. I have been recognized and honored by my peers in appellate law by being elected a Fellow of the American Academy of Appellate Lawyers and being repeatedly named to "SuperLawyers" and "Best Lawyers in America." Twice, most recently in 2024, I placed as "Lawyer of the Year" (highest vote total) for appellate law in Eastern Pennsylvania. I have taught many CLE programs, including several times for the Third Circuit Judicial Conference, and co-authored a Third Circuit practice manual with Judge Roth, at her invitation. I mention all of this as it may affect the weight that would be given to my opinions of a fellow professional.

I first encountered Paul George professionally about over 20 years ago, when he left the Defender Association and established his highly regarded criminal defense partnership with Patricia McKinney, known as McKinney & George. I knew Mr. George as a fellow criminal appeals expert, one of the very few doing the highest quality work in criminal cases before the Superior Court and state Supreme Court. Mr. George had a reputation in the criminal defense legal community as being willing and able to take on some of the most challenging assignments, that is, post-conviction and capital cases, carrying out these duties with consistent excellence. As I always focused my practice on the federal courts, I was pleased to have another name to whom I could confidently refer potential clients needing similar assistance in the state courts. Doing so, I knew that the client would receive highly competent – that is, diligent, creative, knowledgeable, and ethical – assistance from Mr. George. Never did I hear a complaint from one of those referrals or their family.

I interacted with Mr. George again after he joined the District Attorney's Office as a supervisor in the Appeals Division. I was part of the defense team on a high-profile post-conviction appeal that involved a voluminous and poorly preserved record of certain earlier stages of the case. Mr. George worked diligently and collegially with me on preparing a complete and helpful Reproduced Record for the Superior Court, both in a public (redacted) and a sealed (unredacted) form. Similarly, he was accessible, cooperative, honest and fair in relation to the extensive motions practice that was part of the appeal. Always, he attended scrupulously to the interests of his client, the Commonwealth, never fighting uselessly over points on which the defense was clearly right but also not conceding points that were fairly arguable. I never felt that our personal friendship was affecting his actions or judgments in his capacity as an Assistant District Attorney.

Both in his brief for the Commonwealth as appellee and when the case came up for argument before the Superior Court, Mr. George navigated a challenging path with the highest integrity and skill. The case implicated a jurisdictional issue of first impression, as well as largely stipulated record that the Common Pleas judge had nevertheless disputed and a hearing where that judge had mistreated counsel for both parties. (Ultimately, the Superior Court panel unanimously reversed and remanded for further proceedings before a different judge. One member concurred to underscore the need for judges to avoid undermining "public confidence in the judiciary.") I was

highly impressed from beginning to end at how Mr. George navigated the delicate position in which the trial judge had put him, and how forthrightly he presented the Commonwealth's case before the appellate court.

I interacted with Mr. George as an adversary a second time when I represented on appeal a defendant who about ten years earlier had been convicted and served a substantial sentence for aggravated assault, but whose victim had recently died from complications of those injuries. Manslaughter charges were then brought, and I handled an appeal from the denial of a double jeopardy motion. The case involved strong feelings and sensitivities on the part of both the defendant and the victim's surviving family, as well as a difficult legal issue with both jurisdictional and constitutional aspects.

Supervising the young appellate assistant assigned to handle the case against me, Mr. George again ensured that the interests of the Commonwealth and of the victim's survivors were never compromised. The District Attorney's office refused my offer to settle the appeal for a "nolo" plea and a time-served sentence and proceeded to secure an affirmance of the trial court's ruling. Again, I witnessed Mr. George acting with high professionalism in a sensitive and difficult case, while also teaching a young associate how to do the same as a budding prosecutor.

In short, based on more than three decades of personal knowledge and experience, I have nothing but the highest personal and professional regard for Paul George. If his conduct or integrity is being questioned in any regard, I would have great confidence that his response to any such questions would be candid and ultimately satisfactory.

Very truly yours,

PETER GOLDBERGER



**GOLDSHAW GREENBLATT PIERCE LLC**

TWO PENN CENTER, SUITE 1230
1500 JOHN F. KENNEDY BOULEVARD
PHILADELPHIA, PA 19102
PHONE: 215-278-6865

35 KINGS HIGHWAY EAST
HADDONFIELD, NJ 08033
PHONE: 856-873-9090

May 6, 2025

David Rudovsky, Esq.
Kairys, Rudovsky, Messing, Feinberg & Lin, LLP
The Cast Iron Bldg., Suite 501 South
718 Arch Street
Philadelphia, PA  19106

Re:    Letter of Support for Paul George

Dear Mr. Rudovsky

This letter is on behalf of my colleague Paul George. I am a partner at the law firm Goldshaw Greenblatt Pierce LLC. We are a firm that specializes in employment and criminal litigation. I am the partner in charge of criminal litigation in our firm. I have been practicing criminal law since 1987. I started at the Defender Association of Philadelphia and worked there until the end of 1996. This is where I met Mr. George. We have continued a professional and personal relationship since that time. I can tell you that he is both a lawyer and a person of the highest caliber with respect to his advocacy and integrity.

When I first met Mr. George, I was a new attorney at the Defender Association. Mr. George was a senior attorney and someone I went to on numerous occasions for help with my work. Mr. George was respected throughout the organization not only for his trial skills, but also his appellate advocacy. Because of his stellar reputation, he was one of the most sought out attorneys for advice by the over 100 attorneys who did trial and appellate work. Paul was one of the attorneys who was most generous with his time for other lawyers. Mr. George helped me on numerous complex legal issues and with several of my jury trials during my time at the Defender Association of Philadelphia.

Mr. George took the time to talk to me about how to handle our large caseloads, and he took the time to talk to us about the best ways to deal with the stress of the work. He would check in with us regularly to see if there were issues we needed to discuss, personal or professional, and he stressed the need for ethical representation in our practice. He was truly a mentor to me, and I will always be grateful for his help.

I left the Defender Association of Philadelphia in 1996, and I have been in the private practice of law since that time. I have spoken to Mr. George on numerous matters that we have worked on together. Additionally, I have simply called him for advice on complex legal issues where I needed to run something by someone I trusted. Mr. George always made

himself available to me and all our colleagues. He is one of the most respected members in the criminal justice community of Philadelphia.

When Mr. George decided to take an appellate position in District Attorney's Office, we believed it was a significant gain for the office. This was the feeling not just from the defense side, but from the current and former prosecutors who know Mr. George. In my view, Mr. George has maintained a principled approach to appellate cases, defending convictions in the great majority of cases, even where there were strong defense arguments, but willing as well to concede relief where appropriate.

Besides being well respected for his legal acumen, Mr. George is respected for his temperament, personality, and lifestyle. Mr. George is a family man who took great pride in his community involvement. I would often see him at different events that we had as members and former members of the Defender Association of Philadelphia. We would seek each other out to spend time together and I would see and hear about all the good deeds he has done throughout the community. Unfortunately, we were all there when Mr. George lost his wife to cancer some years ago.

I hope that this letter can give you some idea of the high respect that Mr. George is held by myself and other members in the legal community.

Sincerely,

*Ronald L. Greenblatt, Esquire*
Ronald L. Greenblatt, Esquire