

**UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF PENNSYLVANIA
UNITED STATES DISTRICT JUDGE
14614 UNITED STATES COURTHOUSE
INDEPENDENCE MALL
PHILADELPHIA, PENNSYLVANIA 19106

CHAMBERS OF
**JUDGE PAUL S. DIAMOND**
UNITED STATES DISTRICT JUDGE

(267) 299-7730

August 19, 2025

Paul M. George
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107

Dear Mr. George:

I have enclosed a copy of the Report and Recommendation of the three-judge panel in the above matter. It is being filed under seal in accordance with our Local Rule.

If you have any objections, they must be filed under seal within fourteen (14) days. If you do not intend to file objections, please let me know as soon as possible.

Very truly yours,

Paul S. Diamond, J.

cc:    Judge Gerald J. Pappert
       Judge John M. Gallagher
       Alfred W. Putnam, Jr.
       David Rudovsky

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN THE MATTER OF | CIVIL ACTION |
| PAUL M. GEORGE | NO. 22-mc-050 |

**Diamond, Pappert, Gallagher, JJ.**                         **August 19, 2025**

## REPORT AND RECOMMENDATION

The Third Circuit Court of Appeals affirmed Judge Goldberg's finding that Assistant Philadelphia District Attorney Paul George misrepresented critical facts in an unsuccessful effort to persuade the Court to vacate a death sentence imposed on Robert Wharton in 1985.  Judge Goldberg sanctioned George under Rule 11, which requires only negligence, leaving open the question of whether George's misrepresentations were intentional.  We find that they were and thus violated the Pennsylvania Rules of Professional Conduct.  Although George represented to Judge Goldberg and to us that he sought to vacate Wharton's death sentence on legal grounds, this was not true.  George's conduct was intended to further a District Attorney's Office ("DAO") policy, carried out under the guise of its Capital Case Review Committee, to vacate capital sentences.

We recommend George's disbarment not because he and the DAO oppose the death penalty, but because George repeatedly lied to us and Judge Goldberg.  And as the Third Circuit stated, "while the [DAO] may oppose the death penalty, it may not further that position by slanting the facts and the law."  *Wharton v. Superintendent Graterford SCI Phila. Dist. Att'ys Off.*, 95 F.4th 140, 150 (3d Cir. 2024).

1

## I.    BACKGROUND

### A. The Capital Case Review Committee

The DAO is comprised of many divisions and units, most prominently the Law Division, which is broken down into Appeals, Civil Litigation, Post-Conviction Relief Act and Federal Litigation, which mostly handles federal *habeas* matters.  (George Show Cause H'rg Tr. at 9:10–15, George Docket No. 48.)  In late 2017, District Attorney-elect Lawrence Krasner asked Nancy Winkelman—an attorney lacking any criminal-law experience—to be Supervisor of the Law Division.  (Winkelman Show Cause H'rg Tr. at 13:10–17, Winkelman Docket No. 56.)[1]  He appointed George as Assistant Supervisor of the Law Division because Winkelman needed a deputy with "experience in the kinds of cases that would be coming into" the Law Division.  (George Show Cause H'rg Tr. at 5:19–22, 7:22–25, 8:1–10, 12:16–17.)

"[V]ery soon" after George and Winkelman began in the Law Division, "it became clear that there were death penalty cases" on post-conviction review in which they "were going to have to respond to whatever claim the defendant was raising."  (*Id.* at 13:23–14:10.)  So in consultation with the District Attorney, they formed the so-called Capital Case Review Committee ("CCRC"), which consisted of the heads of several divisions and units including the Law Division, the Conviction Integrity Unit and the Homicide Division.  (*Id.* at 14:17–15:12.)  The CCRC met on a "weekly basis" to review "both new . . . potentially capital cases, and . . . old capital cases as  . . . a response

---

[1]     Judge Goldberg sanctioned both George and Winkelman, who retained separate counsel and requested separate hearings due to potential conflicts of interest.  (Second Conflicts H'rg at 4:11–24, George Docket No. 38.)  We refer to ECF filings in the George Matter (22-mc-50) as "George Docket No. x," in the Winkelman Matter (22-mc-51) as "Winkelman Docket No. x," and in the Wharton matter (01-cv-6049) as "Wharton Docket No. x."

became due from [the District Attorney's] Office on what position [it was] going to take in a state or federal court proceeding." (Winkelman Show Cause H'rg Tr. at 19:9–13, 20:7); *see also* (George Show Cause H'rg Tr. at 14:11–16) (noting the Committee would "talk about the pros and cons of the issue in front of the court at that moment"). After discussing a case, the CCRC would "make recommendations to the DA," who attended the meetings and had final decision-making authority. (*Id.* at 14:11–16.)

Once a new death-penalty challenge was filed, Max Kaufman, then-Chief of the Federal Litigation Unit, would notify George, who was designated as the Committee's "reporter." (*Id.* at 17:3–6); (Winkelman Show Cause H'rg Tr. at 87:24–88:3); (Kaufman Decl. ¶ 6, Wharton Docket No. 287-1.) George would purportedly evaluate a petitioner's claim and, if it in his judgment had any merit, work with paralegal Diane Adamczyk to prepare a memorandum with "extensive background about the case" for distribution to the CCRC, (George Show Cause H'rg Tr. at 17:23–18:12; 133:16–134:5); (Winkelman Show Cause H'rg Tr. at 23:16–25, 24:5–18.) Over his seven-and-a-half years in this role, George sent at least "several dozen" such claims to the CCRC, where he then presented to the Committee about the case. (Winkelman Show Cause H'rg Tr. at 24:22–25:8, 110:14–23.) Each time, the CCRC and the District Attorney followed George's recommendation and decided to concede relief. (*Id.* at 107:7–17, 109:13–23, 110:14–23); (George Show Cause H'rg Tr. at 131:19–23.)

### B. *Wharton v. Vaughn*

#### 1. *Habeas* Petition

Robert Wharton was sentenced to death in 1985 for "forc[ing] [his] way into the home of Bradley and Ferne Hart at knifepoint and strangl[ing] the Harts to death.

Wharton and his co-defendant then turned off the heat and abandoned the Harts' infant, Lisa, to freeze to death." *Wharton v. Vaughn*, No. 01-6049, 2022 WL 1488038, at *1 (E.D. Pa. May 11, 2022). Wharton filed a federal *habeas* petition claiming, *inter alia*, that his "trial counsel was allegedly ineffective for failing to present evidence of Wharton's alleged positive adjustment to prison at the penalty phase of his state court proceeding." *Id.* Judge Goldberg initially denied this claim without an evidentiary hearing. *Id.* at *2. The Third Circuit Court of Appeals remanded and ordered a hearing, reasoning that Wharton "made a *prima facie* showing that there is a reasonable probability that at least one juror would have changed his or her vote if presented with [the prison-adjustment] evidence." *Wharton v. Vaughn*, 722 F. App'x 268, 283 (3d Cir. 2018). The Third Circuit explicitly instructed Judge Goldberg to "reconstruct the record and assess it anew." *Id.* at 282–83 (quoting *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011)). In so doing, it said that the district court "cannot merely consider the mitigation evidence that went unmentioned in the first instance; [it] must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony." *Id.*

### 2. The Concession

Krasner and George assumed office a few months before Wharton's claim was remanded. After Judge Goldberg scheduled a status conference to discuss the schedule for the evidentiary hearing, George directed Kaufman to file a "Notice of Concession" agreeing to death-penalty relief "following review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the victims' family, and notice to [Wharton's] counsel." (Concession Notice at 3,

Wharton Docket No. 155); *Wharton v. Vaughn*, No. 01-6049, 2022 WL 4133291, at *10

(E.D. Pa. Sept. 12, 2022) ("In filing the Notice of Concession, [Kaufman] followed the

directive of the Assistant Supervisor of the Law Division and the Office's procedures.").

To Judge Goldberg, however:

> The Notice provided no factual or legal analysis as to the District Attorney's basis for this complete about-face, and no explanation as to why, after decades of advocating for the death penalty, the District Attorney had now reached the conclusion that a Sixth Amendment violation had occurred due to a failure on trial counsel's part to introduce positive prison adjustment evidence. And . . . this concession notice was filed five months after the Pennsylvania Supreme Court had explicitly found, in a death penalty matter on collateral review, that the District Attorney does not maintain prosecutorial discretion to alter a capital jury's verdict via an agreement or by concession and that vacating a jury's death sentence should only occur after careful and independent judicial review. *Commonwealth v. Brown*, 196 A.3d 130, 144-46 (Pa. 2018).

*Wharton v. Vaughn*, No. 01-6049, 2022 WL 1488038, at *3 (E.D. Pa. May 11,

2022).

Two days after the notice of concession was filed, the parties submitted a joint

proposed order, in which Judge Goldberg was to state that "upon a careful and

independent review of all the parties' submissions and all prior proceedings in this

matter," death-penalty relief should be granted.  (Prop. Order at 2, Wharton Docket No.

156.)  Judge Goldberg declined to sign the proposed order because he "received no facts

or analysis which would allow him to undertake a 'careful and independent review' and

grant such extraordinary relief."  *Wharton v. Vaughn*, No. 01-6049, 2022 WL 1488038,

at *3 (E.D. Pa. May 11, 2022).  He gave the DAO an opportunity to justify its concession

in further briefing, (Supp. Briefing Order, Wharton Docket No. 161), and George filed a

supplemental brief in which he represented that he had "carefully reviewed the facts

and law and determined that Wharton's ineffectiveness claim fulfills the criteria

articulated in *Strickland v. Washington*." (DAO April 3, 2019 Brief at 4, Wharton Docket No. 162.) Based on this purported investigation, George and Winkelman (who also signed the brief) represented that Wharton's claim "is not lacking in merit" and that "continuing to seek affirmance of Wharton's death sentence does not justify further expenditure of judicial and legal resources." (*Id.* at 4–5.)

The filing did not include "any evidence of Wharton's positive prison adjustment, the crux of the matter before [Judge Goldberg], nor did it advise that there was any evidence to the contrary [he] should consider—e.g., negative prison adjustment." *Wharton v. Vaughn*, No. 01-6049, 2022 WL 1488038, at *4 (E.D. Pa. May 11, 2022). Judge Goldberg therefore invited the Pennsylvania Attorney General ("OAG") to participate in the case as *amicus* to investigate the prison-adjustment issue as required by the Third Circuit's mandate. The DAO fought the OAG's participation. (Wharton Docket No. 226.)

### 3. Evidentiary Hearing

The OAG investigated the mitigation and anti-mitigation evidence relating to Wharton's prison adjustment between his sentencing hearings, by first obtaining Wharton's records from the Pennsylvania Department of Corrections. (OAG Supplemental Letter, Wharton Docket No. 311.) These records revealed that, in 1986, "Wharton was transported to City Hall . . . to attend a sentencing hearing in an unrelated robbery case," after which he "pushed the deputy sheriff transporting him into a closing elevator door and ran down the courthouse stairs from the second to the first floor." *Wharton v. Vaughn*, No. 01-6049, 2022 WL 1488038, at *5 (E.D. Pa. May 11, 2022). A deputy sheriff fired two shots at Wharton, who subsequently pled guilty to

6

escape. *Id.* Wharton had additional prison misconducts for "possessing implements of escape" which, when combined with the escape attempt, obviously undermined his positive-prison adjustment claim. *Id.* at *15.

Judge Goldberg held an evidentiary hearing to review the mitigation and anti-mitigation prison-adjustment evidence that the OAG and Wharton had presented. The Court asked George, *inter alia*, "[w]as the [DAO] aware of the escape from City Hall prior to filing your notice of concession?" George responded "Yes." (May 11, 2021 Evid. H'rg Tr. at 66:16–19, Wharton Docket No. 267.) Based on the escape attempt and other significant anti-mitigation evidence, Judge Goldberg denied Wharton's petition.

### 4. Sanctions Proceedings

Judge Goldberg identified two "critical issues [in which] it appear[ed] that the District Attorney was less than candid with this Court." *Wharton v. Vaughn*, No. 01-6049, 2022 WL 1488038, at *16 (E.D. Pa. May 11, 2022). First, the DAO withheld "Wharton's premeditated escape from a Philadelphia courtroom . . . when the District Attorney requested that [Judge Goldberg] blindly vacate Wharton's death sentence." *Id.* Second was the "District Attorney's representation . . . [that he] had consulted with the victims' family" when in reality "no communication occurred between the District Attorney and the only surviving victim, Lisa Hart-Newman, and . . . minimal and woefully deficient communication took place with the siblings of the deceased, Bradley and Ferne Hart." *Id.* Citing *Commonwealth v. Brown*,[2] Judge Goldberg admonished

---

[2] In *Commonwealth v. Brown*, the Pennsylvania Supreme Court rejected George's attempt to concede relief in another death-penalty case on post-conviction review. 649 Pa. 293 (2018). That court held that "neither the parties, by agreement, nor this Court, absent a finding of legal error, have the power or ability to order that the jury's verdict be commuted to a life sentence without parole." *Id.* at 317. To do so would contravene the "enormously difficult decision" a jury of Philadelphia citizens made, after hearing the evidence and instructions on the law, to impose the

George, who knew the District Attorney did not have "the discretion to decide that a death sentence should be removed without a further independent review by a court[,] yet this is exactly what the District Attorney attempted to do in federal court." *Id.* at *17.

Judge Goldberg held a sanctions hearing on June 23, 2022, at which Kaufman, Winkelman, and George testified, (Sanctions H'rg Tr., Wharton Docket No. 309), and issued his opinion on September 12, 2022, *Wharton v. Vaughn*, No. 01-6049, 2022 WL 4133291 (E.D. Pa. Sept. 12, 2022). Because Kaufman credibly testified that he had relied on the word of "the highly experienced attorneys on the Capital Case Review Committee and the District Attorney himself" before filing the concession, he escaped sanctions. *Id.* at *10. But George and Winkelman did not. A seasoned criminal-defense attorney like George, Judge Goldberg reasoned, was aware that *Strickland*'s prejudice prong requires review of both mitigation and anti-mitigation evidence and that, just months earlier, the Pennsylvania Supreme Court commanded in *Brown* "that a full development of the facts be undertaken before relief could be granted." *Id.* at *11. Thus, George's representation that he "had 'carefully reviewed the facts' was unreasonable, as was [his] request that the Court sign an order indicating that a 'careful review' had occurred." *Id.* at *6. "Whatever review the Committee performed," the Court reasoned, "it was either not of the merits or was not 'careful.'" *Id.* at *9.

---

death sentence. *Id.* at 316. The court stated that "the PCRA requires a **judicial merits review** favorable to the petitioner before any relief may be granted," *id.* at 318 (emphasis in original), and that after seeking and obtaining a death sentence, the prosecutor's discretion is limited to "persuad[ing] the courts to agree that error occurred as a matter of law." *Id.* at 320. In sum, "a district attorney's concession of error is not a substitute for independent judicial review" and the "differing views of the current" District Attorney were not cause enough to seek a result different from his predecessor in a capital case. *Id.* at 320, 325. George now admits—as he must—that telling the Pennsylvania Supreme Court it was bound to accept the proposed concession without any independent judicial review was a "pretty big mistake." (George Show Cause H'rg Tr. at 22:1–6.)

8

Judge Goldberg also found that "George's statement regarding [his] communication with the victims' family was false and yet another representation to the Court made after an inquiry that was not reasonable." *Id.* at *10.

### 5. Third Circuit Court of Appeals' Opinions

In two separate precedential opinions, a panel of the Third Circuit Court of Appeals affirmed Judge Goldberg on both the merits and his imposition of sanctions. *Wharton v. Graterford*, 95 F.4th 113, 125 (3d Cir. 2024) (merits); *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140 (3d Cir. 2024) (sanctions). On the merits, the court of appeals pointed out how the "adversarial process broke down after the DAO" joined forces with Wharton. *Wharton v. Graterford*, 95 F.4th 113, 125 (3d Cir. 2024). The panel held that the evidence of "Wharton's repeated escape attempts . . . negate any reasonable probability that a juror would have changed his or her vote during [his] resentencing hearing." *Id.* at 123–24.

In affirming Judge Goldberg's sanctions, the panel stated, "while the [District Attorney's] Office may oppose the death penalty, it may not further that position by slanting the facts or the law." *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 150 (3d Cir. 2024). But, the Third Circuit stated, George and Winkelman "crossed that line" when they failed to conduct any factual inquiry into anti-mitigation evidence—including even "a basic criminal-record check"—as required by the Third Circuit's previous mandate. *Id.* They nonetheless told Judge Goldberg that the DAO "had decided to concede relief '[f]ollowing review of this case by the Capital Case Review Committee [and] communication with the victims' family.'" *Id.* at 144. And they did so "just four months after" the Pennsylvania Supreme Court had condemned the District

Attorney's "pattern" of "conced[ing] many death-penalty cases without . . . independent judicial review." *Id.* (citing *Commonwealth v. Brown*, 196 A.3d 130, 146 (Pa. 2018)).  It was then apparent that George and Winkelman's misrepresentations to Judge Goldberg were an attempt at "evading *Brown*," *id.*, a strategy that, as outlined in yet another more recent precedential opinion from the Third Circuit, appears to be the District Attorney's *modus operandi*.  *See Johnson v. Mahonoy*, No. 23-2531, ---F.4th ----, 2025 LX 357019, at *10 (3d Cir. July 14, 2025) (noting that the District Attorney's concession in a separate case was an attempt to "circumvent state law" which required "substantive review of the merits of the claim").

## II.    DISCIPLINARY PROCEEDINGS

Pursuant to Local Rule of Civil Procedure 83.6(V)(A), Judge Goldberg referred George and Winkelman to Chief Judge Sanchez for the issuance of a rule to show cause why they should not be disciplined.  Chief Judge Sanchez referred the matter to a panel of this Court, (George Docket No. 1), and appointed Alfred W. Putnam, Jr. to serve as disciplinary counsel, (George Docket No. 2).  On September 11, 2023, Mr. Putnam filed a Petition for a Rule to Show Cause why George and Winkelman did not violate Professional Conduct Rules 3.1 and 3.3(a) by making false or misleading representations to Judge Goldberg.  (Pet. for Rule to Show Cause, George Docket No. 8.)  That same day, Chief Judge Sanchez granted the Petition and issued the Rule.  (Rule to Show Cause, George Docket No. 9.)  George filed his answer and memorandum of law in support on October 18, 2023, (George Docket Nos. 12, 13), to which Putnam responded on November 8, (George Docket No. 15), and George replied on November 22, (George Docket No. 16).

10

After separate hearings to determine whether conflicts arose from joint representation, George and Winkelman obtained separate counsel (whose fees apparently were paid by the DAO) and requested separate hearings. *See generally* (First Conflicts H'rg, George Docket No. 28, Winkelman Docket No. 31); (Second Conflicts H'rg at 4:11–20, George Docket No. 38, Winkelman Docket No. 43). We held Winkelman's evidentiary hearing on March 28, 2025, (Winkelman Show Cause H'rg Tr.), and George's on May 16, (George Show Cause H'rg Tr.). In his testimony and briefing, George primarily disputes Disciplinary Counsel's contention that the DAO misled the Court pursuant to a policy of ultimately conceding death-penalty relief at post-conviction review. (Pet. for Rule to Show Cause ¶ 28); *see generally* (Pre-H'rg Memo., George Docket No. 45.) In support, George submitted several exhibits, including a list of five "cases . . . of DAO not conceding death penalty relief in PCRA and habeas corpus proceedings." (George Docket No. 46.) But this list, too, was mendacious; our review of those cases showed the DAO eventually conceded relief in each one.

## III.    LEGAL STANDARDS

The Court has inherent authority "to control admissions to its bar and to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *In re Surrick*, 338 F.3d 224, 229 (3d Cir. 2003). This Court applies the Pennsylvania Rules of Professional Conduct ("RPC") in attorney disciplinary proceedings. *See* Loc. R. Civ. P. 83.6(IV)(B). The Local Rules state:

> For misconduct defined in these rules, and for good cause shown, and after notice and opportunity to be heard, any attorney admitted to practice before this court may be disbarred, suspended from practice

11

   before this court, reprimanded or subjected to such other disciplinary
   action as the circumstances may warrant.

*See* Local R. Civ. P. 83.6(IV)(A). The purpose of attorney discipline is "to protect the public from unfit attorneys and to maintain the integrity of the legal profession and the judicial process." *Office of Disciplinary Couns. v. Price*, 732 A.2d 599, 606 (Pa. 1999).

   Disciplinary Counsel alleges George violated RPC 3.1 and 3.3(a)(1). Rule 3.1 provides that a "lawyer shall not bring or defend a proceeding, or *assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous*, which includes a good faith argument for an extension, modification or reversal of existing law." Pa. R. Prof. Conduct 3.1 (emphasis added). The comments to RPC 3.1 clarify that advocates have "a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure." RPC 3.1 cmt. 1. Lawyers must "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions." RPC 3.1. cmt. 2.

   Rule 3.3(a) provides "[a] lawyer shall not knowingly . . . (1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." An "assertion purporting to be on the lawyer's own knowledge . . . may properly be made only when the lawyer knows the assertion is true or *believes it to be true on the basis of a reasonably diligent inquiry*." RPC 3.3(a)(1) cmt. 3 (emphasis added). An attorney's duty of candor to the tribunal is "heightened where the proceeding lacks the 'balance of presentation by opposing advocates.'" *Wharton v. Vaughn*, No. 01-6049, 2022 WL 1488038, at *17 (E.D. Pa. May 11, 2022) (quoting Pa. R. Prof. Conduct 3.3 cmt. 14).

## IV.    DISCUSSION

George concedes that (1) the adversarial system "broke down" in the *Wharton* case, (George Show Cause H'rg Tr. at 133:13–15), thus elevating his duty of candor to Judge Goldberg, (2) it was a "mistake" to oppose the appointment of the OAG as *amicus*, (*id.* at 133:4–5), and (3) the "District Attorney's Office did not fulfill its obligations to the public, the victims, and the courts in how it handled the *Wharton* case," (*id.* at 132:13–19).  Judge Goldberg found that the DAO, under George's direction, made two misrepresentations that warranted Rule 11 sanctions: (1) that the Office was conceding relief after he and the CCRC "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim" was "not without merit," and (2) that the concession followed "communication with the victims' family."  Judge Goldberg and the Third Circuit found that George's misrepresentations violated Rule 11, which "requires only negligence."  *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 147 (3d Cir. 2024).  We must decide, *inter alia*, whether George "knowingly [made] a false statement of material fact or law to a tribunal" in violation of Pennsylvania Rule of Professional Conduct 3.3(a)(1).  We find that he did and that his misrepresentations violated Pennsylvania Rules of Professional Conduct 3.1 and 3.3(a).

### A.  "Careful Review of the Facts and Law"

#### 1.  The Misrepresentations

When, in January of 2018, the Third Circuit Court of Appeals remanded Wharton's penalty-phase claim for an evidentiary hearing, it instructed Judge Goldberg to "*reconstruct the record and assess it anew.  In so doing, we cannot merely consider the mitigation evidence that went unmentioned in the first instance; we must also take*

13

*account of the anti-mitigation evidence that the Commonwealth would have presented* to rebut the petitioner's mitigation testimony." *Wharton v. Vaughn*, 722 F. App'x 268, 282–83 (3d Cir. 2018) (emphasis added). George violated this explicit mandate to pursue a different strategy.

He directed Kaufman to file a notice conceding penalty-phase relief "following review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office." (Concession Notice at 3.) The notice contained no exhibits and did not explain the factual findings, if any, that led to the DAO's decision. Two days later, George had Kaufman file a proposed order, pursuant to which Judge Goldberg would have declared that relief was merited "upon a careful and independent review of all of the parties' submissions and all prior proceedings in this matter." (Prop. Order at 2.) But the Court could not have granted the relief based solely on "the parties' submissions and all prior proceedings"; that's why the Third Circuit mandated an evidentiary hearing on Wharton's claim.

Judge Goldberg declined to sign the proposed order and gave the DAO an opportunity to explain whether he was able to grant their concession "on the current record, without conducting the evidentiary hearing as directed by the United States Court of Appeals for the Third Circuit." (Supp. Briefing Order.) Instead, George and Winkelman submitted a brief doubling down by claiming "the District Attorney's Office carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim . . . is not lacking in merit."[3] (Concession Brief at 3, Wharton Docket No. 162.)

---

[3]    George claims his assertions in the brief cannot be the basis for an ethics violation because the District Court's supplemental briefing order did not require him to "provide a fulsome explanation justifying" the concession. (Pre-H'rg Memo. at 18–19.) Not so. The Order made clear that George was to paint a complete evidentiary picture justifying his concession if he wanted to skip

14

They spilled a lot of ink defending their concession policy, but none at all "reconstruct[ing] the record" and laying out the mitigation and anti-mitigation evidence that they believed substantiated Wharton's claim.[4]  (*Id.*)

## 2. Failure to Reasonably Investigate

With both Wharton and the DAO advocating for penalty-phase relief, "the adversarial process broke down." *Wharton v. Graterford*, 95 F.4th 113, 125 (3d Cir. 2024); *see also Johnson*, 2025 WL 1922769, at *5 (noting that the DAO's concession in that case "reflects a breakdown in the adversarial process").  George told Judge Goldberg to trust that his careful review of the facts and the law was an adequate substitute for independent judicial review.  But George had not, in fact, carefully reviewed the facts and law, as evidenced by his failure to even obtain Wharton's escape conviction or prison disciplinary records before arguing that his positive-prison adjustment warranted relief.[5]  *See Wharton v. Superintendent Graterford SCI*, 95 F.4th

---

the mandated hearing.  *See* (Supp. Briefing Order).  Nonetheless, George still rested on his purportedly "careful review" without providing any factual support.

[4]    The only evidentiary support George and Winkelman pointed to in this brief was a declaration from Wharton's penalty-phase counsel stating that "I was not operating under any strategy or tactic when I did not investigate and present evidence of Mr. Wharton's positive prison adjustment."  (Concession Brief at 3.)  But counsel's failure to investigate is precisely why the Third Circuit ordered the District Court to "reconstruct the record" and evaluate both "mitigation evidence that went unmentioned in the first instance" as well as "the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony." *Wharton v. Vaughn*, 722 F. App'x 268, 282–83 (3d Cir. 2018).

[5]    The harm of the DAO's concession's policy on the adversarial process is the subject of the most recent *Commonwealth v. Brown* case pending before the Pennsylvania Supreme Court on King's Bench review.  *Commonwealth v. Brown*, Order Granting Petition for Exercise of King's Bench Jurisdiction at 1, No. 32-EM-2023 (Pa. Apr. 3, 2024).  That court is deciding "[w]hether, and via what procedure, a common pleas court judge may grant PCRA relief based upon concessions of the parties. *See Commonwealth v. Brown*, 196 A.3d 130 (Pa. 2018)."  *Id.* at 2.

In that case, the DAO is similarly alleged to have provided Common-Pleas Court Judge Bronson incomplete evidentiary support for a concession.  *See Commonwealth v. Brown*, Petitioners' Reply Brief at 14–17, No. 32-EM-2023 (Pa. Nov. 12, 2024); *Commonwealth v. Brown* Oral Argument at 56:40–58:50 (Mar. 5, 2025), https://pcntv.com/pennsylvania-politics-and-policy/pa-courts/pa-supreme-court/.

140, 150 (3d Cir. 2024) ("Although we told Appellants to look beyond the record and suggested where to do so, they never did."). George now (finally) admits that he was at least "negligent" in failing to find the escape conviction, (George Show Cause H'rg Tr. at 75:15), which he at one point called "readily available data," (Winkelman Docket No. 50-1). He admits he "miss[ed]" the escape attempts because his factual investigation was limited to reading the existing record, to which he added Wharton's newly discovered mitigation evidence into the mix. (George Show Cause H'rg Tr. at 74:22–25, 106:4–7.) This inquiry was inherently defective given the Third Circuit's mandate to "reconstruct the record" with both mitigation and anti-mitigation evidence. *Wharton v. Vaughn*, 722 F. App'x 268, 282–83 (3d Cir. 2018).

What's worse, however, is George's proposed order asking Judge Goldberg to set aside the Third Circuit's mandate to reconstruct the record and to instead grant death-penalty relief based on the "parties' submissions and all prior proceedings in this matter." (Proposed Order at 2.) Had Judge Goldberg done so, Wharton's escape attempts never would have seen the light of day. What's more, even if the record already contained the escape attempts, George acknowledged that he never expected Judge Goldberg to read the voluminous record in this several-decades-long case before signing the proposed order. (George Show Cause H'rg Tr. at 112:21–25, 113:1–9.)

---

The Pennsylvania Attorney General filed an *amicus* brief there evidencing the DAO's extensive pattern of conceding relief in post-conviction review cases, many of them capital. *See Commonwealth v. Brown*, Brief for *Amicus Curiae* the Office of Attorney General in Support of Petitioners, No. 32-EM-2023 (Pa. July 12, 2024). The OAG argued that "[c]oncessions may not be used as a means to an end that would otherwise be unavailable under the law." *Id.* at 2. Of the 115 concessions it identified, "almost none of them have been subjected to the adversarial testing by which our system of justice generally makes that determination." *Id.* "Among the few that have been so tested, the results have been of concern; multiple concessions have proven to be unwarranted." *Id.* at 5–13 (citing cases in which the participation of *amicus* demonstrated that the DAO's concessions in those cases were unfounded).

That's why "[c]ourts rely on lawyers' honesty," especially from prosecutors. *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140 (3d Cir. 2024); *see also* Am. Bar Ass'n, *Criminal Justice Standards for the Prosecution Function* § 3-1.4 (4th ed. 2017) ("In light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts and in fulfilling other professional obligations.").

Pursuant to his role as the CCRC's reporter, George sent a memorandum on the *Wharton* case to CCRC members, an hour and fifteen minutes before the Committee met to discuss it on November 26, 2018. (George CCRC Memo. at 2, 7.) The memorandum, prepared by paralegal Diane Adamczyk under George's supervision, (Winkelman Show Cause H'rg Tr. at 23:16–25), listed all of the mitigation evidence, including Wharton's newly discovered evidence, but *no anti-mitigation evidence*. (George CCRC Memo. at 7.) When pressed on this, George said the only anti-mitigation evidence, in his view at the time, was "the crime." (George Show Cause H'rg Tr. at 106:4–7.) But as Disciplinary Counsel pointed out, there was "a lot of anti-mitigation evidence" besides the escape attempt that George claims he read but did not present to the CCRC. (*Id.* at 74:22–25, 106:8-17, 107:4–5); *see also Wharton v. Vaughn*, No. 01-6049, 2022 WL 1488038, at *5–7 (E.D. Pa. May 11, 2022) (listing negative prison-adjustment evidence, including six prison misconducts, two of which were for possessing instruments of escape). He "can't say why" that is, saying only "if it should have been, then it should have been." (*Id.* at 106:21-22.) Either George lied about reviewing Wharton's prison records, kept known anti-mitigation evidence from the Committee, or both.

17

### 3.  Policy of Conceding Death-Penalty Relief

Rather than conceding relief on Wharton's claim after careful review of the facts and law, the DAO's concession in *Wharton* was, like its concessions in all other capital-cases, pre-ordained.  The so-called Capital Case Review Committee was designed solely to facilitate the manner in which to concede relief, not debate whether or not to do so. (George Show Cause H'rg Tr. at 14:11–16.)  George was the chief architect behind the strategies employed to concede death-penalty relief.  Accordingly, in the *Wharton* case, George failed to reasonably investigate, and knowingly withheld from the CCRC, anti-mitigation evidence because, using the CCRC as cover, he sought to get Wharton off death row rather than "persuade the courts to agree that error occurred as a matter of law."  *Brown*, 196 A.3d at 146; *see also Johnson*, 2025 WL 1922769, at *4 (condemning DAO attempt to use federal court as "a fast track to *habeas* relief—one that would have granted [petitioners] *habeas* without any substantive review of the merits of his claims.").

These machinations were pursuant to the DAO's policy to not only never seek the death penalty, but also to concede relief in every death penalty case that arises on post-conviction review.  The CCRC was formed to strategize the most effective arguments to both preclude the imposition of *new* death sentences and overturn *old* ones.  *See* (Winkelman Show Cause H'rg Tr. at 18:14–23) (acknowledging that the CCRC discussed both "new potentially capital cases" and "old capital cases").  Winkelman and George, both "senior member[s] of the Capital Case Review Committee," (Answer at 8, ECF No. 12), acknowledge that the DAO "has a policy of not seeking the death penalty in new cases," (George Show Cause H'rg Tr. at 126:21–22);

18

(Winkelman Show Cause H'rg Tr. at 103:18–104:2), so the CCRC never met to discuss "whether to seek a death penalty in the first instance," (Winkelman Show Cause H'rg Tr. at 18:14–23), but rather the best way to prevent one from being imposed. George wanted us to believe that while it was strategizing how to avoid new death sentences, the CCRC was carefully reviewing claims attacking old ones. The evidence belies such a claim.

George and Winkelman acknowledged that, of the "dozens" of death-penalty post-conviction cases that George brought to the CCRC over seven-and-a-half years, the DAO has never—not once—defended a death sentence in any of them. (*Id.* at 107:7–17, 109:13–23, 110:14–23); (George Show Cause H'rg Tr. at 131:19–23.) Neither Winkelman nor George could remember a single instance in which a member of the CCRC even suggested that the Office defend a previously imposed death sentence.[6] (George Show Cause H'rg Tr. at 135:24–136:5); (Winkelman Show Cause H'rg Tr. at 114:22–115:4.) Tellingly here, George never reconvened the CCRC so that its members could consider the escape attempts brought to light by the Attorney General, instead discussing them only with Krasner and ultimately resting on the concession. (George Show Cause H'rg Tr. at 81:8–20, 115:8–116:19.)

Realizing how bad this looked and perhaps hoping we wouldn't look into the cases ourselves, George argued "the DAO has no policy of conceding all death penalty challenges by persons sentenced to death," (Pre-H'rg Memo. at 23), because he conducted a "case-by-case review," (*id.*), and opposed such relief in five "plainly

---

[6]    Disciplinary Counsel also points to a social media post from the DAO's former Federal Litigation Supervisor—within the Law Division—touting the Office's accomplishments, including a 21-0 record (at the time) in *habeas* concessions. (George Exhibits, Ex. A, George Docket No. 8, at pg. 17.)

19

meritless" claims that he never brought to the CCRC. (George Show Cause H'rg Tr. at 17:23–18:4); (George Exhibits, George Docket No. 46, pg. 2.) Those cases, far from showing any objectivity on the part of the CCRC, are all further proof of the policy, the existence of which Paul George denied while under oath. Contrary to the picture George tries at this late date to paint, while contesting certain claims in varying courts, the DAO conceded relief whenever and wherever it mattered in all five cases, and the Office's often multi-front procedural wranglings show the extent to which the DAO will go to invalidate prior capital sentences. *See Commonwealth v. Anthony Reid* (DAO conceded guilt-phase relief in state-court PCRA case relating to Reid's first of three murders, (Pre-H'rg Memo. at 25), and then conceded penalty-phase relief in pending federal *habeas* case in second murder, (Civ. Action No. 14-5452, ECF No. 38), followed by concession in penalty-phase of third murder case, (Civ. Action No. 14-5451)); *Commonwealth v. Lavar Brown* (after Pennsylvania Supreme Court said the DAO couldn't concede relief in state court for one of two people Brown murdered, Brown filed a federal *habeas* petition and the DAO is attempting to concede relief on the same claim, (Civ. Action No. 10-5553, ECF No. 33), and is also attempting to concede relief in state court for Brown's other murder, (Pre-H'rg Memo. at 33–34)); *Commonwealth v. Darien Houser* (DAO conceded penalty-phase relief on claim to overturn Houser's death sentence, (George Exhibits, Ex. A at 42, George Docket No. 50)); *Commonwealth v. Lenwood Mason* (DAO conceded penalty-phase relief in federal *habeas* case, without any discussion of the merits of Mason's claims, stating in the stipulation submitted to the Court that its filing is not based on the facts or the law, but rather its intent that Mason "never again face a sentence of death [including in state court] for his

20

conviction," (*id.* at 64–66)); *Commonwealth v. Donte Thomas* (DAO advises whoever might represent Thomas in his eventual federal *habeas* proceeding which arguments would enable the DAO to concede relief,[7] (*id.* at 68–71)).

*   *   *

Upon the current District Attorney's first election and the CCRC's creation soon thereafter, the DAO established a policy, with Paul George at quarterback, to undermine duly imposed death sentences challenged in post-conviction proceedings. George filed the concession in *Wharton* pursuant to that policy, not as the result of any review, careful or otherwise, of the facts and the law. George falls back on claiming that prior district attorneys also frequently—but not always—conceded relief. *See, e.g.*, (Resp. to Pet. for Rule to Show Cause at 35); (Post-H'rg Memo. at 6–9). But what prior district attorneys did or didn't do, or what policies they did or didn't implement, isn't the issue. The issue is whether George knowingly or intentionally lied to Judge Goldberg by stating he and the DAO conducted a careful review of the facts and law. He did—beyond any question.

Lies like those George told Judge Goldberg are even more problematic when asking a federal court to disturb a state-court conviction. "Comity is the backbone of federal habeas review." *Johnson*, 2025 WL 1922769, at *1. By conceding relief in the manner he did, George was hoping that Judge Goldberg would simply trust him and "blindly" vacate a state court's sentence of death, which would improperly intrude on a

---

[7]    The DAO has several means by which it works with petitioners to vacate their death sentences. One key step is assisting petitioners in "proving newly discovered evidence" via its "open-file policy and other means." (Post-H'rg Memo. at 6, George Docket No. 50); (Winkelman Show Cause H'rg Tr. at 126:15–19) ("We permit defense counsel . . . to come into our office and to review the defendant's file, subject to limitations.").

"sovereign judicial system" and would "be a disservice to the [Commonwealth of Pennsylvania] and an abdication of [the court's] obligation to . . . decide cases upon proper constitutional grounds." *Sibron*, 392 U.S. at 58–59.  Further, by asking Judge Goldberg to agree to the concession based on falsehoods, the DAO was "undermin[ing] the state [supreme] court's insistence that the executive branch lacks the authority to unilaterally 'reverse a jury's verdict without any judicial review.'" *Johnson*, 2025 WL 1922769, at *5 (quoting *Brown*, 196 A.3d at 146)).

George's misrepresentations violate Rule 3.1 because he falsely claimed that he, the CCRC and the DAO had undertaken a careful review of the facts and law, which would have required him to reconstruct the record with both mitigation and anti-mitigation evidence as instructed by the Third Circuit Court of Appeals.  Further, he violated Rule 3.1 by representing to the Court that it could sign his proposed order without conducting an independent review of the reconstructed record or holding the evidentiary hearing required by the Third Circuit.  In doing so, George was asserting that Judge Goldberg could grant relief without "examin[ing] independently the errors confessed." *Young*, 315 U.S. at 258.  That assertion lacks "a basis in law" and was an "abuse [of] legal procedure" that disregarded the "procedural and substantive . . . limits within which an advocate may proceed." RPC 3.1; *id.* cmt. 1.

George's misrepresentations also violate Rule 3.3(a)(1) because he made a false statement that a careful review had taken place when, in fact, none had.  George contends he cannot be subject to discipline under Rule 3.3(a)(1), which requires a knowingly false statement of fact or law, because that standard "in effect is one of intentionality" and "requires proof that the lawyer . . . intended to deceive or mislead

22

the Court." (Post-H'rg Memo. at 2.)  But the Pennsylvania Supreme Court has rejected that kind of reasoning, imposing an objective standard "which examines the factual basis for the assertion [and] is necessary to protect the public, the profession and the courts." *Price*, 732 A.2d at 604 ("[Respondent] contends that the Office of Disciplinary Counsel should have to prove that his purposeful intent was to defraud the judicial officers with false statements.  We reject this subjective approach as unworkable.").  Thus, an attorney violates Rule 3.3(a)(1) when he makes assertions to the court that were "knowingly false or made without an objective reasonable belief that they were true," including by failing to conduct "a reasonably diligent inquiry into the accuracy of the statements." *Id.* at 605.

We nonetheless find that George's misrepresentations were intentional; they were certainly at least knowing under the objective standard.  He was aware of the Third Circuit's mandate "to look for the kind of mitigation and anti-mitigation evidence that would have been presented," (George Show Cause H'rg Tr. at 72:11–18), and he knew the CCRC reviewed mitigation evidence but no anti-mitigation evidence, just as he had set it up to do.  Then, "purport[edly] . . . on his own knowledge," he asserted that Wharton's claim was meritorious based on his and the CCRC's "careful review of the facts and law," but he knew he never conducted a "reasonably diligent inquiry" into the anti-mitigation evidence specifically required by the Third Circuit. *Id.* cmt. 3.  Finally, when the Attorney General revealed Wharton's escape attempts, he didn't reconvene the Committee to discuss it.  Combined, these facts make clear that George intended to mislead the Court in order to achieve his policy goal, which "undermine[d] the integrity

23

of the adjudicative process" by "allow[ing] the tribunal to be misled by false statements of law or fact."  RPC 3.3 cmt. 2.

## B.  Communication with Victims' Families

The DAO also told Judge Goldberg that its concession was made "following . . . communication with the victims' family," which "any reasonable reader would" understand to mean that "the victims' family had been consulted and that they concurred in the outcome."  *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 151–52 (3d Cir. 2024).  But that was highly misleading; only "one family member had been contacted, . . . the sole surviving victim, Lisa Hart-Newman had never been contacted, . . . [and] several family members, including Lisa Hart-Newman, would have been vehemently opposed to the concession had they been informed of it."  *Wharton v. Vaughn*, No. 01-6049, 2022 WL 4133291, at *9 (E.D. Pa. Sept. 12, 2022).  Judge Goldberg only learned of the family's opposition to the concession due to the OAG's participation as *amicus*.  *Id.*

The DAO contacts crime victims' families regarding penalty-phase concessions pursuant to the following process: After an initial CCRC meeting at which the Committee members decide to concede relief, the DAO's victim-witness coordinator, Heather Wames, contacts victims' family members and advises them that "the office was considering conceding penalty phase relief."  (Winkelman Show Cause H'rg Tr. at 25:11–22.)  At a subsequent meeting of the CCRC, the head of the Victim Services Unit purportedly reports to the Committee on those communications.  (*Id.* at 27:1–5.)  Wames then tells the families that the DAO decided to concede relief.  (*Id.* at 27:16–20.)

24

The CCRC held its initial meeting to review the Wharton case on November 26, 2018, at which George, the Committee's "reporter," distributed a paralegal-drafted memorandum describing the case.  (George CCRC Memo. at 2.)  The memorandum listed seven of the Harts' family members, complete with contact information for each of them.  (*Id.*)  But in a December 13, 2018 e-mail, Wames told George she spoke only "with David Hart, Bradley's brother and Ferne's brother-in-law," about the possible concession.  (Wames Memo., Winkelman Docket No. 50-3.)  George thus knew there were at least six family members who the DAO should have contacted but didn't— including the *sole-surviving victim*.  He then gave Judge Goldberg the "impression that the Office had conferred with the family before making the decision to concede and that the family either agreed with the decision or did not object to it."  *Wharton v. Vaughn*, No. 01-6049, 2022 WL 4133291, at *12 (E.D. Pa. Sept. 12, 2022).

George's dishonest statement that the DAO communicated with the victims' family, including the sole surviving victim who "was left to die by Wharton after her parents were murdered," *id.* at *10, was an abuse of his position of public trust, particularly given the Court's responsibility under 18 U.S.C. § 3771 to ensure that the victims' family-members were "reasonably heard," during the proceedings.  In affirming the District Court's sanctions, the Court of Appeals stated: "*Any reasonable reader* would expect, as Judge Goldberg did, that this phrasing meant Lisa had been contacted. Yet she was not. And *any reasonable reader* would expect, as Judge Goldberg did, that the Office had solicited the views of other family members. Yet the Office had not contacted anyone besides Bradley's brother." *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 150 (3d Cir. 2024) (emphasis added).  The District and

25

Circuit Courts needed only to conclude that this was a "negligent misrepresentation" under Rule 11. *Id.* at 150–51. But it was far more than that. George knew his representation was misleading and false, as evidenced by the Wames's e-mail to George that only one of seven known family members had been contacted. He also violated RPC 3.1 by implying that the victims' family had been contacted about and consented to the penalty-phase concession knowing that he had no factual basis for doing so.

## V.    RECOMMENDED DISCIPLINE

We believe disbarment is the appropriate discipline to protect the profession and the public. Although "[d]isbarment is the most serious form of . . . discipline, . . . it is our responsibility, nevertheless, to protect the public and preserve public confidence in the legal profession and the judicial system." *Off. Disciplinary Counsel v. Davis*, 614 A.2d 1116, 1122 (Pa. 1992).

The American Bar Association's Standards for Imposing Lawyer Sanctions guide our Court when imposing attorney discipline. *See, e.g.*, *In re Malofiy*, Dkt. 14-mc-139, Doc. No. 52. The ABA counsels that, "[a]fter misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose." ABA, Standards for Imposing Lawyer Sanctions § 9.1. The ABA condemns lawyers who make false statements to the court or otherwise abuse the legal process. Generally, disbarment is appropriate when "a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding." *Id.* § 6.11. Such conduct is even more serious when it abuses the public trust. *Id.*

§ 5.21 ("Disbarment is generally appropriate when a lawyer in an official or governmental position knowingly misuses the position with the intent to obtain a significant benefit or advantage for himself or another, or with the intent to cause serious or potentially serious injury to a part or to the integrity of the legal process.").

George lied to Judge Goldberg about two critical facts—that the DAO had communicated with the victims' families and that he believed Wharton's *Strickland* claim was meritorious after a careful review of the facts and the law. His false statements were intended to cause serious injury to the integrity of the legal process by duping the Court into "abrogat[ing] a jury's verdict without any semblance of a record." *Brown*, 196 A.3d at 146; *cf. Johnson*, 2025 WL 1922769, at *14 ("Johnson and the Philadelphia DA tried to short-circuit state-court review by asking the federal District Court to bless a 'Settlement Agreement' based on underdeveloped and unproven claims.").

There are several aggravating circumstances also favoring disbarment. *See* ABA, Standards for Imposing Lawyer Sanctions § 9.22. First, George has been practicing law since 1977,[8] so by now he knows his professional obligations to the Court. *Id.* § 9.22(i) ("substantial experience in the practice of law"). Second, in a case where the facts were egregious and the public's interests overriding, he flouted the interests of the public and the victims' families. *Id.* § 9.22(h) ("vulnerability of victim"). Third, as these proceedings have made clear, George's conduct was the result of a "dishonest or selfish motive"—placing the DAO's policy priorities above its professional

---

[8]    *See* (George Show Cause H'rg Tr. at 5:4–6); *Paul M. George*, Disciplinary Board of Pennsylvania, https://www.padisciplinaryboard.org/for-the-public/find-attorney/attorney-detail/25722 (last visited June 25, 2025).

and prosecutorial obligations. *Id.* § 9.22(b).  Fourth, his conduct showed utter disregard for the authority of the judiciary.  Despite the Pennsylvania Supreme Court's warnings, George tried to "to use a federal court to bypass the state judiciary's limits on prosecutorial authority."  *Johnson*, 2025 WL 1922769, at *5.[9]  Fifth, George was the chief architect of this stratagem.  Winkelman, who had no criminal-law experience prior to becoming Supervisor of the Law Division, was a "fine administrator," (George Show Cause H'rg Tr. at 11:13–21, 13:7–9), but it was George who "had experience in the kinds of cases that would be coming into [the Law] Division."  (*Id.* at 12:16–17.)  He was experienced and knowledgeable when it came to the post-conviction review process and, given his role in the CCRC machinations, was best positioned to achieve the desired outcome—abrogating capital sentences whenever and however possible.

Perhaps most significantly, George has been dishonest throughout.  ABA, Standards for Imposing Lawyer Sanctions § 9.22(f) ("submission of . . . false statements . . . during the disciplinary process"); *id.* § 9.22(g) ("refusal to acknowledge wrongful nature of conduct").  It started before Judge Goldberg, where George "steadfastly insisted that [he] had done nothing wrong, owes no explanation, and will provide none."  *Wharton v. Vaughn*, No. 01-6049, 2022 WL 4133291, at *12 (E.D. Pa. Sept. 12, 2022); *see, e.g.*, (Sanctions H'rg Tr. at 11:24–12:14) ("Our position at this point, just to be clear, is that we don't think any explanation is necessary. . . .  You know our position that they did not violate any lack of candor.").  Then he lied repeatedly throughout these proceedings.  He claimed his misrepresentations "are entirely true and were not

---

[9]      George also blew past well-settled United States Supreme Court precedent requiring federal courts to "conduct [their] own examination of the record in all cases where the Federal Government or a State confesses that a conviction has been erroneously obtained."  *Sibron*, 392 U.S. at 58.

28

grounds for any sanction." (Memo. in Resp. to Pet. for Rule to Show Cause at 10, 11). He *again* repeated the same fabrication that "[t]he DAO carefully reviewed Wharton's *Strickland* claim—including both mitigation *and anti-mitigation evidence*—and determined that relief was warranted and, further, communication with the victims' family took place." (*Id.*) (emphasis added); *see also, e.g.*, (Memo. in Resp. to Pet. for Rule to Show Cause at 11) ("Respondents . . . independently evaluated Wharton's claim and reached a fact-specific decision to concede relief.").

George testified falsely when repeatedly denying the existence of a DAO policy to abrogate previously imposed sentences of death when it is beyond obvious that one exists and that the CCRC is the vehicle through which it is carried out. (George Show Cause H'rg Tr. at 127:7–17, 128:4–17); (Pre-H'rg Memo. at 23); (Post-H'rg Memo. at 3–6.) He incredibly denied that he kept "aggravating circumstances" from the Committee or Judge Goldberg. (George Show Cause H'rg Tr. at 78:20–79:2; 107:11–14.) And he denied that he knew about Wharton's escape attempt when conceding relief, (*id.* at 75:12–18), which contradicts his answer to Judge Goldberg the first time he had ever been asked that question, (May 11, 2021 Evid. H'rg Tr. at 66:16–19, Wharton Docket No. 267). George's attempt to reconcile this contradiction was not credible. As Judge Goldberg put it, this answer was "clearly designed to obfuscate rather than clarify." *Wharton v. Vaughn*, No. 01-6049, 2022 WL 4133291, at *12 (E.D. Pa. Sept. 12, 2022).

There are also factors in George's favor, including the absence of a prior disciplinary record before this Court or the Supreme Court of Pennsylvania. *Paul M. George*, Disciplinary Board of Pennsylvania, https://www.padisciplinaryboard.org/for-the-public/find-attorney/attorney-detail/25722 (last visited June 25, 2025); (George

29

Show Cause H'rg Tr. at 5:25–6:4). George also submitted letters of good character from members of the criminal-defense bar, (George Exhibits at 181, Ex. 8, George Docket No. 8), though these lawyers are acquainted with George's character as a Public Defender and in private practice, (George Show Cause H'rg Tr. at 5:9–6:4), not as an ADA. Finally, he claims to have stepped down from his position as Assistant Supervisor, but he still works at the DAO in a part-time capacity. (George Show Cause H'rg Tr. at 26:13–17.)

Despite these mitigators, the equities favor disbarment. George is a "highly-recognized criminal lawyer, including in capital cases, with over forty years' experience." (Post-H'rg Memo. at 12.) In the final years of his career, he used that experience to circumvent and subvert, in misleading and dishonest ways, verdicts rendered by judges and juries who heard the evidence and applied the law. Unfortunately, he placed the attainment of that objective above his duty of candor to our Court. But federal courts are not required to "accept the novel stratagem of a lone official, leaving [them] powerless to respect state rules and the limits of their own jurisdiction." *Johnson*, 2025 WL 1922769, at *5. George's use of a position of public trust to lie to Judge Goldberg implicates "vital societal interests," which obligates the Panel to resolve any doubt as to George's "fitness to practice in a federal court . . . in favor of the public." *In re Mitchell*, 901 F.2d 1179, 1189 (3d Cir. 1990) (internal citations omitted); *see also* Am. Bar Ass'n, *Criminal Justice Standards for the Prosecution Function* § 3-1.4(b) (4th ed. 2017) ("The prosecutor should not make a statement of fact or law, or offer evidence, that the prosecutor does not reasonably believe to be true, to a court . . . .").

30

We recommend that Paul M. George be disbarred from the bar of the United States District Court for the Eastern District of Pennsylvania.

*/s/ Paul S. Diamond*

Paul S. Diamond, J.

*/s/ Gerald J. Pappert*

Gerald J. Pappert, J.

*/s/ John M. Gallagher*

John M. Gallagher, J.